LEE TRAN & LIANG LLP
  Enoch H. Liang (SBN 212324)
  enoch.liang@ ltlattorneys.com
  Cyrus Khojandpour (SBN 260233)
  cyrus.khojandpour@ltlattorneys.com
601 S. Figueroa Street, Suite 3900
Los Angeles, CA 90017
Tel: (213) 612-8900
Fax: (213) 612-3773

Attorneys for Plaintiff
NEWEGG INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEWEGG INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>EZRA SUTTON, P.A., a New Jersey Professional Corporation, and EZRA SUTTON, an individual,<br><br>Defendants. | Case No.: 2:15-cv-1395<br><br>**COMPLAINT FOR COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Newegg Inc. ("Newegg"), by and through its counsel, bringing this action against Defendants, alleges as follows:

1.      This is a civil action seeking relief for copyright infringement under the copyright laws of the United States (17 U.S.C. §§ 101 *et seq.*).

## PARTIES

2.      Newegg is a corporation organized and existing under the laws of Delaware, with its principal place of business at 16839 East Gale Avenue, City of Industry, CA 91745.

3.      Defendant Ezra Sutton, P.A. ("the Sutton firm") is a professional corporation and law firm organized and existing under the laws of New Jersey, with a principal place of business at Plaza 9, 900 Route 9, Suite 201, Woodbridge, NJ 07095.

4.      Defendant Ezra Sutton is an individual residing at 776 Bowyer Ave., Long Branch, NJ 07740-4855.

5.      On information and belief, the Sutton firm and Ezra Sutton (collectively, "Defendants") conduct business in this District.  Newegg has been harmed in this District.  On information and belief, the acts of infringement alleged herein were committed knowing that it would cause harm to Newegg in this District.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction under 17 U.S.C. §§ 101 *et seq.*, and 28 U.S.C. §§ 1331, 1338(a), and 1367.

7.      This Court has personal jurisdiction over the Defendants, and venue in this District is proper under 28 U.S.C. §§ 1391(b) and 1400(a).

## SUMMARY OF THE FACTS

8.      Newegg is the second-largest online-only retailer in the United States, and sells various products through newegg.com and other websites.  For several years, Newegg has been subjected to numerous lawsuits for alleged patent

COMPLAINT

1    infringement by patent trolls and other entities that Newegg believes abuse the

2    patent laws by targeting end-users and resellers of technology.

3        9.    Newegg routinely and aggressively defends itself from patent

4    infringement suits that it believes to be meritless and abusive in nature.  In doing

5    so, and based on mutual agreements, Newegg and Newegg's outside counsel

6    frequently collaborate with other defendants and their respective outside counsel to

7    achieve common goals.

8        10.    Newegg incurs considerable expenses in attorney's fees, costs, and

9    other resources to defend itself from meritless lawsuits.

10       11.    Newegg, Newegg.com, Inc., and Rosewill, Inc. (collectively, "the

11   Newegg Companies"), along with Sakar International, Inc. ("Sakar") and 56 other

12   defendants, were sued by Adjustacam, LLC ("Adjustacam") in July, 2010 in the

13   U.S. District Court for the Eastern District of Texas for alleged patent infringement

14   ("the Adjustacam litigation").

15       12.    All defendants other than the Newegg Companies and Sakar settled

16   with Adjustacam well before trial and were dismissed.

17       13.    Defendants represented Sakar in the Adjustacam litigation.

18       14.    Adjustacam moved to dismiss its cases against the Newegg

19   Companies and Sakar, and the District Court granted its motions.  The Newegg

20   Companies and Sakar each then moved for attorneys' fees and costs pursuant to 35

21   U.S.C. § 285 and 28 U.S.C. § 1920.

22       15.    The District Court denied the Newegg Companies' and Sakar's

23   motions for attorney's fees.  Both the Newegg Companies and Sakar separately

24   appealed to the U.S. Court of Appeals for the Federal Circuit ("the Adjustacam

25   appeal").  Newegg then began drafting its appeal brief.

26       16.    The opening appeal briefs of the Newegg Companies and Sakar were

27   due on September 25, 2014.  On September 16, 2014, only nine (9) days before the

28   due date, Mr. Sutton contacted Newegg's outside counsel concerning the

1  Adjustacam appeal.  This email communication and others are attached as Exhibit
2  1.  Mr. Sutton asked Newegg's outside counsel if Newegg "need[ed] any sections
3  from Sakar in order to prepare Sakar's section of the appeal brief."  *See* Exhibit 1.

4       17.    At the time of Mr. Sutton's September 16, 2014 email, there was no
5  agreement or understanding in place between Newegg and Sakar to share costs,
6  attorneys, or work product in connection with the Adjustacam appeal, so Mr.
7  Sutton's request was perplexing to Newegg.  Nevertheless, Newegg's Chief Legal
8  Officer Lee Cheng spoke with Mr. Sutton about how Newegg might still be able to
9  help him and Sakar regarding Sakar's appeal brief.  Specifically, Newegg offered
10 to help incorporate Sakar's arguments into Newegg's brief, so that a joint brief
11 could be filed, if Sakar would share the legal fees incurred by Newegg.  *See*
12 Exhibit 1.

13      18.    Mr. Sutton declined Newegg's offer to share fees, but agreed instead
14 to file only a "short brief" of approximately ten pages with Sakar-specific
15 arguments and record citations so as not to be duplicative of Newegg's brief or
16 derail Newegg's briefing process.  *See* Exhibit 1.

17      19.    On September 17, 2014, Newegg agreed to assist Mr. Sutton and
18 Sakar by providing Mr. Sutton with a copy of the most current draft of Newegg's
19 brief specifically "for reference and resource purposes."  *See* Exhibit 1.  In the
20 same communication, Newegg specifically asked Mr. Sutton to agree in writing "to
21 not circulate our communications or any of Newegg's work product to any third
22 party without our consent," indicating that drafts would be provided only for Mr.
23 Sutton's reference.  *See* Exhibit 1.  Newegg also asked Mr. Sutton to confirm that
24 Mr. Sutton "will be submitting a separate brief for Sakar".  *See* Exhibit 1.

25      20.    On September 18, 2014, Mr. Sutton sent an email to Newegg
26 indicating that he agreed "not to circulate any of the briefs" that Newegg agreed to
27 send.  *See* Exhibit 1.

28

COMPLAINT

21.    On September 18, 2014, in reliance on Mr. Sutton's written assurances, Newegg sent a copy of its draft appeal brief ("Newegg's Draft Brief") to Defendants.   A copy of Newegg's Draft Brief, redacted for confidentiality purposes, is attached as Exhibit 2.

22.    Prior to providing Defendants with a copy of Newegg's Draft Brief, Newegg and Newegg's lead outside counsel had distributed copies of Newegg's Draft Brief to other attorneys, law firms, and firm staff on Newegg's appellate team for the purpose of eliciting comments and suggestions prior to filing.

23.    After Defendants agreed to Newegg's express conditions and received Newegg's Draft Brief, and before Newegg filed its appeal brief, Defendants filed an appeal brief ("Defendants' First Brief") with the U.S. Court of Appeals of the Federal Circuit on September 24, 2014.   A copy of Defendants' First Brief is attached as Exhibit 3.   Defendants' First Brief was substantially similar to Newegg's Draft Brief.

24.    Newegg filed its appeal brief with the U.S. Court of Appeals for the Federal Circuit on September 25, 2014. ("Newegg's Final Brief").   Newegg's Final Brief is substantially similar to Newegg's Draft Brief.   Newegg's Final Brief, redacted for confidentiality purposes, is attached as Exhibit 4.

25.    After discovering that Defendants' First Brief was nearly identical to Newegg's Draft Brief, Newegg sent a letter to the Honorable Daniel E. O'Toole, Clerk of Court for the U.S. Court of Appeals for the Federal Circuit, on September 29, 2014 explaining the circumstances so as not to unnecessarily burden the Court with duplicative briefing.

26.    Newegg also demanded that Sakar withdraw its brief and replace it with the "short brief" Mr. Sutton had originally agreed to file, which would not include Newegg's original work product.

27.    In response to Newegg's request, Defendants moved to withdraw Defendants' First Brief on October 14, 2014 and filed a shorter, revised appeal

1  brief on behalf of Sakar on October 15, 2014 ("Defendants' Second Brief").  A

2  copy of Defendants' Second Brief, redacted for confidentiality purposes, is

3  attached as Exhibit 5.  Defendants' Second Brief still includes a considerable

4  amount of material from Newegg's Draft Brief.  *See* Exhibits 2 and 5.

5        28.  Newegg's Draft Brief and Newegg's Final Brief were authored by

6  Newegg, The Webb Law Firm, P.C., Latham & Watkins LLP, Weil, Gotshal &

7  Manges LLP, and McDermott Will & Emery LLP (collectively, "the Authors").

8  Newegg owns the exclusive rights in Newegg's Draft Brief and Newegg's Final

9  Brief and all derivative works thereof by way of written assignment from the

10  Authors.

11        29.  Newegg's Draft Brief was registered with the United States Copyright

12  Office on October 20, 2014 as Registration No. TXU001911314.  A copy of the

13  Certificate of Registration is attached as Exhibit 6.

14        30.  Newegg's Final Brief was submitted to the United States Copyright

15  Office for registration on October 24, 2014.

16        31.  Newegg's Draft Brief and Newegg's Final Brief are expressive works

17  of authorship that present legal argument, policy justifications, and a summary of

18  the Adjustacam litigation in a manner uniquely attributable to Newegg and its

19  outside counsel.

20        **CLAIM FOR RELIEF**

21        **COPYRIGHT INFRINGEMENT**

22        32.  Newegg re-alleges and incorporates herein by reference each and

23  every allegation contained in paragraphs 1 through 31 of this Complaint as if fully

24  set forth herein.

25        33.  Newegg owns own all right, title, and interest in and to the copyrights

26  for Newegg's Draft Brief and Newegg's Final Brief, and is the owner of a valid

27  United States Copyright Registration for Newegg's Draft Brief.  *See* Exhibit 6.

28        34.  Newegg never authorized Defendants to reproduce or distribute either

1   Newegg's Draft Brief or Newegg's Final Brief.

2   35.   Defendants had access to Newegg's Draft Brief after being provided

3   the same by Newegg "for reference and resource purposes" on September 18,

4   2014.  *See* Exhibit 1.

5   36.   On information and belief, Defendants had access to Newegg's Final

6   Brief as of September 25, 2014, the date it was filed with the Court of Appeals for

7   the Federal Circuit.

8   37.   Defendants' First Brief, as it was filed with the U.S. Court of Appeals

9   for the Federal Circuit on September 25, 2014, is substantially similar to Newegg's

10  Draft Brief and Newegg's Final Brief.   *See* Exhibits 2, 3, and 4.

11  38.   Defendants' First Brief is a verbatim copy of Newegg's Draft Brief

12  with the exception that the references to "Newegg" are replaced with references to

13  "Sakar," and a few other minor edits.  The copying is so extensive that even certain

14  typographical errors in Newegg's Draft Brief appeared in Defendants' First Brief.

15  *See* Exhibits 2 and 3.

16  39.   Defendants' Second Brief includes a substantial portion of

17  Defendants' First Brief, and therefore includes portions that are substantially

18  similar to Newegg's Draft Brief and Newegg's Final Brief.  *See* Exhibits 2 and 5.

19  40.   On information and belief, Defendants knowingly, willfully, and

20  intentionally infringed, and continues to infringe, the copyrights of Newegg's Draft

21  Brief and Newegg's Final Brief.

22  41.   The aforementioned acts of Defendants violate Newegg's exclusive

23  rights under 17 U.S.C. § 106 to reproduce, distribute, and prepare derivative works

24  of Newegg's Draft Brief and Newegg's Final Brief, and constitutes willful,

25  deliberate, and ongoing infringement of Newegg's copyrights in the same.

26  42.   As the direct result of Defendants' infringing actions as herein

27  alleged, Newegg has been irreparably, materially, and substantially harmed and

28  damaged.

COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Newegg requests that judgment be entered against Defendants and in favor of Newegg, and for the following:

(a)    that Defendants be found to have willfully and deliberately committed acts of copyright infringement against Newegg;

(b)    that Defendants be preliminary and permanently enjoined and restrained from reproducing, distributing, publicly performing, and preparing derivative works of Newegg's Draft Brief and Newegg's Final Brief;

(c)    that Defendants be ordered to pay Newegg actual damages and profits and/or statutory damages as provided by 17 U.S.C. § 504, as applicable;

(d)    that Defendants be ordered to account for and disgorge to Newegg all gains, profits, and advantages derived by reason of its copyright infringement;

(e)    that Defendants be ordered to pay Newegg's costs and reasonable attorneys' fees as provided by 17 U.S.C. § 505 and 28 U.S.C. § 1920; and

(f)    that Newegg be awarded such further relief as the Court may deem just and proper.

DATED: February 26, 2015          LEE TRAN & LIANG LLP


By /s/ Enoch H. Liang
   Enoch H. Liang
   Cyrus Khojandpour
   Attorneys for Plaintiff
   Newegg Inc.

-7-

1

## **DEMAND FOR JURY TRIAL**

2      Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule

3  38-1, Plaintiff hereby demands a trial by jury for all issues trialable by a jury.

4

5  DATED:  February 26, 2015          LEE TRAN & LIANG LLP

6

7                    By /s/ Enoch H. Liang
                        Enoch H. Liang
8                       Cyrus Khojandpour
                        Attorneys for Plaintiff
9                       Newegg Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-8-

# EXHIBIT 1

## Excerpts of Correspondence Between Newegg and Sakar

**From:** Ezra Sutton [mailto:esutton@ezrasutton.com]
**Sent:** Thursday, September 18, 2014 11:22 AM
**To:** 'Lee.C.Cheng (svp.usca00.Newegg) 22015'; Daniel H. Brean; 'Angela.B.Chen (leg.usca00.Newegg) 22382'
**Cc:** 'Jennifer.W.Gatewood (leg.usca00.Newegg) 22034'; Kent E. Baldauf Jr.
**Subject:** RE: URGENT: Adjustacam Appeal -- Sakar International

Dear Lee:

In response to your email below, this is to confirm that I agree not to circulate any of our communications, and I agree not to circulate any of the briefs that you are sending me, regarding Section 285, and any other matters.  I agree to keep them confidential within our office, and I will use them primarily for preparing Sakar's appeal brief.

This is to also confirm that your summary of our telephone call is correct.  I will be submitting a separate appeal brief for Sakar, and I am not participating in the oral argument.

Thank you for your help.

EZRA SUTTON
900 Route 9 North, Suite 201
Woodbridge, New Jersey 07095
Tel: 732-634-3520
Fax: 732-634-3511

**From:** Lee.C.Cheng (svp.usca00.Newegg) 22015 [mailto:Lee.C.Cheng@newegg.com]
**Sent:** Wednesday, September 17, 2014 9:11 PM
**To:** Daniel H. Brean; Angela.B.Chen (leg.usca00.Newegg) 22382
**Cc:** Ezra Sutton; Jennifer.W.Gatewood (leg.usca00.Newegg) 22034; 'Kent Baldauf Jr. (kbaldaufjr@webblaw.com)'
**Subject:** RE: URGENT: Adjustacam Appeal -- Sakar International

Dan—

I just spoke to Ezra and he will be filing a separate, short brief on behalf of Sakar.  Jennifer will send him briefs that we have prepared in other 285 cases and the latest draft of our present Adjustacam brief for reference and resource purposes.  He has further indicated that he will not be making an appearance at oral arguments.  I would encourage you to have a short discussion with him about what his perceptions from being involved directly in this case from Day 1 and having attended various hearings.

[REDACTED]

Ezra—

I would like to, before Jennifer sends our 285 briefs, and particularly our Adjustacam draft brief, out of a surfeit of caution, get your written agreement to not circulate our communications or any of Newegg's work product to any third party without our prior consent.
It's strictly intended for your reference and benefit.

Please also confirm that my summary of our call is correct, and that you will be submitting a separate brief for Sakar, and not participating in the Oral Argmument.

Best,

Lee

From: Lee.C.Cheng (svp.usca00.Newegg) 22015
Sent: Tuesday, September 16, 2014 8:31 PM
To: Ezra Sutton
Cc: Daniel H. Brean (dbrean@webblaw.com<mailto:dbrean@webblaw.com>);
Jennifer.W.Gatewood (leg.usca00.Newegg) 22034; Angela.B.Chen (leg.usca00.Newegg) 22382
Subject: URGENT: Adjustacam Appeal -- Sakar International

Dear Ezra—

Dan Brean of the Webb law firm indicated that you asked the Parsons Behle firm if Sakar can add material to our Adjustacam appellate brief. I'm not aware of any agreement between Newegg/Sakar to share counsel or work on the Adjustacam appeal. We are not aware of any effort by Sakar to engage the Webb firm to do any work for Sakar or any discussions relating to joint defense, and no one ever contacted us or Webb about joint representation in this matter.

To the extent that Sakar is interested in sharing work and costs, I expect Sakar to fund fully half the costs of the work and at this point, given the amount of work put in by Newegg and its outside counsel to prepare a compelling brief and oral argument, to minimize its editorial contribution. I expect Sakar to pay in full as we will not further subsidize work that they benefit from.

Can you arrange an all-hands' call in the tomorrow—I'd like to have a conversation with all hands'—clients and outside counsel. Again, I am instructing Webb to not regard Sakar as a client or to include any Sakar material until that discussion takes place and an agreement and arrangement is reached.

Thanks.

Best,

Lee Cheng
Chief Legal Officer and Corporate Secretary
Newegg Inc.
----------------------------

16839 Gale Ave.
City of Industry, CA 91745
Phone: (626) 271-9700 x. 22015
Cell: (626) 255-5861
Email: lee.c.cheng@newegg.com<mailto:lee.c.cheng@newegg.com>


**From:** Dana M. Herberholz [mailto:DHerberholz@parsonsbehle.com]
**Sent:** Tuesday, September 16, 2014 3:23 PM
**To:** Ezra Sutton
**Cc:** Trey@yw-lawfirm.com; edward.reines@weil.com; Daniel H. Brean
**Subject:** Re: Adjustacam, LLC v. Newegg, Inc. and Sakar International; CAFC Case Nos. 2013-1665, -1666, -1667

Ezra,

Our firm is no longer representing Newegg in this appeal, and we will be filing a motion to withdraw shortly. I've copied Daniel Brean of the Webb Firm, who is taking over and will be handling the briefing. Please contact Daniel.

Best,

Dana



A Professional
Law Corporation

**Dana M. Herberholz | Attorney at Law**
800 W. Main Street, Suite 1300 | Boise, Idaho 83702
Main 208.562.4900 | Direct 208.562.4906 | Fax 208.562.4901
**parsonsbehle.com | vCard**

CONFIDENTIALITY NOTICE:  This electronic mail message and any attachment are confidential and may also contain privileged attorney-client information or work product.  The message is intended only for the use of the addressee.  If you are not the intended recipient, or the person responsible to deliver it to the intended recipient, you may not use, distribute, or copy this communication.  If you have received the message in error, please immediately notify us by reply electronic mail or by telephone at 801.532.1234, and delete this original message.

On Sep 16, 2014, at 8:52 AM, "Ezra Sutton" <esutton@ezrasutton.com> wrote:

Dear Dana and Edward:

     On behalf of Sakar International, please let me know if you need any sections from Sakar in order to prepare Sakar's section of the appeal brief?  Please call or reply by email. Thank you.

EZRA SUTTON
900 Route 9 North, Suite 201
Woodbridge, New Jersey 07095
Tel: 732-634-3520
Fax: 732-634-3511

# EXHIBIT 2

2013-1665, -1666, -1667

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ADJUSTACAM, LLC,

Plaintiff-Appellant,

v.

NEWEGG INC., NEWEGG.COM, INC., & ROSEWILL, INC.,

Defendants-Cross-Appellants

and

SAKAR INTERNATIONAL, INC.,

Defendant-Cross-Appellant

Appeals from the United States District Court for the Eastern District of Texas
in Case No. 10-CV-329, Chief Judge Leonard Davis

## BRIEF OF DEFENDANTS-CROSS-APPELLANTS NEWEGG INC., NEWEGG.COM, INC., & ROSEWILL, INC.

Kent. E. Baldauf, Jr.
Daniel H. Brean
Anthony W. Brooks
THE WEBB LAW FIRM
One Gateway Center
420 Fort Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 471-8815

Edward R. Reines
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

*Counsel for Defendants-Cross-Appellants*

October 20, 2014

0

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Adjustacam v. Newegg, 2013-1665

<u>CERTIFICATE OF INTEREST FOR NEWEGG INC.</u>

Counsel for Newegg Inc. hereby certifies the following:

1.     The full name of every party or amicus represented by me is:

      Newegg Inc.; Newegg.com, Inc.; Rosewill, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      Not applicable.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      No publicly held company owns ten percent or more stock in Newegg Inc.; Newegg.com, Inc.; or Rosewill, Inc.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Kent E. Baldauf, Jr., The Webb Law Firm
      Daniel H. Brean, The Webb Law Firm
      Anthony W. Brooks, The Webb Law Firm
      Herbert A Yarbrough, III, Yarbrough & Wilcox, PLLC
      Debra Elaine Gunter, Yarbrough Wilcox, PLLC
      John N. Zarian, Parsons Behle & Latimer
      Robert A. Matson, Parsons Behle & Latimer
      Justin Neil Stewart, Parsons Behle & Latimer
      Dana M. Herberholz, Parsons Behle & Latimer

Christopher Cuneo, Parsons Behle & Latimer
Edward R. Reines, Weil Gotshal & Manges


Dated:  October 20, 2014      _____
                                      Kent E. Baldauf, Jr.
                                      *Counsel for Defendants-Cross-Appellants*

# **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ...................................................................... 6
JURISDICTIONAL STATEMENT ......................................................................... 1
STATEMENT OF THE ISSUES ............................................................................. 1
STATEMENT OF THE CASE ................................................................................ 2
STATEMENT OF FACTS ....................................................................................... 6
    I.   Introduction ................................................................................................. 6
    II.   The Parties ................................................................................................. 7
    III.   AdjustaCam's Infringement Allegations ................................................... 8
    IV.   AdjustaCam's Validity Arguments ......................................................... 16
    V.   AdjustaCam's Nuisance-Value Settlements and Demands ..................... 18
SUMMARY OF THE ARGUMENT ...................................................................... 25
STANDARD OF REVIEW .................................................................................... 27
ARGUMENT ......................................................................................................... 28
    I.   The District Court Abused its Discretion by Not Finding This Case Exceptional ........... 28
        A.   AdjustaCam Filed and Prosecuted This Case in Bad Faith ....................... 30
            1.   AdjustaCam Brought this Case for the Improper Purpose of Obtaining Nuisance-Value Settlements ................................................. 32
            2.   Nuisance Litigation is Exceptional ............................................... 37
            3.   Nuisance Litigation Should be Discouraged ................................ 39
        B.   The Accused Cameras Could Not Possibly Have Infringed ...................... 43
        C.   AdjustaCam's Validity Positions Were Frivolous .................................... 45
    II.   AdjustaCam's Appeal Must be Dismissed for Lack of Subject Matter Jurisdiction ........ 47
CONCLUSION ...................................................................................................... 50

## Cases

*Am. Standard, Inc. v. York Int'l Corp.*, 244 F. Supp. 2d 990 (W.D. Wis. 2002) ....32

*Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG, 2000 U.S. Dist. LEXIS 1186 (D. Conn. Jan. 18, 2000) ........................................................... 32, 38

*Benitec Austl, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340 (Fed. Cir. 2007) .................44

*Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005) ... 28, 29

*Cf. Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943 (Fed. Cir. 2010) ........................................................36

*Colombrito v. Kelly*, 764 F.2d 122 (2d Cir. 1985)....................................................34

*Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384 (1990) .......................................27

*Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338 (Fed. Cir. 2010).................44

*Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805 (Fed. Cir. 1990)....................14

*Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314 (Fed. Cir. 2011) .................. 32, 37

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744 (2014)..... 27, 29

Ingenuity 13, LLC v. Doe No. 2:12-cv-8333-ODW, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013) ................................................................... 33, 34

*Jang v. Boston Sci. Corp.,* 532 F.3d 1330 (Fed. Cir. 2008)....................................45

*Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302 (Fed. Cir. 2013) ........... 36, 37

*MarcTec, LLC v. Johnson & Johnson,* 664 F.3d 907 (Fed. Cir. 2012) ...................42

*Mathis v. Spears*, 857 F.2d 749 (Fed. Cir. 1988)....................................................35

*Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 726 F.3d 1359 (Fed. Cir. 2013) ................................................................................................. 32, 33, 34

*NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282 (Fed. Cir. 2005)................45

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014) ................................................................................................. passim

*Rude v. Westcott*, 130 U.S. 152 (1889)..................................................................22

4

*Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995)..........45

*SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348 (Fed. Cir. 2012)........... 45, 46

*Steffel v. Thompson*, 415 U.S. 452 (1974) ................................................................44

*Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC, 2009 U.S. Dist. LEXIS
    4546 (W.D. Wis. Jan. 21, 2009) .......................................................................34

### *Statutes*

28 U.S.C. § 1295(a)(1)...........................................................................................1

28 U.S.C. § 2107(a) ...............................................................................................1

28 U.S.C. §§ 1331 ..................................................................................................1

28 U.S.C. §§ 1338(a) .............................................................................................1

35 U.S.C. § 285 .......................................................................................... passim

### *Rules*

Federal Rule of Appellate Procedure 4 ..................................................................1

## <u>STATEMENT OF RELATED CASES</u>

No other appeal in or from this same civil action was previously before this Court or any other court of appeals.   Newegg Inc., Newegg.com, Inc., and Rosewill, Inc. (collectively, "Newegg" or "the Newegg Defendants") and their undersigned counsel are unaware of any other actions now pending in this or any other court that will directly affect or be directly affected by this Court's decision in the present appeal.

## JURISDICTIONAL STATEMENT

Newegg's Cross-Appeal:

The district court had original jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). Newegg filed a timely and proper notice of appeal under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

AdjustaCam's Appeal:

For reasons discussed below, this Court does *not* have subject matter jurisdiction over AdjustaCam's appeal and AdjustaCam's appeal must be dismissed.

## STATEMENT OF THE ISSUES

1.   Whether the district court erred by failing to find this case exceptional and egregious under 35 U.S.C. § 285 and its inherent authority to award Newegg its attorneys' fees and expert fees, despite clear and unrebutted evidence showing that this lawsuit was meritless, and that it was filed and prosecuted to leverage the high cost and burden of litigation to coerce a nuisance-value settlement payment from Newegg.

2.   Whether this Court has subject matter jurisdiction over AdjustaCam's appeal, given that the case on the merits was mutually and voluntarily dismissed in its entirety, and no case or controversy remains between the parties.

1

## STATEMENT OF THE CASE

AdjustaCam, LLC ("AdjustaCam") brought this action in July 2010 against 59 defendants, including the Newegg Defendants, alleging that certain camera products sold by Newegg infringed United States Patent No. 5,885,343 ("the '343 Patent"), entitled "Camera Clip." A0004. The '343 Patent is owned by Global-Media Group, LLC and AdjustaCam is the exclusive licensee of the patent. A1789.

Immediately after filing suit AdjustaCam began seeking to settle with the defendants for amounts far below the cost of defense. All defendants other than the Newegg Defendants and Sakar International, Inc. ("Sakar") settled with AdjustaCam well before trial and were dismissed. A0004. Generally, each defendant paid ███████████ and, in many cases, ███████████ as a settlement fee, and always as a round number. A1282.

A *Markman* hearing was held on February 9, 2012 to construe various claim terms of the '343 Patent. A0013. Magistrate Judge Love issued a *Markman* order on April 10, 2012, which was subsequently adopted in full by Chief Judge Davis on June 7, 2012. A0013-27; A0012 ("the *Markman* Order").

Among the terms addressed in the *Markman* Order was the term "[r]otatably attached / adapted to be rotatably attached / adapted to rotatably attach." A0020-

23.   The parties disputed whether the term as used in the claims "allow[s] for a 'rotatably attached' object to rotate over more than a single axis."   A0020.   The district court agreed with the defendants, noting that "[t]he claims plainly describe each 'rotatably attached' object as rotating about a single axis."   A0022.[1]   The district court also explained that "[e]very reference to a 'rotatably attached' object in the specification and claims describes the attachment as permitting motion over a single axis of rotation."   A0021.   Although the term "did not require construction," the district court nonetheless resolved the claim interpretation dispute, holding that "'rotatably attached' objects in the patent-in-suit are limited to a single axis of rotation."   A0022-23 (prohibiting the parties from contradicting the district court's resolution of the dispute as the case went forward).

    In the few months following the *Markman* Order, AdjustaCam quickly proceeded to seek to dismiss all remaining defendants from the case, most of whom agreed to the dismissal and sought no relief from AdjustaCam.   A0147-53 (dismissing Amazon.com, Auditek, Digital Innovations, CDW, etc.).   These

---

[1] As the district court explained (A0020), the claims of the '343 Patent referred consistently to a "rotatably attached" hinge member rotating in only one of two specific axes of rotation, depending on whether it was rotating with respect to the camera or the support frame.  *See, e.g.,* Claim 1 ("a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member"); ("a support frame rotatably attached to said hinge member . . . said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation").

companies generally paid AdjustaCam ███████████ to be dismissed from the lawsuit—again, always as a round number.  A1282.

On August 27, 2012, after considerable expert discovery was completed and the case was on the verge of summary judgment and *Daubert* proceedings, AdjustaCam filed a motion to dismiss its claims against the Newegg Defendants with prejudice.  A2136-37.  The motion also sought to dismiss the Newegg Defendants' invalidity and non-infringement declaratory judgment counterclaims for lack of subject matter jurisdiction, with prejudice, based on a covenant not to sue that extinguished the case or controversy with respect to the counterclaims.  *Id.*  According to AdjustaCam, the reason for its motion was that it had "recently resolved its claims against almost all of the remaining Defendants," including defendants whose products were sold by Newegg, such that "NewEgg/Rosewill is no longer selling unlicensed webcams manufactured by any other Defendant."  A2137.  Thus, AdjustaCam professed a "desire[] to simplify this case by focusing its claims going forward solely upon Defendant Sakar and Defendant Kohl's, which is accused of infringement solely on account of Sakar manufactured products.  NewEgg/Rosewill's remaining damages exposure . . . is relatively *de minimis*, and is dwarfed by the damages exposure of Sakar."  A2137-38.

Newegg opposed the motion to dismiss, arguing that its declaratory judgment counterclaims should not be dismissed *with* prejudice.  A2093-95

(explaining that "the covenant not to sue offered by AdjustaCam lacks certain critical elements required to protect Newegg from charges of infringement by AdjustaCam or its successors regarding future Newegg products").  AdjustaCam subsequently filed a new, unopposed motion that sought to dismiss its infringement claims with prejudice and Newegg's counterclaims without prejudice, which the district court granted.  A1986-87; A155.

Newegg then filed a motion for attorneys' fees and expert fees, which was denied.  A0156, A0160.  Newegg also submitted an unopposed bill of costs in the amount of $8,492.66, but when the district court entered final judgment, the judgment did not reflect Newegg's unopposed costs, erroneously stating that "all costs are to be borne by the party that incurred them."  A0199-200, A0001-03.

Newegg moved the district court to amend the erroneous judgment, A0199-200, but when the correction was not made before the appeal deadline Newegg filed a notice of appeal seeking review of the denial of its motion for attorneys' fees.  A0160; A0195.   AdjustaCam filed a separate notice of appeal the same day, seeking review of the district court's claim construction order.  A0193.  Although AdjustaCam's notice of appeal also referred to the district court's final judgment, that final judgment was not premised on any claim construction issues, nor did AdjustaCam seek a consent judgment incorporating the claim construction order as

the basis for a judgment of non-infringement.  Rather, the final judgment merely reflected the parties' agreed mutual dismissal of the case.  A0001-03; A1986-87.

The appeals were docketed by this Court but then deactivated due to Newegg's pending motion to correct the judgment.  Dkt. No. 17.  When the district court had still not decided Newegg's motion to correct the judgment after six months, Newegg withdrew the motion, deciding to forego its costs to avoid further delay of this appeal.  A0162.  This Court subsequently reactivated the appeal.  Dkt. No. 20.

Meanwhile, after Newegg had withdrawn its motion to correct the judgment, and shortly before this appeal was reactivated, the Supreme Court decided *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), which relaxed the standard for finding a case "exceptional" under Section 285.

## STATEMENT OF FACTS

### I.  Introduction

Unable to squeeze a nuisance-value settlement payment from Newegg after more than two years of litigation, patent assertion entity AdjustaCam decided it would rather dismiss Newegg with prejudice than risk the inevitability that this case would be resolved on the merits in Newegg's favor.

AdjustaCam never genuinely believed that Newegg infringed its patent, nor reasonably could it—the '343 Patent covers adjustable cameras with very precisely

6

defined axes of rotation that are facially absent from Newegg's accused products. Even after the district court emphatically rejected AdjustaCam's attempt to sidestep its patent's claim language, AdjustaCam pressed on with the case and made overreaching and unsupportable nuisance-value settlement demands. Finally, when summary judgment briefing was underway and trial was looming, AdjustaCam, having already obtained settlement payments from almost all other defendants, cut and ran to avoid putting its patents in jeopardy and thus preserve its shakedown business.

The filing and prosecution of this action by AdjustaCam was solely intended to extort nuisance-value settlement fees from defendants, not to resolve any legitimate claims of infringement or damages. Such a baseless case that abuses the judiciary for personal gain is exceptional and warrants fee shifting.

By the time Newegg filed its motion for attorneys' fees and expert fees, AdjustaCam had forced Newegg to spend more than $350,000 in attorneys' fees and expert fees to defend itself. A1793-94. Newegg contends that it should not have to bear these fees.

## II. The Parties

AdjustaCam is a limited liability company that is exclusively in the business of patent litigation. As a wholly-owned subsidiary of Acacia Research Group, LLC, its business follows the all-too-familiar model of using the burden and

expense of patent litigation as leverage to extort settlement fees from defendants. A1779.

Newegg is an online-only retailer that primarily sells computers, computer components and peripherals, and consumer electronics. Newegg conducts its business via www.newegg.com. Rosewill is Newegg's private-label brand for certain products. Rosewill does not manufacture its products, but simply purchases and re-sells its products under its "Rosewill" brand name.

A large number of AdjustaCam's target defendants in this case were successful online retailers like Amazon.com and Newegg, who simply purchased and re-sold the accused cameras, not manufacturers who actually made the accused cameras.

### III.     AdjustaCam's Infringement Allegations

AdjustaCam is the exclusive licensee of United States Patent No. 5,855,343 ("the '343 Patent"), entitled "Camera Clip." A1789. The '343 Patent is generally directed to a camera clip that supports a camera when sitting on a flat surface or when attached to an object, such as a computer monitor:



'343 Patent, Figs. 1, 2, 4.  The clip allows the camera to rotate in two distinct directions about distinct axes of rotation.

First, as shown in Fig. 1, the camera can be rotated to pan side-to-side. The specification explains: "[h]inge member 16 is rotatably attached to camera 12, where camera 12 rotates over a first axis 26 in a direction shown by arrow 28 relative to hinge member 16." '343 Patent, at 4:17-19. Second, as shown in Fig. 2, the camera can be tilted upward and downward. The specification explains: "[h]inge member 16 rotates over a second axis 32 in the direction shown by arrow 34 relative to support frame 18. First axis 26 is perpendicular to second axis 32." '343 Patent, at 4:21-24.

These particular axes of rotation are expressly required by all independent claims in the '343 Patent. *See, e.g.,* '343 Patent, Claim 1 ("a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, *rotating, about a first axis of rotation*, relative to said hinge member"); *id* ("a support frame rotatably attached to said hinge member . . . , said hinge member *rotating about a second axis of rotation* relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation").[2]

To be clear, the camera products claimed in the '343 Patent require *three* distinct components of importance to this case: (1) a camera; (2) a hinge member; and (3) a support frame. While the camera product—including the hinge

---

[2] All emphases herein are added unless otherwise indicated.

member—rotates about two axes, the camera of the '343 Patent *itself* only rotates about one axis; this is what is described, and this is what is claimed. This is evident from the claim language, which specifies that the *camera* is "rotatably attached" to the *hinge member* of the claimed apparatus such that the camera rotates about a single axis of rotation (the claimed "first axis of rotation"). Similarly, the *support frame* of the apparatus is itself "rotatably attached" to the *hinge member* such that the support frame rotates relative to the hinge member about a separate, single axis of rotation (the claimed "second axis of rotation"). Importantly, the two axes of rotation with respect to the three components are distinct, and are distinctly claimed. Accordingly, the district court correctly held that the term "[r]otatably attached / adapted to be rotatably attached / adapted to rotatably attach" as used in the claims indicated that "'rotatably attached' objects in the patent-in-suit are limited to a single axis of rotation." A0022-23.

Unlike the camera covered by the '343 Patent, AdjustaCam accused products do not rotate about a single axis of rotation. Instead, these products (the "Accused Ball-and-Socket Products") include a camera connected to a support frame via a ball-and-socket joint, which facilitates rotation about *multiple axes*.

This continues substantial and material differences between the Accused Ball-and-Socket Products and the '343 Patent claims, as illustrated by the following photographs of the accused Rosewill RCM-8163 (below left) and

11

Hercules Classic (below right) webcams, which are representative of the Accused Ball-and-Socket Products:



A1786; *see also* A1755-75.  The nature of these ball-and-socket joints is that they allow for rotation for each of the parts of the camera product about multiple axes— the camera is able to spin and pivot about multiple axes of rotation with respect to the socket (not just a single axis), and the support frame is likewise able to spin and pivot about multiple axes of rotation with respect to the ball (not just a single axis). A1755-75.  Comparing the accused products to the claims and specification of the '343 Patent shows that AdjustaCam's infringement allegations were baseless.

Another key reason the '343 Patent claims do not map to the Accused Ball-and-Socket Products is the fact that, unlike the *three* distinct components claimed in the '343 Patent, the Accused Ball-and-Socket Products have only *two* distinct components of importance to this case: (1) a camera; and (2) a support frame.  The use of a ball-and-socket joint between these two components eliminates the need

for a third element—an intermediate hinge member—as claimed in the '343 Patent.    A ball-and-socket camera is simply an inapt product to accuse of infringement given the precisely claimed three-part camera of the '343 Patent and its limited rotation capabilities.  The Accused Ball-and-Socket Products work in a fundamentally different and, arguably, more streamlined and elegant, manner.

Because of its expressly claimed hinge member, the '343 Patent claims require that the camera and support frame each be able to independently rotate about only a single axis of rotation.  *See* A0022 (district court explaining that "[t]he claims plainly describe *each* 'rotatably attached' object [i.e., the camera and support frame] as rotating about a single axis").  But in the Accused Ball-and-Socket Products, both the camera and support frame components can rotate about multiple axes with respect to each other.   The mere fact that the cameras can be *both* twisted *and* tilted about the socket ends the infringement inquiry because it establishes rotation of the camera about multiple distinct axes.   The *Markman* order conclusively established that such a configuration was outside the scope of the claims.

Long before the district court's *Markman* Order, however, the Accused Ball-and-Socket Products were facially non-infringing—the ball-and-socket joints are prominent and plainly visible, and their functionality is plain.  At the outset of this lawsuit no reasonable litigant could realistically have expected to avoid summary

13

judgment.  Yet even after the *Markman* Order cemented AdjustaCam's inability to prove infringement by the Accused Ball-and-Socket Products, AdjustaCam pressed on.

After the *Markman* Order, AdjustaCam served the expert report of John C. Muskivitch who—despite the district court's clarification that "rotatably attached" objects are "limited to a single axis of rotation"—opined that the Accused Ball-and-Socket Products included a hinge member "adapted to be rotatably attached to the camera."  *See generally* A1253-60.  By continuing to press its frivolous infringement arguments, and by forcing Newegg to retain a testifying expert to respond to such arguments, AdjustaCam's bad faith is evident. *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990) ("Where, as here, the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, and inference is proper of bad faith.").

AdjustaCam's only defense of its baseless case is a hollow contention that its infringement allegations are consistent with the district court's constructions because "what Newegg/Rosewill allege is a ball and socket joint is actually a modified ball and socket joint . . . because there is a channel that restricts movement."  A1194.




A1194-95.  According to AdjustaCam, "[t]his restricted movement results in two functionally independent joints which have ranges of movement independent of each other."  *Id.*   In other words, AdjustaCam's nonsensical position is that even though the camera can move in *two* different and distinct directions with respect to the support frame, the fact that a channel restricts that movement compared to a channel-less camera means that somehow the Accused Ball-and-Socket Products are "limited to a *single* axis of rotation."  A0022-23.

The testimony of AdjustaCam's expert highlights the absurdity of this contention.  In Dr. Muskovitch's deposition, he explained that the various rotations are "separate" because "if I rotate it around to the center, there is nothing that forces it to move, to tilt or to sway to either side."  A0482-83; A0484 ("There is two axes, but they are separate.").  Even though the supposedly "constrained" ball-and-socket joint is capable of moving in multiple directions, as long as one only chooses to move the joint in a single direction at a time, Dr. Muskovitch concluded that the joint is "*limited* to a single axis of rotation."

15

While the presence of two axes of rotation for the camera would be sufficient to preclude infringement, Dr. Muskovitch in fact conceded that there are at least *three* different axis of rotation for the camera in each Accused Ball-and-Socket Product: "This happens to be a constrained ball and socket joint. So it can [1] spin about the axis, it can [2] move forward, it may be able to [3] move to the side." A0485-87.

Based on the foregoing, there could never have been any infringement by the Accused Ball-and-Socket Products. AdjustaCam's argument that a garden-variety ball-and-socket joint can somehow morph into, and be recharacterized as, two separate (single axis) joints is manifestly unreasonable. Even a "constrained ball-and-socket joint," as contrived by AdjustaCam, allows movement in multiple axes of rotation and is, therefore, outside the reach of the '343 Patent's claims.

## IV.      AdjustaCam's Validity Arguments

Adjustacam also took frivolous positions in distinguishing prior art, such as Japanese Utility Model Publication No. H2-19997 to Irifune ("Irifune"). This prior art discloses a camera rotatably attached to a hinge member (mounting device (2)) via the threaded "camera attachment shaft (9)":



A1386, A1387, A1394. AdjustaCam's expert took the indefensible position that Irifune does not disclose a device that can be rotatably attached to a camera. Specifically, Dr. Muskivitch reasoned that "[w]ith Irifune, the camera is not even attached to the hinge member until fully tightened down using camera attachment shaft (9) and camera attachment screws (10 and (11))." A1263. Using an exceedingly narrow definition of "attached" ("permanently fixed joined, connected, or bound"), Dr. Muskivitch opined that Irifune did not meet the claim requirements because "[o]nce the camera is attached to the fixed part 2, the camera cannot rotate about a first axis relative to the hinge member." *Id.* Put another way, in Dr. Muskivitch's view, when the camera of Irifune is screwed all the way onto the hinge member, the camera cannot be rotated, and if the camera is loosened to permit rotation, the camera is not attached. *Id.* ("[E]ven assuming for the sake of argument that with Irifune the camera is attached, it is not "rotatably attached.").

As early as August 12, 2011, in a reexamination proceeding regarding the '343 Patent, the USPTO rejected the asserted claims as anticipated and/or obvious

based on Irifune.   A1425; A1431-36; A1376-96 (English translation of Irifune). Like Dr. Muskivitch later did in the litigation, during the reexamination proceedings patent owner Global-Media argued that the camera of Irifune is not "rotatably attached" to the hinge member because the camera "is not attached to the hinge member until *fully screwed or threaded to the hinge member*." A1448. To make such an argument, Global-Media posited that the plain and ordinary meaning of attached is "permanently fixed, joined, connected, or bound." A1447. The examiner rejected this argument twice, correctly concluding that "it is clearly possible to loosen the attachment screw, to enable the pivoting of the camera relative to support (fixed part 2) while the camera is still attached to the support." A1508-10; A1476.   After the third rejection based on Irifune, Global-Media cancelled all the asserted claims on September 20, 2012.   A1515-19, A1460, A1465, A1469-74, A1493, A1502-06.

## V. AdjustaCam's Nuisance-Value Settlements and Demands

Newegg, like its co-defendants, was served with a lawsuit and then approached by AdjustaCam to discuss settlement of the case.   Nearly every defendant proceeded to settle for a dollar amount well under the cost to defend oneself against the infringement allegations, most for less than ▆▆▆▆▆▆.   A1282 (AdjustaCam settlement agreement summary).

Just two months after filing this lawsuit in July 2010, AdjustaCam executed its first nuisance-value settlement with defendant Trippe Manufacturing in the amount of ████████. A2182. Soon thereafter, AdjustaCam settled with defendants Klip Extreme, LLC and Software Brokers of America (D/B/A Intcomex) for ████████, and a few months later AdjustaCam settled with defendants Phoebe Micro and jWIN for ████████ and ████████, respectively. *Id.* By the time AdjustaCam dismissed Newegg in 2012, AdjustaCam had settled with at least:

- Twelve defendants for ████████ or less;
- Three defendants for an amount between ████████████;
- Five defendants for an amount between ████████████; and
- Two defendants for an amount between ████████████.

A1282. All of the payments made by the various defendants are facially a small fraction of the cost of defense of a patent infringement lawsuit.

None of the settlement payments have any demonstrable tie to the defendants' potential exposure in the litigation. Yet AdjustaCam and its damages expert maintained that AdjustaCam's settlement agreements (and demands) were based on an established target royalty of $1.25-$1.50/unit. *See* A1195-97 ("In its licensing program for this litigation, AdjustaCam used this $1.25 - $1.50 per webcam royalty rate as a baseline for licensing the various defendants."); A1324

("[T]he 14 lump-sum settlements were based on negotiations targeting a royalty of $1.25 to $1.50."); A1327-30.  This assertion has no support in the record.  For example, looking at the units sold by AdjustaCam's licensees, the effective royalty rate for 15 of the lump-sum settlement ranged from a minimum of ▮▮▮▮▮▮▮▮ to a maximum of ▮▮▮▮▮▮▮, with scattered data points in between:

Attachment 12



A1283-85.  Of those 15 settlements, not a single agreement included an effective royalty rate between $1.25 and $1.50 per unit for the defendant's known past sales figures.  *Id.*  Few were even close.

The alleged basis for the target royalty of $1.25-$1.50/unit was two settlement and license agreements entered into in 2001[3] by one of AdjustaCam's

---

[3] The PAR Technologies agreements were therefore dated five years prior to the hypothetical negotiation date in this case.  *See* A0540 (indicating that the hypothetical negotiation date in this case was 2006).

predecessors in interest, PAR Technologies, both of which included lump sum payments plus prospective running royalty components. A1197; A1282; A1303-06. One of these agreements had a tiered prospective royalty structure ranging from ▮▮▮▮▮▮ per unit as the number of units increased, and the other had a royalty structure of ▮▮▮▮ per unit that decreased to ▮▮▮▮ as the sales volume increased. A0542-45; A0631. From these two PAR Technologies agreements alone, to the exclusion of the more than a dozen other licenses that do not support the proffered royalty rage, and without making any comparison of the PAR Technologies licenses to the facts of the case against Newegg, AdjustaCam and its expert took the position that "a royalty in the $1.25 to $1.50 frame" was an appropriate and consistent target for licensing discussions. A1305-06.

Moreover, this supposed "target" royalty was essentially fixed in AdjustaCam's view, as it was determined with no regard for price of the accused products sold by the defendants, the cost of the patented clip feature in the accused products, or even the number of units sold. A1309-10 (characterizing $1.25 to $1.50 as the "intrinsic value of the patented feature" regardless of the sales price); A1311-12 (stating that the manufacturing cost of the patented camera clip is "not relevant" because "licensees have uniformly agreed to pay in the range of $1.25 to $1.50 per unit"); A1329-30 (explaining that a substantial increase in sales

21

"wouldn't affect my analysis because the target had always been in the range of $1.25 to $1.50").

AdjustaCam also tried to paint its target royalty as an established royalty. A1201 ("AdjustaCam's settlement numbers were tied to a pre-established unit royalty of $1.25 - $1.50 per infringing device."). But AdjustaCam falls far short of the high standard for proving and established royalty because AdjustaCam did not show that the PAR Technologies licenses were of sufficient number and frequency "to establish a regular price for a license" and "reflect a general acquiescence in [the price's] reasonableness," that the royalty-establishing licenses were not settlements of threatened or actual litigation, and that the circumstances and rights of the licenses are comparable to those in the present lawsuit. *See, e.g., Rude v. Westcott*, 130 U.S. 152, 165 (1889); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). None of these factors are met in this case—the two PAR Technologies licenses were both settlements of litigation and neither was shown by AdjustaCam to be in any way comparable to the dispute between AdjustaCam and Newegg other than the fact that both involve the '343 Patent. A1196; A0631.

In attempt to manufacture some credibility for its "target royalty," six of AdjustaCam's litigation settlement agreements were drafted to include ███████ ██████████████████████████████████████████ once a certain threshold of

sales was met beyond a fixed amount said to be covered by the lump-sum payment]].  A0545-49.  This self-serving provision was included by AdjustaCam knowing full well that none of those six defendants would sell enough products to ever pay a running royalty during the term of the patent.  A0558 (AdjustaCam's expert stating "I understand that AdjustaCam utilized this royalty structure because these licensees had a low volume of past sales it would be highly unlikely that total volume sales would exceed the units included in the lump-sum payment"); A1313-14 (AdjustaCam's expert admitting that none of the six licensees ever reached the maximum number of sales and had to pay a running royalty).  Conveniently, AdjustaCam set the meaninglessly high number of units threshold, when divided by the lump sum payment, to equate to an effective royalty for past sales of ███████████████████████████████.  A0631-33.  In reality, the parties to those six agreements, like every other settling defendant, paid nuisance value (between ███████████████████████) to settle with AdjustaCam.  A631-33.

Thus, all of AdjustaCam's settlement licenses in reality reflect a nuisance-value lump sum payment, and AdjustaCam has no evidence that it ever approached any negotiations with an intention to obtain its alleged target royalty.  Indeed, AdjustaCam's 30(b)(6) representative could not even verify that it was, at any time, aware of the number of units sold by any of the defendants with which it

settled.  A1337-38.  Such information certainly does not appear in AdjustaCam's expert's report.

AdjustaCam also made multiple settlement offers to Newegg that reflect a nuisance value and were untied to Newegg's sales of the accused cameras.  By the time of a November 9, 2011 mediation, Newegg had confirmed sales of 14,499 units of the accused Rosewill products for total revenues of $63,760 and sales of 5,904 units of other accused products—the majority of which were supplied to Newegg by other named defendants—for total revenues of $33,379.   A1784; A1226; A1362-63.  Despite claiming entitlement to a minimum per-unit royalty between $1.25 and $1.50, AdjustaCam demanded $75,000—nearly three times its "target" per-unit royalty and more than 75% of Newegg's total revenue from sales of the accused products.  A1226; A1362-63.

After mediation and before eventually dismissing Newegg, AdjustaCam made two additional nuisance-value settlement demands. In March 2012, after many of the accused Newegg products had been the subject of settlements between AdjustaCam and Newegg's suppliers, AdjustaCam demanded $65,000 to settle the case. A1227.  Then, on July 11, 2012, less than two weeks after serving a report from its damages expert, AdjustaCam demanded more than $50,000 to settle. A1227; A1365.  This reduced demand was still nearly three times the amount calculated by AdjustaCam's own expert.  A1244-45 (calculating damages as to

24

Newegg at $17,928—i.e., $1.25 x 14,342 units).  In fact, AdjustaCam's expert admitted that this final demand, effectively more than $3.50 per unit, would be decidedly unreasonable.  A1331 ("Q. Do you believe a per-unit royalty for Newegg of $3 or more than $3 would be reasonable?  A. No.")

## <u>SUMMARY OF THE ARGUMENT</u>

AdjustaCam sued Newegg and its dozens of co-defendants solely for the improper purpose of seeking nuisance-value settlement payments.  This patent lawsuit had nothing to do with any bona fide complaint of infringement.  Newegg should not have to bear the burden and expense of such bad faith abuses of the patent system.

Every agreement AdjustaCam obtained for its patent was for a dollar amount constituting a small fraction of the cost of defense, the majority for ███████ or less, and always as a round number.  Yet AdjustaCam desperately twisted this nuisance-value evidence in attempt to justify an unsupportable $1.25 per unit royalty demand—a supposed "target royalty" that never really existed and was never used as a target by anybody in settlement discussions.  In truth, the defendants universally paid off AdjustaCam because it was far cheaper than defending themselves, just as AdjustaCam intended.

Newegg refused to pay to make this case go away because AdjustaCam was abusively accusing products that did not, and could not, infringe the patent-in-suit,

and was merely using the high cost of litigation defense for settlement leverage. For justice to be done, somebody had to challenge AdjustaCam's baseless case and extortive business practices. Newegg accepted the task.

AdjustaCam's patent covers a camera that is claimed to rotate in a *single* axis of rotation. But it is undisputed that AdjustaCam accused products having ball-and-socket joints such that, by definition, the cameras can be rotated about *multiple* axes of rotation. This impossibility of infringement was apparent when the lawsuit was filed, but AdjustaCam pursued the case anyway because proving infringement was never the point of this lawsuit.

Even after the district court construed the claims decisively foreclosing AdjustaCam's effort to avoid the single-axis-of-rotation claim requirement, AdjustaCam pressed on undeterred as long as Newegg refused to accept AdjustaCam's many nuisance-value settlement offers. Clearly AdjustaCam assumed that eventually Newegg would take the easy way out and just pay to make this case go away, but AdjustaCam guessed wrong.

Only after extensive and burdensome expert discovery solidified the long-known and fatal shortcomings of AdjustaCam's case, AdjustaCam simply walked away. Finally conceding that its shakedown efforts against Newegg were futile and that its infringement case was doomed, AdjustaCam dismissed its case with

prejudice, thus avoiding having to back up its allegations in court and put its patent in jeopardy.

To make matters worse, all Newegg's time and money (totaling more than $350,000 in attorneys' fees and expert fees) was wasted on defending this frivolous lawsuit even though AdjustaCam knew for nearly a year before Newegg was dismissed that Newegg's potential exposure was truly *de minimis*.   Newegg initially confirmed accused sales of less than $100,000, and that figure decreased over time as AdjustaCam' licensed Newegg's suppliers to a figure less than $20,000.

Nuisance litigation like AdjustaCam's cannot be encouraged, nor can it be immunized from fee-shifting merely because AdjustaCam eventually dismissed the case.  Although bad faith nuisance litigation is commonplace among today's patent litigants, litigants are presumed to litigate in good faith.  Because AdjustaCam did not litigate in good faith, this case "stands out from the others" and is exceptional under *Octane Fitness*, and is also sufficiently egregious to warrant expert fee shifting.  This Court should declare as much and remand the case to determine the amount of Newegg's recoverable fees.

## **STANDARD OF REVIEW**

The denial of a motion for attorneys' fees under 35 U.S.C. § 285 is reviewed for abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1747 (2014) ("[A]n appellate court should review all aspects of a district court's § 285 determination for abuse of discretion.").

A district court's decision not to award expert fees under its inherent authority is also reviewed for an abuse of discretion. *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921 (Fed. Cir. 2012).

"The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" Highmark, 134 S. Ct. at 1748 n. 2 (quoting *Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

## ARGUMENT

### I. The District Court Abused its Discretion by Not Finding This Case Exceptional and Egregious

The Supreme Court in its recent *Octane Fitness* decision explained that, under 35 U.S.C. § 285, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." 134 S. Ct. at 1756. "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their

28

discretion, considering the totality of the circumstances." *Id.* For particularly egregious cases, district courts also have the inherent authority to award expert fees. *MarcTec v. Johnson & Johnson,* 664 F.3d 907, 921 (Fed. Cir. 2012) (explaining that district courts should exercise this inherent authority in cases involving fraud or bad faith where "the very temple of justice has been defiled") (internal quotation marks omitted).

As noted above, the district court decided Newegg's motion before *Octane Fitness* relaxed the standard for finding a case "exceptional" under Section 285. In denying Newegg's motion, the district court recited and applied the then-applicable law under *Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005), stating that absent material inappropriate conduct in litigation, "an exceptional case may only be found if 'both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless.'" A0005.

Unlike under the *Brooks Furniture* standard relied on by the district court, the exceptionality standard now does not, for example, require proof of both objective baselessness and bad faith, require misconduct to be independently sanctionable, or require proof by clear and convincing evidence. *Octane Fitness*, 134 S. Ct. at 1757-58. Here, because the district court erred by denying Newegg's motion under the strict *Brooks Furniture* standard, it certainly also erred under the far less burdensome *Octane Fitness* standard as well.

In denying Newegg's motion for attorneys' fees and expert fees, the district court misapprehended the evidence and the parties' contentions to reach a manifestly incorrect result.  Under either the *Brooks Furniture* or *Octane Fitness* analytical framework, this "clearly erroneous assessment of the evidence" constitutes an abuse of discretion.  *Highmark*, 134 S. Ct. at 1748 n. 2.

### A.  AdjustaCam Filed and Prosecuted This Case in Bad Faith

According to the district court, "there is insufficient evidence that the action was brought in bad faith and for an improper purpose."  A0006.  In fact, the evidence of bad faith was overwhelming.

Not only did AdjustaCam pursue Newegg for two years on patent claims that were facially not infringed by the Accused Ball-and-Socket Products, but it pressed on with its case even after the *Markman* Order emphatically precluded any possible relief for AdjustaCam.  *See infra.*  All the while, AdjustaCam made Newegg spend considerable sums of money on discovery—including extensive expert discovery—defending against these baseless allegations.  To make matters worse, all this time and money was wasted on a frivolous lawsuit even though AdjustaCam knew that Newegg's potential exposure was minimal.  A1784; A1226; A1362-63.

This bad faith behavior is easily understood when one looks at

30

AdjustaCam's purpose in bringing its lawsuits—to extract nuisance-value settlements.  Even the district court conceded that "the smaller settlements suggest this case was a settlement driven case."  A0007.  The merits of the cases had nothing to do with the filing and maintenance of the lawsuits.  As long as AdjustaCam could convince its target defendants that it was cheaper, and made more business sense, to pay a small sum of money to make the case go away than to defend themselves, AdjustaCam would continue to collect its money without ever having to risk its patent and justify its positions in court.  But AdjustaCam did not count on Newegg defending itself, and had no choice but to dismiss Newegg if it wanted to preserve its shakedown business.

> *1. AdjustaCam Brought this Case for the Improper Purpose of Obtaining Nuisance-Value Settlements*

As explained above, the record shows that AdjustaCam's settlement agreements are all for nuisance value.  *See supra* Statement of Facts, Part V.  The vast majority of Newegg's co-defendants paid ███████ or less to settle, more than half paying ████████ or less, and always as a round number.  A1282.

None of AdjustaCam's post-hac efforts to align those nuisance-value agreements with its supposed damages calculations pass muster.  *See supra* Statement of Facts, Part V.  AdjustaCam's fabrication of an unsupportable and unused "target" royalty (e.g., A1195-96), as well as its illusory and never-paid "running royalty" components of six of its settlements (A0545-49; A0558; A1313-14; A0631-33), are no more than self-serving litigation-induced arguments.  In reality, the effective royalties paid by Newegg's co-defendants were all over the map.  A1283-85 (effective royalties ranging from ████████████ per unit).  Not even the two supposedly "foundational" PAR Technologies license agreements support a "target" (and, essentially, fixed) royalty of $1.25 to $1.50 per unit.  A0542-45 (discussing royalty ranges from ████████████); A0631.

AdjustaCam's settlements, as well as the settlement demands made to Newegg, are not reasonably tied to any prior comparable licenses or the potential

infringement exposure of any party.  The settlement payments are merely round numbers set to encourage defendants not to fight the lawsuit on the merits due to the far greater expense involved in doing so.  District courts cannot turn a blind eye to such flagrant bad faith.

As this Court has observed, "low settlement offers . . . effectively ensure[] that [the patentee's] baseless infringement allegations remained unexposed, allowing [the patentee] to continue to collect additional nuisance value settlements."  *Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314, 1327 (Fed. Cir. 2011); *see also Am. Standard, Inc. v. York Int'l Corp.*, 244 F. Supp. 2d 990, 997 (W.D. Wis. 2002) (Bad faith litigation tactics "force defendants into settlement and away from their legitimate defenses."); *Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG, 2000 U.S. Dist. LEXIS 1186, at *10 (D. Conn. Jan. 18, 2000) (holding that the filing of many lawsuits seeking relatively small settlements "gives rise to a suspicion of *barratry* and *champerty*").

Here, AdjustaCam's settlement amounts are very small compared to the cost of defense, showing that AdjustaCam's desire is to obtain settlement revenue rather than actually pursue its targeted defendants in litigation.  When Newegg, after nearly two years, still refused to pay to settle and remained determined to vindicate its positions in the litigation, AdjustaCam's response exposed its true

purpose in suing Newegg. Instead of trying to prove Newegg's defenses wrong in court, AdjustaCam simply walked away from its case. Such an "overall vexatious litigation strategy" that is wasteful of judicial resources evidences bad faith. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 726 F.3d 1359, 1367 (Fed. Cir. 2013).

Belated timing of dismissal can also evidence bad faith and justify fee shifting. In *Monolithic Power Systems*, the case was deemed exceptional in large part because the plaintiff "withdrew its claims and granted covenants not to sue after substantial litigation had taken place," "moving to dismiss only after [defendants] had completed their filings for the final pretrial conference, wasting the parties' and the court's resources." *Id.* Likewise, here AdjustaCam waited two years to dismiss Newegg, knowing that Newegg's exposure was minimal, and did not actually dismiss Newegg until after Newegg had incurred considerable expense in attorney and expert fees. AdjustaCam cannot just lose interest and walk away with zero consequences after forcing Newegg to spend more than $350,000 in attorneys' fees and expert fees to defend itself. A1793-94 (explaining that Newegg expended $286,102.52 in attorneys' fees, plus $68,183.93 in expert fees).

In *Ingenuity 13, LLC v. Doe*, copyright plaintiffs were found to have acted in bad faith and sanctioned for fees in circumstances largely identical to those in this

case.  No. 2:12-cv-8333-ODW, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013).  First, the plaintiffs engaged in a strategy to file lawsuits against many defendants.  *Id.* at *6-7.  Due to "the high cost of litigation," "[m]ost defendants settled . . . , resulting in proceeds of millions of dollars due to the numerosity of defendants."  *Id.*  "For defendants that refused to settle, the Principals engaged in vexatious litigation designed to coerce settlement. These lawsuits were filed using boilerplate complaints based on a modicum of evidence, calculated to maximize settlement profits by minimizing costs and effort."  Importantly, like AdjustaCam, in *Ingenuity 13* "[t]he Principals have shown little desire to proceed in these lawsuits when faced with a determined defendant.  Instead of litigating, they dismiss the case."  *Id.* at *7.

Courts have acknowledged in various circumstances that it is fundamentally unfair for a plaintiff to force a defendant to endure the substantial burden and expense of litigation and then lose interest and walk away from the case without any consequences.  *See Colombrito v. Kelly*, 764 F.2d 122, 134-35 (2d Cir. 1985) (noting that awarding fees would be appropriate "if a litigant had made a practice of repeatedly bringing potentially meritorious claims and then dismissing them with prejudice after inflicting substantial litigation costs on the opposing party and the judicial system"); *Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC, 2009 U.S. Dist. LEXIS 4546, at *12 (W.D. Wis. Jan. 21, 2009) ("Plaintiff cannot

expect to subject defendant Rose to a year of litigation and walk away with no consequences."); *compare Monolithic Power Sys.*, 726 F.3d at 1367 (affirming award of fees, emphasizing that vexatious case was dismissed "after substantial litigation had taken place . . . wasting the parties' and the court's resources").

AdjustaCam professes that its desire was not to extort a nuisance-value settlement from Newegg.   According to AdjustaCam, its decision to dismiss Newegg was for "strategic reasons unrelated to the merits"—essentially, "winnowing out" Newegg due to its *de minimis* infringement in comparison with Sakar once other defendants were dismissed and some of Newegg's sales became licensed.   A1192-93.   First, the timing of events, with the *Markman* Order triggering several small settlements in short order, does not bear out AdjustaCam's position.   *See supra*.   Second, AdjustaCam's implying that it is perfectly acceptable to file and maintain lawsuits against "*de minimis* infringers" so long as it "winnows them out" and dismisses them before trial is deeply misguided.   Section 285's exceptional case provision exists precisely to prevent such "gross injustice to an alleged infringer." *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988). AdjustaCam knew of Newegg's minimal exposure long before Newegg was dismissed and, in fact, well before Newegg had to endure the burden and expense of the February 2012 *Markman* hearing and subsequent discovery, including considerable expert discovery.   A1784; A1226; A1362-63 (describing sales figures

36

provided to AdjustaCam at least as early as November 2011); A2136 (August 2012 dismissal motion).    Shackling Newegg with considerable and unjustifiable litigation costs, despite Newegg's minimal exposure, is exceptional and abusive.

### 2. *Nuisance Litigation is Exceptional and Egregious*

It is no secret that nuisance litigation brought by patent assertion entities is now fairly common and has become its own lucrative industry.  *See, e.g.,* Colleen V. Chien, *Patent Trolls by the Numbers*, Santa Clara University Studies Research Paper No. 08-13, *available at* http://ssrn.com/abstract=2233041 (March 13, 2013) (explaining that patent assertion entities file the majority patent lawsuits in the U.S., primarily targeting non-technology companies).

It would be a mistake, however, to conclude from this state of affairs that such litigation misconduct is not "exceptional" within the meaning of Section 285. *Octane Fitness* explained that "an 'exceptional' case is simply one that stands out from others" regarding weak merits positions or litigation misconduct.  134 S. Ct. at 1756.  But the Court certainly did not suggest, let alone hold, that courts should allow themselves to become desensitized to bad faith nuisance litigation just because it is commonplace.

Section 285 is supposed to be remedial—to correct for unfairness and injustice in a flexible, fact-specific manner.  *See Octane Fitness*, 134 S. Ct. at

1753, 1756 n.6; *see also Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1312-13 (Fed. Cir. 2013). Neither Congress nor the Supreme Court was so cynical as to assume that patent litigation ordinarily involves bad faith and misconduct. The obvious assumption of Section 285 is that patent litigation will be brought and conducted in good faith, and that a case is "exceptional" when it sufficiently deviates from this expectation of litigants. *Cf. Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 954 (Fed. Cir. 2010) ("[T]here is a presumption that an assertion of infringement of a duly granted patent is made in good faith.").

Moreover, using the court system to further AdjustaCam's extortive business practices is the kind of egregious bad faith that warrants shifting of expert fees. *MarcTec*, 664 F.3d at 921. Bad faith assertions of frivolous lawsuits unreasonably burden the litigation targets and the judicial system. Awarding expert fees is especially appropriate where a plaintiff's vexatious misconduct forces a defendant to incur those expert fees unnecessarily, as those fees are not compensable under Section 285. *Id.* at 921-22 (holding that expert fees were properly awarded because "Cordis was forced to incur expert witness expenses to rebut MarcTec's unreliable and irrelevant expert testimony," such that "MarcTec's vexatious conduct and bad faith increased the cost of litigation in ways that are not compensated under § 285"). Here, as in *MarcTec*, AdjustaCam's experts'

38

testimony was fatally flawed and could not possibly have proven infringement or AdjustaCam's alleged damages.    AdjustaCam only proceeded into expert discovery to apply more pressure to Newegg for a nuisance-value settlement.   For Newegg to have to spend $68,183.93 on experts to rebut AdjustaCam's experts' baseless allegations, on top of all the other misconduct and expense inflicted by AdjustaCam in seeking nuisance-value settlements, is a grave injustice that cannot be permitted.  *Id.* at 921 (inherent authority should be exercised to shift expert fees where "the very temple of justice has been defiled").

Patent litigation is supposed to resolve legitimate disputes surrounding bona fide infringement allegations, not facilitate nuisance-value patent monetization campaigns.  *See Eon-Net,* 653 F.3d at 1328 ("[T]he appetite for licensing revenue cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith.").  This Court should take this opportunity to clarify that litigation brought for the purposes of extorting nuisance-value settlements is exceptional will not be tolerated or immunized from fee-shifting simply because it is widespread.   And to the extent a nuisance litigation campaign cross into the expert discovery phase of a case, those expert expenses should not have to be borne by the defendants.

### 3.  *Nuisance Litigation Should be Discouraged*

Section 285 and *Octane Fitness* recognize that the specter of fee-shifting is intended to have a deterrent effect on bad faith litigation and misconduct. 134 S. Ct. at 1756 n.6 (reminding district courts of "the need in particular circumstances to advance considerations of compensation and deterrence"). That purpose would be frustrated if all one had to do to avoid any possible fee-shifting is dismiss its case and avoid losing on the merits. AdjustaCam cannot avoid the expensive and wasteful consequences of its extortion tactics simply because it dismissed Newegg from the case. *See Kilopass*, 738 F.3d at 1317 ("[T]rial courts retain broad discretion to make findings of exceptionality under § 285 *in a wide variety of circumstances*.").

To be clear, a plaintiff's voluntary dismissal of a meritless case should be encouraged. But when a case is brought for reasons unrelated to the merits and to obtain nuisance-value settlements, as it was here, the incentive to dismiss must also include an incentive to dismiss at a meaningful time—i.e., before substantial expense and burden is inflicted on the defendant. This Court should clarify that Section 285 provides those incentives, and that such plaintiffs who pursue their cases for too long before dismissing will be viewed as acting in bad faith and will be ordered to pay a defendant's attorney's fees. And again, to the extent a nuisance litigation campaign cross into the expert discovery phase of a case, those expert expenses should not have to be borne by the defendants.

40

Using the United States judiciary to leverage nuisance-value settlements also reflects selfish opportunism and unreasonably burdens the courts. *See Artese*, 2000 U.S. Dist. LEXIS 1186 at *10-11 ("[I]t is not merely the prejudice and costs to the opposing party but also the effect upon the judicial system of such litigation. When we consider the numerous other cases commenced by this plaintiff . . . there has been indeed a substantial burden on the judicial system."). Behavior that treats the judiciary as a pawn for nuisance-value settlement negotiations and makes courts waste considerable time and resources should be strongly discouraged.

By contrast, defendants like Newegg, who do not pay a patentee in a nuisance litigation simply to make a lawsuit go away, play an important role in the patent system. Such defendants insist that plaintiffs justify their positions and, when the plaintiffs cannot or will not do so, will vindicate their defenses in court. But for defendants like Newegg, abusive nuisance litigants would never be exposed because every case would settle and conceal the misconduct. Given the remedial nature of Section 285, Newegg and other similarly-situated defendants should not be discouraged from taking this more onerous and expensive course, helping to ensure that the patent system is not abused.

Absent a meaningful fee-shifting standard where fees are reasonably attainable, defendants are more likely to simply settle nuisance litigations because

41

the financial downsides are overwhelming.   If AdjustaCam's conduct is not deemed exceptional and egregious in this case, it will embolden nuisance litigants to continue their abusive conduct unchecked.

## B. The Accused Cameras Could Not Possibly Have Infringed

The district court agreed with AdjustaCam that the Accused Ball-and-Socket Products included constrained ball-and-socket joints that restricted movement to some extent. A0006. According to the district court, this constricted movement made it possible for AdjustaCam to prevail in proving infringement:

> [i]f the ball and socket joint truly restricts the range of movement such that it cannot rotate about multiple axes, the constrained ball and socket joint could meet the claim limitation which requires the hinge member being rotatably attached to the camera in a single axis of rotation. Since one could reasonably argue Defendants' products meet the "rotatably attached" limitation, AdjustaCam's infringement theories are not objectively baseless.

A0006. The problem is that the above-emphasized portion—the premise and *sine qua non* of the district court's conclusion—is not true and does not even reflect AdjustaCam's position. It is undisputed that the Accused Ball-and-Socket Products included cameras that were in fact capable of rotating about multiple axes with respect to the socket—they could be both twisted and tilted up and down.

AdjustaCam never argued that the constrained ball-and-socket joints were incapable of rotating about multiple axes—it merely posited that the different rotations were "separate." A0482-83 ("[I]f I rotate it around to the center, there is nothing that forces it to move, to tilt or to sway to either side."); A0484 ("There is two axes, but they are separate."); A0485-87 ("This happens to be a constrained

43

ball and socket joint.  So it can [1] spin about the axis, it can [2] move forward, it may be able to [3] move to the side.").

On this record, there is no question that the cameras of the Accused Ball-and-Socket Products were capable of rotating in at least two different and distinct directions with respect to the sockets, not merely rotating about the claimed and singular "first axis of rotation."  '343 Patent, Claim 1 ("*said camera*, when the hinge member is so attached, *rotating, about a first axis of rotation*, relative to said hinge member").  It was objectively baseless for AdjustaCam to contend that such cameras were "limited to a *single* axis of rotation."  A0022-23.  One could not reasonably argue otherwise.

Importantly, AdjustaCam was not advancing a theory of infringement under the doctrine of equivalents, and so its case hinged on proof of literal infringement. *See, e.g.,* A0996-97 and A1160-61 (AdjustaCam's expert report presenting only direct, literal infringement theory).

Long before the district court's *Markman* Order formally doomed AdjustaCam's case, the plain language of the claims, and especially in light of the specification, made clear that the Accused Ball-and-Socket Products could not possibly infringe.  A0022 ("The claims plainly describe each 'rotatably attached' object as rotating about a single axis."); A0021 ("Every reference to a 'rotatably attached' object in the specification and claims describes the attachment as

44

permitting motion over a single axis of rotation."). From the outset of this lawsuit, no reasonable plaintiff could have expected to succeed in proving infringement.

The situation would be somewhat different if AdjustaCam honestly did not know that infringement was impossible to prove at the outset of the case, but later discovered that it could not prevail. Here, such ignorance is implausible given the readily apparent functionality of the accused products and the simplicity of the patent and its claims. But even if AdjustaCam could legitimately plead ignorance, ignorance is no excuse to continue undeterred—for nearly five months, which included considerable and expensive expert discovery—after the district court's decisive *Markman* ruling in Newegg's favor. A0013-27 (April 10, 2012 *Markman* Order); A2141 (August 27, 2012 motion to dismiss Newegg). Here, as in *MarcTec*, AdjustaCam "not only initiated a frivolous lawsuit, it persisted in advancing unfounded arguments that unnecessarily extended this litigation and caused [defendant] to incur needleless litigation expenses. This vexatious conduct is, by definition, litigation misconduct, and provides a separate and independent basis supporting the district court's determination that this case is exceptional." *MarcTec, LLC v. Johnson & Johnson,* 664 F.3d 907, at 920-21 (Fed. Cir. 2012).

### C. AdjustaCam's Validity Positions Were Frivolous

As explained above, AdjustaCam advanced the following frivolous argument in response to the clear anticipation of its claims by Irifune: "With

Irifune, the camera is not even attached to the hinge member until fully tightened down using camera attachment shaft (9) and camera attachment screws (10 and (11)." A1263. Using the exceedingly narrow definition of "attached" offered in the reexamination, AdjustaCam's expert Dr. Muskivitch opined that, "[o]nce the camera is attached to the fixed part 2, the camera cannot rotate about a first axis relative to the hinge member." *Id.*

These concocted arguments were objectively baseless for several reasons. First, AdjustaCam's illogical attempt to narrow the meaning of "rotatably attached" contradicts the claim language and the specification of the '343 Patent. If the camera disclosed in the '343 Patent was "permanently fixed to," or had to be fully tightened down to the hinge member, then the camera could not rotate about the first axis of rotation as the claims and specification require. Indeed, such arguments contradict AdjustaCam's own proposed construction of "rotatably attached" in this litigation ("connected such that the connected object is capable of being rotated"). A2813-14. The Irifune camera is certainly "capable of being rotated"—e.g., when it is partially unscrewed from the threaded camera attachment shaft on the hinge. AdjustaCam's argument that a camera is not rotatably attached to a hinge member unless it is "permanently fixed to" or fully tightened down to the hinge member also contradicts the district court's *Markman* Order because such a camera would not be capable of rotation about any axis. A0021 ("Every

reference to a 'rotatably attached' object in the specification and claims describes the attachment as permitting motion over a single axis of rotation.").   AdjustaCam could not reasonably expect to prevail against Newegg's invalidity arguments based on Irifune.

## II. AdjustaCam's Appeal Must be Dismissed for Lack of Subject Matter Jurisdiction

Consistent with AdjustaCam's bad faith overreaching and indifference to the merits of this litigation, AdjustaCam brought its own affirmative appeal to this Court where subject matter jurisdiction is indisputably lacking.   There is no legal support whatsoever for AdjustaCam's attempt to appeal a claim construction issue that it lost in the district court, made no effort to preserve for appeal, and expressly extinguished when it dismissed its case against Newegg with prejudice. This frivolous appeal only compounds the exceptionality of this case and causes Newegg to incur further needless legal expenses.

An "actual controversy must be extant at all stages of review, not merely at the time the complaint was filed." *Benitec Austl, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1345 (Fed. Cir. 2007) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974)).   "Subject matter jurisdiction is a threshold requirement for a court's power to exercise jurisdiction over a case, and no amount of 'prudential reasons' or perceived increases in efficiency, however sound, can empower a federal court to

hear a case where there is no extant case or controversy." *Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed. Cir. 2010).

AdjustaCam filed its notice of appeal seeking review of the district court's claim construction rulings. A0193. But by that time, Newegg had already been dismissed with prejudice from the case and given a covenant not to be sued in the future for infringement of the '343 Patent. A2136-37; A1986-87; A0155. The dismissal and covenant extinguished any ongoing disputes between AdjustaCam and Newegg concerning the infringement and validity of the '343 Patent. Indeed, when dismissing Newegg AdjustaCam even argued that its covenant divested the district court of subject matter jurisdiction over Newegg's declaratory judgment counterclaims, citing *Dow Jones*, 606 F.3d at 1348 and *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995). A2136-37. If there is no jurisdiction over Newegg's non-infringement and invalidity counterclaims due to a lack of an ongoing controversy, certainly there can be no jurisdiction over AdjustaCam's underlying infringement claims that were dismissed with prejudice.

This Court has often recognized its inability to reach claim construction issues that are not subject to an ongoing case or controversy. *See, e.g, SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1354 (Fed. Cir. 2012) ("[W]here, as here, a party's claim construction arguments do not affect the final judgment entered by the court, they are not reviewable. . . . Without a final judgment as to

48

the infringement or validity of these claims, the court's claim constructions that impact only these withdrawn claims are not properly before us."); *Jang v. Boston Sci. Corp.,* 532 F.3d 1330, 1336 (Fed. Cir. 2008) (resolving claim construction issues "that do not actually affect the infringement controversy between the parties" would result in impermissible advisory opinion because "[t]he Supreme Court has explicitly held that Article III does not permit the courts to resolve issues when it is not clear that the resolution of the question will resolve a concrete controversy between interested parties"); *see also NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282, 1311 (Fed. Cir. 2005).

Although AdjustaCam purports to appeal from the district court's final judgment, because that final judgment was in no way based on the claim construction ruling, but was instead based entirely on the mutual consent of the parties to end the case, this Court lacks subject matter jurisdiction to review the claim constructions.

This is not a case where the parties consented to a judgment of non-infringement based on the claim constructions to allow for appeal of the construction. *See, e.g., SanDisk*, 695 F.3d at 1353 ("SanDisk voluntarily withdrew the '893 and '808 patents and claims 1 and 10 of the '842 patent from this action, and it does not dispute that the district court never entered a stipulated judgment of

non-infringement with respect to these claims. Thus, these claims do not present a current infringement controversy before this court.").

Here, AdjustaCam made no effort whatsoever to preserve any challenges to the district court's claim constructions when it decided to dismiss its case against Newegg. Even in defending AdjustaCam's litigation positions and opposing Newegg's motion for attorneys' fees, AdjustaCam noted no disagreement with the district court's claim constructions. A1191-94; A1194 (arguing that "AdjustaCam's infringement positions are entirely consistent with the Court's construction").

This Court cannot hear AdjustaCam's appeal because it lacks subject matter jurisdiction over the challenges raised to the claim construction rulings by the district court. AdjustaCam's appeal must be dismissed.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, this case should be declared exceptional and egregious, and the case should be remanded for a determination of the amount of attorneys' fees and expert fees owed to Newegg.

Additionally, AdjustaCam's appeal should be dismissed for lack of subject matter jurisdiction.

Respectfully submitted,

Dated:  October 20, 2014       By:   _____

Kent E. Baldauf, Jr.
Daniel H. Brean
Anthony W. Brooks
THE WEBB LAW FIRM
One Gateway Center
420 Fort Duquesne Blvd.
Suite 1200
Pittsburgh, PA 15222
Telephone:  (412) 471-8815

Edward R. Reines
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

*Counsel for Defendants-Cross-Appellants*

51

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the body of this brief, beginning with the Jurisdictional Statement on page 1, and ending with the last line of the conclusion on page _____, including headings, footnotes, and quotations, contains _____ words, in compliance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

_____
Kent E. Baldauf, Jr.
*Counsel for Defendants-Cross-Appellants*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 20, 2014, copies of the foregoing Brief of Defendant-Cross-Appellant was served on counsel for Plaintiff-Appellant AdjustaCam, LLC via the Court's ECF system and via electronic mail upon the following:

[INSERT]

_____
Kent E. Baldauf, Jr.
*Counsel for Defendants-Cross-Appellants*

EXHIBIT 3

Appeal Nos. 2013-1665, -1666, -1667

# United States Court of Appeals

### *for the*

# Federal Circuit

ADJUSTACAM, LLC,

*Plaintiff-Appellant,*

– v. –

NEWEGG, INC., NEWEGG.COM, INC. and ROSEWILL, INC.,

*Defendants-Cross-Appellants,*

– and –

SAKAR INTERNATIONAL, INC.,

*Defendant-Cross-Appellant.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS IN CASE NO. 10-CV-00329,
CHIEF JUDGE LEONARD DAVIS

## BRIEF OF DEFENDANT-CROSS-APPELLANT
## SAKAR INTERNATIONAL, INC.

EZRA SUTTON
EZRA SUTTON & ASSOCIATES, P.A.
900 Route 9 North, Suite 201
Woodbridge, New Jersey 07095
(732) 634-3520

*Attorneys for Defendant-Cross-
   Appellant Sakar International, Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Adjustacam v. Newegg, 2013-1665

<u>CERTIFICATE OF INTEREST FOR SAKAR INTERNATIONAL, INC.</u>

Counsel for Sakar International, Inc. hereby certifies the following:

1.     The full name of every party or amicus represented by me is:

      Sakar International, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      Not applicable.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      No publicly held company owns ten percent or more stock in
      Sakar International, Inc.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Ezra Sutton, Ezra Sutton, P.A.

Dated:  September 24, 2014      <u>/s/ Ezra Sutton</u>
                                       Ezra Sutton
                                       *Counsel for Defendant-Cross-Appellant*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES .................................................................1

JURISDICTIONAL STATEMENT ...................................................................2

STATEMENT OF THE ISSUES.........................................................................2

STATEMENT OF THE CASE.............................................................................3

STATEMENT OF FACTS ...................................................................................7

   I.   Introduction..................................................................................................7

   II.   The Parties ................................................................................................8

   III.   AdjustaCam's Infringement Allegations.......................................9

   IV.   AdjustaCam's Validity Arguments .............................................18

   V.   AdjustaCam's Nuisance-Value Settlements and Demands.........20

SUMMARY OF THE ARGUMENT ..................................................................25

STANDARD OF REVIEW ................................................................................28

ARGUMENT ......................................................................................................28

   I.   The District Court Abused its Discretion by Not Finding This Case Exceptional ..............................................................................................28

      A.   AdjustaCam Filed and Prosecuted This Case in Bad Faith .....................30

         1.   AdjustaCam Brought this Case for the Improper Purpose of Obtaining Nuisance-Value Settlements ................................................................32

2.     Nuisance Litigation is Exceptional and Egregious ...............................37

3.     Nuisance Litigation Should be Discouraged ........................................39

B.   The Accused Cameras Could Not Possibly Have Infringed...................42

C.   AdjustaCam's Validity Positions Were Frivolous ..................................44

II.   AdjustaCam's Appeal Must be Dismissed for Lack of Subject Matter Jurisdiction....................................................................................................46

CONCLUSION ...................................................................49

# TABLE OF AUTHORITIES

**Cases**

*Am. Standard, Inc. v. York Int'l Corp.*, 244 F. Supp. 2d 990 (W.D. Wis. 2002) ....33

*Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG, 2000 U.S. Dist. LEXIS 1186 (D. Conn. Jan. 18, 2000) ......................................................... 33, 40

*Benitec Austl, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340 (Fed. Cir. 2007) .................46

*Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005) ....29, 30

*Cf. Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943 (Fed. Cir. 2010) ...............................................................38

*Colombrito v. Kelly*, 764 F.2d 122 (2d Cir. 1985)....................................................35

*Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384 (1990) .........................................28

*Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338 (Fed. Cir. 2010) ...............47

*Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805 (Fed. Cir. 1990)....................15

*Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314 (Fed. Cir. 2011) .................. 33, 39

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744 (2014)..... 28, 30

*Ingenuity 13, LLC v. Doe No. 2:12-cv-8333-ODW*, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013) ............................................................................... 34, 35

*Jang v. Boston Sci. Corp.,* 532 F.3d 1330 (Fed. Cir. 2008)......................................48

*Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302 (Fed. Cir. 2013) ........... 37, 40

*MarcTec, LLC v. Johnson & Johnson,* 664 F.3d 907 (Fed. Cir. 2012)  28, 29, 38, 44

*Mathis v. Spears*, 857 F.2d 749 (Fed. Cir. 1988)......................................................36

*Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 726 F.3d 1359 (Fed. Cir. 2013) ......................................................................................................... 34, 35

*NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282 (Fed. Cir. 2005).................48

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014) ................................................................................................ passim

*Rude v. Westcott*, 130 U.S. 152 (1889) ............................................................ 23, 46

*Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995) ..........47

*SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348 (Fed. Cir. 2012) ........... 47, 48

*Steffel v. Thompson*, 415 U.S. 452 (1974) .............................................................46

*Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC, 2009 U.S. Dist. LEXIS 4546 (W.D. Wis. Jan. 21, 2009) ........................................................................35

## *Statutes*

28 U.S.C. § 1295(a)(1) ...........................................................................................2

28 U.S.C. § 2107(a) ................................................................................................2

28 U.S.C. §§ 1331 ...................................................................................................2

28 U.S.C. §§ 1338(a) ..............................................................................................2

35 U.S.C. § 285 .............................................................................................. passim

## *Rules*

Federal Rule of Appellate Procedure 4 ...................................................................2

## STATEMENT OF RELATED CASES

No other appeal in or from this same civil action was previously before this Court or any other court of appeals.  Sakar International, Inc. ("Sakar" or "Defendant Sakar") and its undersigned counsel are unaware of any other actions now pending in this or any other court that will directly affect or be directly affected by this Court's decision in the present appeal.

1

# JURISDICTIONAL STATEMENT

Sakar's Cross-Appeal:

The district court had original jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  Sakar filed a timely and proper notice of appeal under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4.  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

AdjustaCam's Appeal:

For reasons discussed below, this Court does *not* have subject matter jurisdiction over AdjustaCam's appeal and AdjustaCam's appeal must be dismissed.

# STATEMENT OF THE ISSUES

1.     Whether the district court erred by failing to find this case exceptional and egregious under 35 U.S.C. § 285 and its inherent authority to award Sakar its attorneys' fees and expert fees, despite clear and unrebutted evidence showing that this lawsuit was meritless, was prosecuted in bad faith, and was prosecuted to leverage the high cost and burden of litigation to coerce a nuisance-value settlement payment from Sakar.

2.     Whether this Court has subject matter jurisdiction over AdjustaCam's appeal, given that the case on the merits was mutually and voluntarily dismissed in its entirety, and no case or controversy remains between the parties.

## <u>STATEMENT OF THE CASE</u>

AdjustaCam, LLC ("AdjustaCam") brought this action in July 2010 against 59 defendants, including Defendant Sakar, alleging that certain camera products sold by Sakar infringed United States Patent No. 5,885,343 ("the '343 Patent"), entitled "Camera Clip."  A0004.  The '343 Patent is owned by Global-Media Group, LLC and AdjustaCam is the exclusive licensee of the patent.  A1789.

After filing suit AdjustaCam began seeking to settle with the defendants for amounts far below the cost of defense.  All defendants other than Defendant Sakar and Newegg Inc., Newegg.com, Inc., and Rosewill, Inc. (collectively, "Newegg" or "the Newegg Defendants") settled with AdjustaCam well before trial and were dismissed.  A0004.  However, 20 out of 22 defendants settled for less than ████████.  A1282.

During the reexamination, on August 12, 2011, the USPTO issued a first Office Action and rejected the asserted claims of the '343 Patent, as being anticipated and/or obvious based on Japanese Utility Model Publication No. H2-19997 to Irifune (the "Irifune Publication") and U.S. Patent No. 5,880,783 to Ma entitled "Digital Camera for a Computer" (the "Ma Patent").

Then a *Markman* hearing was held on February 9, 2012 to construe various claim terms of the '343 Patent.  A0013.  Magistrate Judge Love issued a *Markman*

order on April 10, 2012, which was subsequently adopted in full by Chief Judge

Davis on June 7, 2012.  A0013-27; A0012 ("the *Markman* Order").

Among the terms addressed in the *Markman* Order was the term "[r]otatably

attached / adapted to be rotatably attached / adapted to rotatably attach." A0020-

23.  The parties disputed whether the term as used in the claims "allow[s] for a

'rotatably attached' object to rotate over more than a single axis."  A0020.  The

district court agreed with the defendants, noting that "[t]he claims plainly describe

each 'rotatably attached' object as rotating about a single axis."  A0022.[1]  The

district court also explained that "[e]very reference to a 'rotatably attached' object

in the specification and claims describes the attachment as permitting motion over

a single axis of rotation."  A0021.  Although the term "did not require

construction," the district court nonetheless resolved the claim interpretation

dispute, holding that "'rotatably attached' objects in the patent-in-suit are limited

to a single axis of rotation."  A0022-23 (prohibiting the parties from contradicting

the district court's resolution of the dispute as the case went forward).

---

[1] As the district court explained (A0020), the claims of the '343 Patent referred
consistently to a "rotatably attached" hinge member rotating in only one of two
specific axes of rotation, depending on whether it was rotating with respect to the
camera or the support frame.  *See, e.g.,* Claim 1 ("a hinge member adapted to be
rotatably attached to the camera, said camera, when the hinge member is so
attached, rotating, about a first axis of rotation, relative to said hinge member");
("a support frame rotatably attached to said hinge member . . . said hinge member
rotating about a second axis of rotation relative to said support frame, said first axis
of rotation being generally perpendicular to said second axis of rotation").

Since Sakar's accused products had essentially a ball and socket joint, it was clear that Sakar accused products had multiple axes of rotation, and not just one or two axes of rotation, as required by the '343 Patent claims. Therefore, it was clear that there was no infringement for a camera having a multi-axis ball and socket joint.

Nevertheless AdjustaCam continued to settle with 20 out of 22 defendants for less than ███████████████████████. At the same time, AdjustaCam's counsel was also **delaying and prolonging** the reexamination of the '343 Patent for one year until August 30, 2012 when the USPTO finally rejected the asserted claims of the '343 Patent during a third Office Action as being not patentable and therefore invalid. This was more than 2 years into the case, and most of the defendants had already settled except for Sakar, and the Newegg Defendants. Then, on September 20, 2012, after most of the defendants had settled, AdjustaCam's counsel finally responded to the USPTO by **cancelling** the asserted claims from the '343 Patent. AdjustaCam could have cancelled the asserted claims of the '343 Patent (or at least withdrawn them from this litigation) long before September 20. Instead, AdjustaCam acted in bad faith by asserting frivolous responses to the USPTO's first two rejections between August 12, 2011 and August 30, 2012, in order to buy additional time to enter into additional nuisance-value settlements.

5

On August 27, 2012, after considerable expert discovery was completed and the case was on the verge of summary judgment and *Daubert* proceedings, AdjustaCam filed a motion to dismiss its claims against the Newegg Defendants with prejudice. A2136-37. The motion also sought to dismiss the Newegg Defendants' invalidity and non-infringement declaratory judgment counterclaims for lack of subject matter jurisdiction, with prejudice, based on a covenant not to sue that extinguished the case or controversy with respect to the counterclaims. *Id.* According to AdjustaCam, the reason for its motion was that it had "recently resolved its claims against almost all of the remaining Defendants," including defendants whose products were sold by Newegg, such that "NewEgg/Rosewill is no longer selling unlicensed webcams manufactured by any other Defendant." A2137. Thus, AdjustaCam professed a "desire[] to simplify this case by focusing its claims going forward solely upon Defendant Sakar and Defendant Kohl's, which is accused of infringement solely on account of Sakar manufactured products. NewEgg/Rosewill's remaining damages exposure . . . is relatively *de minimis*, and is dwarfed by the damages exposure of Sakar." A2137-38.

After AdjustaCam dismissed both the asserted claims and Sakar from the case, Sakar filed a motion for attorneys' fees and expert fees ████████████, which was denied by the trial court. A0156, A0160.

On Sept. 18, 2013, Sakar then filed a notice of appeal seeking review of the denial of its motion for attorneys' fees. Although AdjustaCam's notice of appeal also referred to the district court's final judgment, that final judgment was not premised on any claim construction issues, nor did AdjustaCam seek a consent judgment incorporating the claim construction order as the basis for a judgment of non-infringement.  Rather, the final judgment merely reflected the parties' agreed mutual dismissal of the case.  A0001-03; A1986-87.

Meanwhile, after Newegg had withdrawn its motion to correct the judgment, and shortly before this appeal was reactivated, the Supreme Court decided *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), which relaxed the standard for finding a case "exceptional" under Section 285.

## STATEMENT OF FACTS

### I.  Introduction

Unable to squeeze a ██████████ settlement payment from Sakar after more than two years of litigation, since all of the defendants had settled except for Sakar and the Newegg Defendants, AdjustaCam decided to dismiss Sakar with prejudice in order to end the case.

The filing and prosecution of this action by AdjustaCam was intended to extort nuisance-value settlement fees from defendants, and not to resolve any legitimate claims of infringement or damages.  In fact, AdjustaCam knew at the

time of the first Office Action rejection of the claims on August 12, 2011, that AdjustaCam could not prevail. Yet, AdjustaCam did not withdraw the patent claims and continued with the prosecution of its infringement claims and with the settlements. Such a baseless case that abuses the judiciary for personal gain is exceptional and warrants fee shifting.

By the time Sakar filed its motion for attorneys' fees and expert fees, AdjustaCam had forced Sakar to spend a total of ███████, including ███████ in attorney's fees and █████ in expert witness fees to defend itself. A1793-94. Sakar contends that it should not have to bear these fees, and that Sakar should be reimbursed by AdjustaCam

## II. The Parties

AdjustaCam is a limited liability company that is exclusively in the business of patent litigation. As a wholly-owned subsidiary of Acacia Research Group, LLC, its business follows the all-too-familiar model of using the burden and expense of patent litigation as leverage to extort settlement fees from defendants. A1779.

Sakar is a wholesaler of consumer electronics products and accessories that it sells to various retailers throughout the United States under the brand name VIVITAR®. Sakar does not manufacture its products, including the accused webcam products in this case, but simply purchases its products from third parties

in China and then resells them in the United States. Sakar's accused webcam products in this case were sold under Sakar's licensed brand name "Kodak."

A large number of AdjustaCam's target defendants in this case were successful online retailers like Amazon.com and Newegg, who simply purchased and re-sold the accused cameras, not manufacturers who actually made the accused cameras.

### III. AdjustaCam's Infringement Allegations

AdjustaCam is the exclusive licensee of United States Patent No. 5,855,343 ("the '343 Patent"), entitled "Camera Clip." A1789. The '343 Patent is generally directed to a camera clip that supports a camera when sitting on a flat surface or when attached to an object, such as a computer monitor:







'343 Patent, Figs. 1, 2, 4.  The clip allows the camera to rotate in two distinct directions about distinct axes of rotation.

First, as shown in Fig. 1, the camera can be rotated to pan side-to-side.  The specification explains: "[h]inge member 16 is rotatably attached to camera 12, where camera 12 rotates over a **first axis 26** in a direction shown by arrow 28 relative to hinge member 16." '343 Patent, at 4:17-19.  Second, as shown in Fig. 2, the camera can be tilted upward and downward.  The specification explains: "[h]inge member 16 rotates over a **second axis 32** in the direction shown by arrow 34 relative to support frame 18.  First axis 26 is perpendicular to second axis 32." '343 Patent, at 4:21-24.

10

These particular two axes of rotation are expressly required by all independent claims in the '343 Patent. *See, e.g.,* '343 Patent, Claim 1 ("a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, *rotating, about a first axis of rotation*, relative to said hinge member"); *id* ("a support frame rotatably attached to said hinge member . . . , said hinge member *rotating about a second axis of rotation* relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation").[2]

To be clear, the camera products claimed in the '343 Patent require *three* distinct components of importance to this case: (1) a camera; (2) a hinge member; and (3) a support frame. While the camera product—including the hinge member—**rotates about two axes**, the camera of the '343 Patent *itself* only rotates about one axis; this is what is described, and this is what is claimed. This is evident from the claim language, which specifies that the *camera* is "rotatably attached" to the *hinge member* of the claimed apparatus such that the camera rotates about a **single axis of rotation** (the claimed "first axis of rotation"). Similarily, the *support frame* of the apparatus is itself "rotatably attached" to the *hinge member* such that the support frame rotates relative to the hinge member about a **separate, single axis of rotation** (the claimed "second axis of rotation"). Importantly, the

_____

[2] All emphases herein are added unless otherwise indicated.

11

two axes of rotation with respect to the three components are distinct, and are distinctly claimed. Accordingly, the district court correctly held that the term "[r]otatably attached / adapted to be rotatably attached / adapted to rotatably attach" as used in the claims indicated that "'rotatably attached' objects in the patent-in-suit are limited to a single axis of rotation." A0022-23.

Unlike the camera covered by the '343 Patent, AdjustaCam accused products do not rotate about a single axis of rotation. Instead, Sakar's products (the "Accused Ball-and-Socket Products") include a camera connected to a support frame via a **ball-and-socket joint**, which facilitates rotation about ***multiple axes***, not just a first and second axis of rotation, as claimed.

This constitutes substantial and material differences between the Accused Ball-and-Socket Camera Product of Sakar and the '343 Patent claims, as illustrated by the following photographs of the accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130):



A0307.  The nature of these ball-and-socket joints is that they allow for rotation for each of the parts of the camera product about **multiple axes**—the camera is able to spin and pivot about **multiple axes of rotation** with respect to the socket (**not just a single axis**), and the support frame is likewise able to spin and pivot about multiple axes of rotation with respect to the ball (**not just a single axis**). A0296-98.  Comparing the accused products to the claims and specification of the '343 Patent shows that **AdjustaCam's infringement allegations were baseless**.

Another key reason the '343 Patent claims do not read on the Accused Ball-and-Socket Products is the fact that, unlike the *three* distinct components claimed in the '343 Patent, Sakar's accused Ball-and-Socket Product has only *two* distinct components of importance to this case: (1) a camera; and (2) a support frame.  The use of a ball-and-socket joint between these two components eliminates the need for a third element—an intermediate hinge member—as claimed in the '343 Patent.  **A ball-and-socket camera is simply not an infringing product** to accuse of infringement given the precisely claimed three-part camera of the '343 Patent and its limited rotation capabilities.  Sakar's Accused Ball-and-Socket Product works in a fundamentally different and, arguably, more streamlined and elegant manner. Also, the *Markman* order conclusively established that such a configuration was outside the scope of the claims.

Because of its expressly claimed hinge member, the '343 Patent claims require that the camera and support frame each be able to independently rotate about only a single axis of rotation. *See* A0022 (district court explaining that "[t]he claims plainly describe *each* 'rotatably attached' object [i.e., the camera and support frame] as rotating about a single axis"). But in the Accused Ball-and-Socket Products, both the camera and support frame components can rotate about multiple axes with respect to each other. The mere fact that the cameras can be *both* twisted *and* tilted about the socket ends the infringement inquiry because it establishes rotation of the camera about multiple distinct axes.

Long before the district court's *Markman* Order, however, Sakar's Accused Ball-and-Socket Products were facially non-infringing—the ball-and-socket joints are prominent and plainly visible, and their functionality is plain. At the outset of this lawsuit no reasonable litigant could realistically have expected to avoid summary judgment. Yet even after the first Office Action rejection and the *Markman* Order cemented AdjustaCam's inability to prove infringement by Sakar's Accused Ball-and-Socket Product, AdjustaCam pressed on with the case in bad faith, and continued to extract settlements, including attempts to settle with Sakar.

At the deposition of Muskovitch (Adjustacam's patent expert) on August 24, 2012, he admitted that Sakar's camera did not infringe. (*See* the three admissions

14

below by Muskovitch.) Therefore, AdjustaCam's bad faith is evident. *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990) ("Where, as here, the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith.").

AdjustaCam's only defense of its baseless case is a hollow contention that its infringement allegations are consistent with the district court's constructions because "[w]hat Sakar alleges is a 'ball and socket joint' is actually a modified joint with a socket and no ball…because there is a channel that restricts movement." A0262.



A0262-63. According to AdjustaCam, "[t]his restricted movement results in two functionally independent joints which have ranges of movement independent of each other." *Id.* In other words, AdjustaCam's **nonsensical position** is that even though the camera can move in *two* different and distinct directions with respect to the support frame, the fact that a channel restricts that movement compared to a

channel-less camera means that somehow the Accused Ball-and-Socket Products are "limited to a *single* axis of rotation."   A0022-23.  Such frivolous arguments amount to bad faith.

The testimony of AdjustaCam's expert highlights the absurdity of this contention.  In Dr. Muskovitch's deposition, he explained that the various rotations are "separate" because "if I rotate it around to the center, there is nothing that forces it to move, to tilt or to sway to either side."  A0482-83; A0484 ("There is two axes, but they are separate.").  Even though the supposedly "constrained" ball-and-socket joint is capable of moving in multiple directions, as long as one only chooses to move the joint in a single direction at a time, Dr. Muskovitch concluded that the joint is "*limited* to a single axis of rotation."

While the presence of two axes of rotation for the camera would be sufficient to preclude infringement, Dr. Muskovitch in fact conceded that there are at least *three* different axis of rotation for cameras such as Sakar's Accused Ball-and-Socket Product: "This happens to be a constrained ball and socket joint.  So it can [1] spin about the axis, it can [2] move forward, it may be able to [3] move to the side."  A0485-87.  Significantly, Dr. Muskivitch, admitted three times during his deposition on cross-examination that Sakar's Kodak webcams with a ball and stem fixed to the camera DO NOT rotate about a single axis of rotation as required by asserted claims 1(a) and 19(a):

16

**1) First Admission**
A. Yes. The stem and the ball and the camera all are -- if you are
going to rotate it, they will all rotate together.
Q. Okay. So am I correct, would you be -- is it correct to say that the
Kodak camera does not rotate relative to the stem and ball because
they are fixed to each other?
A. That's correct. (Muskivitch Deposition, p.280, ll.4-12);
**2) Second Admission**
Q. Well, we have -- we have already talked about the relationship
between the camera and the stem and ball, and we have agreed earlier
-- or you agreed earlier that -- that in a Kodak webcam, there is no
rotational movement between the -- the camera and the ball and stem
that fits [are fixed] together. Do you remember that?
A. Yeah, sure, sure. (Id. at 308, ll.12-19); and
**3) Third Admission**
Q. Okay. But there is no relative movement between the ball and
stem, which are -- and the camera, which are fixed together,
correct?
A. I agree. Right. (Id. at 311, ll.14-17).

(A0297-98).

Based on the foregoing admissions by AdjustaCam's expert, there could

never have been any infringement by Sakar's Accused Ball-and-Socket Product.

AdjustaCam's argument that a garden-variety ball-and-socket joint can somehow

morph into, and be recharacterized as, two separate (single axis) joints is

manifestly unreasonable. Even a "constrained ball-and-socket joint," as contrived

by AdjustaCam, allows movement in **multiple axes** of rotation and is, therefore,

outside the reach of the '343 Patent's claims.

## IV.    AdjustaCam's Validity Arguments

Adjustacam also took frivolous positions in distinguishing the prior art cited

by the Examiner, such as Japanese Utility Model Publication No. H2-19997 to

Irifune ("Irifune"). This prior art discloses a camera rotatably attached to a hinge

member (mounting device (2)) via the threaded "camera attachment shaft (9)":



A1386, A1387, A1394.  AdjustaCam's expert took the indefensible position that

Irifune does not disclose a device that can be rotatably attached to a camera.

Specifically, Dr. Muskivitch reasoned that "[w]ith Irifune, the camera is not even

attached to the hinge member until fully tightened down using camera attachment

shaft (9) and camera attachment screws (10 and (11)." A1263.  Using an

exceedingly narrow definition of "attached" ("permanently fixed joined,

connected, or bound"), Dr. Muskivitch opined that Irifune did not meet the claim

requirements because "[o]nce the camera is attached to the fixed part 2, the camera

cannot rotate about a first axis relative to the hinge member." *Id.*  Put another

way, in Dr. Muskivitch's view, when the camera of Irifune is screwed all the way

18

onto the hinge member, the camera cannot be rotated, and if the camera is loosened to permit rotation, the camera is not attached. *Id.* ("[E]ven assuming for the sake of argument that with Irifune the camera is attached, it is not "rotatably attached.").

As early as August 12, 2011, in a reexamination proceeding regarding the '343 Patent, **the USPTO rejected the asserted claims as anticipated and/or obvious based on Irifune**. A1425; A1431-36; A1376-96 (English translation of Irifune). Like Dr. Muskivitch later did in the litigation, during the reexamination proceedings patent owner Global-Media argued that the camera of Irifune is not "rotatably attached" to the hinge member because the camera "is not attached to the hinge member until *fully screwed or threaded to the hinge member*." A1448. To make such an argument, Global-Media posited that the plain and ordinary meaning of attached is "permanently fixed, joined, connected, or bound." A1447. The examiner rejected this argument twice, correctly concluding that "it is clearly possible to loosen the attachment screw, to enable the pivoting of the camera relative to support (fixed part 2) while the camera is still attached to the support." A1508-10; A1476. After the third and final rejection based on Irifune, Global-Media cancelled all the asserted claims on September 20, 2012 which effectively ended the case. By that time, all the parties had settled, except two. A1515-19, A1460, A1465, A1469-74, A1493, A1502-06.

## V. AdjustaCam's Nuisance-Value Settlements and Demands

Sakar, like its co-defendants, was served with a lawsuit and was then approached by AdjustaCam to discuss settlement of the case. Nearly every defendant proceeded to settle for a dollar amount well under the cost to defend oneself against the infringement allegations, 20 out of 22 for less than ████. A1282 (AdjustaCam settlement agreement summary).

Just two months after filing this lawsuit in July 2010, AdjustaCam executed its first nuisance-value settlement with defendant Trippe Manufacturing in the amount of ████. A2182. Soon thereafter, AdjustaCam settled with defendants Klip Extreme, LLC and Software Brokers of America (D/B/A Intcomex) for ████, and a few months later AdjustaCam settled with defendants Phoebe Micro and jWIN for ████ and ████, respectively. *Id.* By the time AdjustaCam dismissed Sakar in 2012, AdjustaCam had entered into 20 out of 22 settlements for less than ████:

• Twelve defendants for ████ or less;

• Three defendants for an amount between ████;

• Five defendants for an amount between ████; and

A1282. All of the payments made by the various defendants are clearly only a small fraction of the cost of defense of a patent infringement lawsuit.

None of the settlement payments have any demonstrable tie to the defendants' potential exposure in the litigation. Yet AdjustaCam and its damages expert maintained that AdjustaCam's settlement agreements (and demands) were based on an established target royalty of $1.25-$1.50/unit. *See* A1195-97 ("In its licensing program for this litigation, AdjustaCam used this $1.25 - $1.50 per webcam royalty rate as a baseline for licensing the various defendants."); A1324 ("[T]he 14 lump-sum settlements were based on negotiations targeting a royalty of $1.25 to $1.50."); A1327-30. This assertion has no support in the record. For example, looking at the units sold by AdjustaCam's licensees, the effective royalty rate for 15 of the lump-sum settlement ranged from a minimum of ▇▇▇▇▇▇ to a maximum of ▇▇▇▇▇▇, with scattered data points in between:



Attachment 12

A1283-85.  Of those 15 settlements, not a single agreement included an effective royalty rate between $1.25 and $1.50 per unit for the defendant's known past sales figures.  *Id.*  Few were even close.

The alleged basis for the target royalty of $1.25-$1.50/unit was two settlement and license agreements entered into in 2001[3] by one of AdjustaCam's predecessors in interest, PAR Technologies, both of which included lump sum payments plus prospective running royalty components.  A1197; A1282; A1303-06.  One of these agreements had a tiered prospective royalty structure ranging from ▓▓▓▓▓▓▓▓▓ per unit as the number of units increased, and the other had a royalty structure of ▓▓▓▓▓ per unit that decreased to ▓▓▓▓▓ as the sales volume increased.  A0542-45; A0631.  From these two PAR Technologies agreements alone, to the exclusion of the more than twenty other licenses that do not support the proffered royalty rage, and without making any comparison of the PAR Technologies licenses to the facts of the case against Sakar, AdjustaCam and its expert took the unsupported position that "a royalty in the $1.25 to $1.50 frame" was an appropriate and consistent target for licensing discussions.  A1305-06.

Moreover, this supposed "target" royalty was essentially fixed in AdjustaCam's view, as it was determined with no regard for price of the accused

---

[3] The PAR Technologies agreements were therefore dated five years prior to the hypothetical negotiation date in this case.  *See* A0540 (indicating that the hypothetical negotiation date in this case was 2006).

products sold by the defendants, the cost of the patented clip feature in the accused products, or even the number of units sold. A1309-10 (characterizing $1.25 to $1.50 as the "intrinsic value of the patented feature" regardless of the sales price); A1311-12 (stating that the manufacturing cost of the patented camera clip is "not relevant" because "licensees have uniformly agreed to pay in the range of $1.25 to $1.50 per unit"); A1329-30 (explaining that a substantial increase in sales "wouldn't affect my analysis because the target had always been in the range of $1.25 to $1.50").

AdjustaCam also tried to paint its target royalty as an established royalty. A1201 ("AdjustaCam's settlement numbers were tied to a pre-established unit royalty of $1.25 - $1.50 per infringing device."). But AdjustaCam falls far short of the high standard for proving and established royalty because AdjustaCam did not show that the PAR Technologies licenses were of sufficient number and frequency "to establish a regular price for a license" and "reflect a general acquiescence in [the price's] reasonableness," that the royalty-establishing licenses were not settlements of threatened or actual litigation, and that the circumstances and rights of the licenses are comparable to those in the present lawsuit. *See, e.g., Rude v. Westcott*, 130 U.S. 152, 165 (1889); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). None of these factors are met in this case—the two PAR Technologies licenses were both settlements of litigation prior to this

case, and neither was shown by AdjustaCam to be in any way comparable to the dispute between AdjustaCam and Sakar other than the fact that both involve the '343 Patent.  A1196; A0631.

In attempt to manufacture some credibility for its "target royalty," six of AdjustaCam's litigation settlement agreements were drafted to include ██████████ ████████████████████████████████████████████████ once a certain threshold of sales was met beyond a fixed amount said to be covered by the lump-sum payment]].  A0545-49.  This self-serving provision was included by AdjustaCam knowing full well that none of those six defendants would sell enough products to ever pay a running royalty during the term of the patent.  A0558 (AdjustaCam's expert stating "I understand that AdjustaCam utilized this royalty structure because these licensees had a low volume of past sales it would be highly unlikely that total volume sales would exceed the units included in the lump-sum payment"); A1313-14 (AdjustaCam's expert admitting that none of the six licensees ever reached the maximum number of sales and had to pay a running royalty).  Conveniently, AdjustaCam set the meaninglessly high number of units threshold, when divided by the lump sum payment, to equate to an effective royalty for past sales of ██████████████████████████████.  A0631-33.  In reality, the parties to those six agreements, like every other settling defendant, paid nuisance value (between ██████████████████) to settle with AdjustaCam.  A631-33.

Thus, all of AdjustaCam's settlement licenses in reality reflect a **nuisance-value** lump sum payment, and AdjustaCam has no evidence that it ever approached any negotiations with an intention to obtain its alleged target royalty. Indeed, AdjustaCam's 30(b)(6) representative could not even verify that it was, at any time, aware of the number of units sold by any of the defendants with which it settled. A1337-38. Such information certainly does not appear in AdjustaCam's expert's report.

AdjustaCam also made multiple settlement demands to Sakar that reflected nuisance value settlements, and were untied to Sakar's sales of the accused cameras. However, Sakar refused all of AdjustaCam's settlement demands in 2011 and 2012 because the asserted claims of the '343 Patent were not infringed, invalid, and had been rejected by the U.S. Patent Office.

## SUMMARY OF THE ARGUMENT

AdjustaCam sued Sakar and its dozens of co-defendants solely for the improper purpose of seeking nuisance-value settlement payments. This patent lawsuit had nothing to do with any bona fide complaint of infringement. Sakar should not have to bear the burden and expense of such bad faith abuses of the patent system.

Twenty (20) out of twenty-two (22) of AdjustaCam's settlements were for less than ▮▮▮▮▮▮, which is a dollar amount constituting a small fraction of the

25

cost of defense. Yet AdjustaCam desperately twisted this nuisance-value evidence in attempt to justify an unsupportable $1.25 per unit royalty demand—a supposed "target royalty" that never really existed and was never used as a target by anybody in settlement discussions. In truth, the defendants universally paid off AdjustaCam because it was far cheaper than defending themselves, just as AdjustaCam intended.

Sakar refused to pay to make this case go away because AdjustaCam was abusively accusing products that did not, and **could not infringe** the patent-in-suit, and was merely using the high cost of litigation defense for settlement leverage. For justice to be done, somebody had to challenge AdjustaCam's baseless case and extortive business practices. Sakar accepted the task.

AdjustaCam's patent covers a camera that is claimed to rotate in a *single* axis of rotation. But it is undisputed that AdjustaCam accused products, including Sakar's, having ball-and-socket joints such that, by definition, the cameras can be rotated about *multiple* axes of rotation. This impossibility of infringement was apparent when the lawsuit was filed, but AdjustaCam pursued the case anyway because proving infringement was never the point of this lawsuit.

Even after the district court construed the claims decisively foreclosing AdjustaCam's effort to avoid the single-axis-of-rotation claim requirement, AdjustaCam pressed on undeterred as long as Sakar refused to accept

AdjustaCam's many nuisance-value settlement offers. Clearly AdjustaCam assumed that eventually Sakar would take the easy way out and just pay to make this case go away, but AdjustaCam guessed wrong.

Only after extensive and burdensome expert discovery solidified the long-known and fatal shortcomings of AdjustaCam's case, AdjustaCam simply walked away. Finally conceding that its shakedown efforts against Sakar were futile and that its infringement case was doomed, AdjustaCam dismissed its case with prejudice, thus avoiding having to back up its allegations in court of infringement.

To make matters worse, all Sakar's time and money (███████████ in attorneys' fees and expert fees) was wasted on defending this frivolous lawsuit even though AdjustaCam knew for nearly a year before Sakar was dismissed that Sakar's accused ball and socket product did not infringe.

Nuisance litigation like AdjustaCam's cannot be encouraged, nor can it be immunized from fee-shifting merely because AdjustaCam eventually dismissed the case. Although bad faith nuisance litigation is commonplace among today's patent litigants, litigants are presumed to litigate in good faith. Because AdjustaCam did not litigate in good faith, this case "stands out from the others" and is exceptional under *Octane Fitness*, and is also sufficiently egregious to warrant expert fee shifting. This Court should declare as much and remand the case to determine the amount of Sakar's recoverable fees.

## <u>STANDARD OF REVIEW</u>

The denial of a motion for attorneys' fees under 35 U.S.C. § 285 is reviewed for abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1747 (2014) ("[A]n appellate court should review all aspects of a district court's § 285 determination for abuse of discretion.").

A district court's decision not to award expert fees under its inherent authority is also reviewed for an abuse of discretion. *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921 (Fed. Cir. 2012).

"The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" Highmark, 134 S. Ct. at 1748 n. 2 (quoting *Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

## <u>ARGUMENT</u>

### I. The District Court Abused its Discretion by Not Finding This Case Exceptional and Egregious

The Supreme Court in its recent *Octane Fitness* decision explained that, under 35 U.S.C. § 285, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." 134 S. Ct. at 1756. "District courts may

determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* For particularly egregious cases, district courts also have the inherent authority to award expert fees. *MarcTec v. Johnson & Johnson,* 664 F.3d 907, 921 (Fed. Cir. 2012) (explaining that district courts should exercise this inherent authority in cases involving fraud or bad faith where "the very temple of justice has been defiled") (internal quotation marks omitted).

As noted above, the district court decided Sakar's motion **before** *Octane Fitness* relaxed the standard for finding a case "exceptional" under Section 285. In denying Sakar's motion, the district court recited and applied the then-applicable law under *Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005), stating that absent material inappropriate conduct in litigation, "an exceptional case may only be found if 'both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless.'" A0005.

Unlike under the *Brooks Furniture* standard relied on by the district court, the exceptionality standard now does not, for example, require proof of both objective baselessness and bad faith, require misconduct to be independently sanctionable, or require proof by clear and convincing evidence. *Octane Fitness*, 134 S. Ct. at 1757-58. Here, because the district court erred by denying Sakar's

29

motion under the strict *Brooks Furniture* standard, it certainly also erred under the far less burdensome *Octane Fitness* standard as well.

In denying Sakar's motion for attorneys' fees and expert fees, the district court misapprehended the evidence and the parties' contentions to reach a manifestly incorrect result. Under either the *Brooks Furniture* or *Octane Fitness* analytical framework, this "clearly erroneous assessment of the evidence" constitutes an abuse of discretion. *Highmark*, 134 S. Ct. at 1748 n. 2.

## A. <u>AdjustaCam Filed and Prosecuted This Case in Bad Faith</u>

According to the district court, "there is insufficient evidence that the action was brought in bad faith and for an improper purpose." A0006. In fact, the evidence of bad faith was overwhelming.

Not only did AdjustaCam pursue Sakar for two years on patent claims that were facially **not infringed by the Accused Ball-and-Socket Products**, but it pressed on with its case even after the Patent Office rejected the claims on August 12, 2011, and even after the *Markman* Order emphatically precluded any possible relief for AdjustaCam. *See infra.* All the while, AdjustaCam made Sakar spend considerable sums of money on discovery—including extensive expert discovery—defending against these baseless allegations. To make matters worse, all this time and money was wasted on a frivolous lawsuit even though AdjustaCam knew that Sakar's potential exposure was minimal. A1784; A1226;

30

A1362-63.

This bad faith behavior is easily understood when one looks at AdjustaCam's purpose in bringing its lawsuits—to extract **nuisance-value settlements**. Even the district court conceded that "the smaller settlements suggest this case was a settlement driven case." A0007. The merits of the cases had nothing to do with the filing and maintenance of the lawsuits. As long as AdjustaCam could convince its target defendants that it was cheaper, and made more business sense, to pay a small sum of money to make the case go away than to defend themselves, AdjustaCam would continue to collect its money without ever having to risk its patent and justify its positions in court. But AdjustaCam did not count on Sakar defending itself, and had no choice but to dismiss Sakar if it wanted to preserve its shakedown business.

However, Sakar was not dismissed until after the U.S. Patent Officefinally rejected AdjustaCam's claims on August 30, 2012.

### 1. *AdjustaCam Brought this Case for the Improper Purpose of Obtaining Nuisance-Value Settlements*

As explained above, the record shows that AdjustaCam's settlement agreements are all for nuisance value. *See supra* Statement of Facts, Part V. Twenty (20) out of twenty-two (22) defendants paid less than ▮▮▮▮ to settle.

None of AdjustaCam's post-hac efforts to align those nuisance-value agreements with its supposed damages calculations pass muster. *See supra* Statement of Facts, Part V. AdjustaCam's fabrication of an unsupportable and unused "target" royalty (e.g., A1195-96), as well as its illusory and never-paid "running royalty" components of six of its settlements (A0545-49; A0558; A1313-14; A0631-33), are no more than self-serving litigation-induced arguments. In reality, the effective royalties paid by Sakar's co-defendants were all over the map. A1283-85 (effective royalties ranging from ▮▮▮▮▮▮ per unit). Not even the two supposedly "foundational" PAR Technologies license agreements support a "target" (and, essentially, fixed) royalty of $1.25 to $1.50 per unit. A0542-45 (discussing royalty ranges from ▮▮▮▮▮▮; A0631.

AdjustaCam's settlements, as well as the settlement demands made to Sakar, are not reasonably tied to any prior comparable licenses or the potential infringement exposure of any party. The settlement payments are merely round

numbers set to encourage defendants not to fight the lawsuit on the merits due to the far greater expense involved in doing so. District courts cannot turn a blind eye to such **flagrant bad faith**.

As this Court has observed, "low settlement offers . . . effectively ensure[] that [the patentee's] baseless infringement allegations remained unexposed, allowing [the patentee] to continue to collect additional nuisance value settlements." *Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314, 1327 (Fed. Cir. 2011); *see also Am. Standard, Inc. v. York Int'l Corp.*, 244 F. Supp. 2d 990, 997 (W.D. Wis. 2002) (Bad faith litigation tactics "force defendants into settlement and away from their legitimate defenses."); *Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG, 2000 U.S. Dist. LEXIS 1186, at *10 (D. Conn. Jan. 18, 2000) (holding that the filing of many lawsuits seeking relatively small settlements "gives rise to a suspicion of *barratry* and *champerty*").

Here, AdjustaCam's settlement amounts are very small compared to the cost of defense, showing that AdjustaCam's desire is to obtain settlement revenue rather than actually pursue its targeted defendants in litigation. When Sakar, after nearly two years, still refused to pay to settle and remained determined to vindicate its positions in the litigation, AdjustaCam's response exposed its true purpose in suing Sakar. Instead of trying to prove Sakar's defenses wrong in court, AdjustaCam simply walked away from its case. Such an "overall vexatious

litigation strategy" that is wasteful of judicial resources evidences bad faith. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 726 F.3d 1359, 1367 (Fed. Cir. 2013).

Belated timing of dismissal can also evidence bad faith and justify fee shifting. In *Monolithic Power Systems*, the case was deemed exceptional in large part because the plaintiff "withdrew its claims and granted covenants not to sue after substantial litigation had taken place," "moving to dismiss only after [defendants] had completed their filings for the final pretrial conference, wasting the parties' and the court's resources." *Id.* Likewise, here AdjustaCam waited two years to dismiss Sakar, and did not actually dismiss Sakar until after Sakar had incurred considerable expense in attorney and expert fees. AdjustaCam cannot just lose interest and walk away with zero consequences after forcing Sakar to spend ██████ in attorneys' fees and expert fees to defend itself.

In *Ingenuity 13, LLC v. Doe*, copyright plaintiffs were found to have acted in bad faith and sanctioned for fees in circumstances largely identical to those in this case. No. 2:12-cv-8333-ODW, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013). First, the plaintiffs engaged in a strategy to file lawsuits against many defendants. *Id.* at *6-7. Due to "the high cost of litigation," "[m]ost defendants settled . . . , resulting in proceeds of millions of dollars due to the numerosity of defendants." *Id.* "For defendants that refused to settle, the Principals engaged in

vexatious litigation designed to coerce settlement. These lawsuits were filed using boilerplate complaints based on a modicum of evidence, calculated to maximize settlement profits by minimizing costs and effort." Importantly, like AdjustaCam, in *Ingenuity 13* "[t]he Principals have shown little desire to proceed in these lawsuits when faced with a determined defendant. Instead of litigating, they dismiss the case." *Id.* at *7.

Courts have acknowledged in various circumstances that it is fundamentally unfair for a plaintiff to force a defendant to endure the substantial burden and expense of litigation and then lose interest and walk away from the case without any consequences. *See Colombrito v. Kelly*, 764 F.2d 122, 134-35 (2d Cir. 1985) (noting that awarding fees would be appropriate "if a litigant had made a practice of repeatedly bringing potentially meritorious claims and then dismissing them with prejudice after inflicting substantial litigation costs on the opposing party and the judicial system"); *Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC, 2009 U.S. Dist. LEXIS 4546, at *12 (W.D. Wis. Jan. 21, 2009) ("Plaintiff cannot expect to subject defendant Rose to a year of litigation and walk away with no consequences."); *compare Monolithic Power Sys.*, 726 F.3d at 1367 (affirming award of fees, emphasizing that vexatious case was dismissed "after substantial litigation had taken place . . . wasting the parties' and the court's resources").

Section 285's exceptional case provision exists precisely to prevent "gross injustice to an alleged infringer." *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988). Shackling Sakar with considerable and unjustifiable litigation costs is exceptional and abusive.

## 2. Nuisance Litigation is Exceptional and Egregious

It is no secret that nuisance litigation brought by patent assertion entities is now fairly common and has become its own lucrative industry.  *See, e.g.,* Colleen V. Chien, *Patent Trolls by the Numbers*, Santa Clara University Studies Research Paper No. 08-13, *available at* http://ssrn.com/abstract=2233041 (March 13, 2013) (explaining that patent assertion entities file the majority patent lawsuits in the U.S., primarily targeting non-technology companies).

It would be a mistake, however, to conclude from this state of affairs that such litigation misconduct is not "exceptional" within the meaning of Section 285. *Octane Fitness* explained that "an 'exceptional' case is simply one that stands out from others" regarding weak merits positions or litigation misconduct.  134 S. Ct. at 1756.  But the Court certainly did not suggest, let alone hold, that courts should allow themselves to become desensitized to bad faith nuisance litigation just because it is commonplace.

Section 285 is supposed to be remedial—to correct for unfairness and injustice in a flexible, fact-specific manner.  *See Octane Fitness*, 134 S. Ct. at 1753, 1756 n.6; *see also Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1312-13 (Fed. Cir. 2013).  Neither Congress nor the Supreme Court was so cynical as to assume that patent litigation ordinarily involves bad faith and misconduct. The obvious assumption of Section 285 is that patent litigation will be brought and

conducted in good faith, and that a case is "exceptional" when it sufficiently deviates from this expectation of litigants. *Cf. Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 954 (Fed. Cir. 2010) ("[T]here is a presumption that an assertion of infringement of a duly granted patent is made in good faith.").

Moreover, using the court system to further AdjustaCam's extortive business practices is the kind of egregious bad faith that warrants shifting of expert fees. *MarcTec*, 664 F.3d at 921. Bad faith assertions of frivolous lawsuits unreasonably burden the litigation targets and the judicial system. Awarding expert fees is especially appropriate where a plaintiff's vexatious misconduct forces a defendant to incur those expert fees unnecessarily, as those fees are not compensable under Section 285. *Id.* at 921-22 (holding that expert fees were properly awarded because "Cordis was forced to incur expert witness expenses to rebut MarcTec's unreliable and irrelevant expert testimony," such that "MarcTec's vexatious conduct and bad faith increased the cost of litigation in ways that are not compensated under § 285"). Here, as in *MarcTec*, AdjustaCam's experts' testimony was fatally flawed and could not possibly have proven infringement or AdjustaCam's alleged damages. AdjustaCam only proceeded into expert discovery to apply more pressure to Sakar for a nuisance-value settlement. For Sakar to have to spend $19,589 on experts to rebut AdjustaCam's experts' baseless

38

allegations, on top of all the other misconduct and expense inflicted by AdjustaCam in seeking nuisance-value settlements, is a grave injustice that cannot be permitted. *Id.* at 921 (inherent authority should be exercised to shift expert fees where "the very temple of justice has been defiled").

Patent litigation is supposed to resolve legitimate disputes surrounding bona fide infringement allegations, not facilitate nuisance-value patent monetization campaigns. *See Eon-Net,* 653 F.3d at 1328 ("[T]he appetite for licensing revenue cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith.").  This Court should take this opportunity to clarify that litigation brought for the purposes of extorting nuisance-value settlements is exceptional will not be tolerated or immunized from fee-shifting simply because it is widespread.   And to the extent a nuisance litigation campaign cross into the expert discovery phase of a case, those expert expenses should not have to be borne by the defendants.

### 3.  *Nuisance Litigation Should be Discouraged*

Section 285 and *Octane Fitness* recognize that the specter of fee-shifting is intended to have a deterrent effect on bad faith litigation and misconduct.  134 S. Ct. at 1756 n.6 (reminding district courts of "the need in particular circumstances to advance considerations of compensation and deterrence").  That purpose would be frustrated if all one had to do to avoid any possible fee-shifting is dismiss its

case and avoid losing on the merits. AdjustaCam cannot avoid the expensive and wasteful consequences of its extortion tactics simply because it dismissed Sakar from the case. *See Kilopass*, 738 F.3d at 1317 ("[T]rial courts retain broad discretion to make findings of exceptionality under § 285 *in a wide variety of circumstances*.").

To be clear, a plaintiff's voluntary dismissal of a meritless case should be encouraged. But when a case is brought for reasons unrelated to the merits and to obtain nuisance-value settlements, as it was here, the incentive to dismiss must also include an incentive to dismiss at a meaningful time—i.e., before substantial expense and burden is inflicted on the defendant. This Court should clarify that Section 285 provides those incentives, and that such plaintiffs who pursue their cases for too long before dismissing will be viewed as acting in bad faith and will be ordered to pay a defendant's attorney's fees. And again, to the extent a nuisance litigation campaign cross into the expert discovery phase of a case, those expert expenses should not have to be borne by the defendants.

Using the United States judiciary to leverage nuisance-value settlements also reflects selfish opportunism and unreasonably burdens the courts. *See Artese*, 2000 U.S. Dist. LEXIS 1186 at *10-11 ("[I]t is not merely the prejudice and costs to the opposing party but also the effect upon the judicial system of such litigation. When we consider the numerous other cases commenced by this plaintiff . . . there has

been indeed a substantial burden on the judicial system."). Behavior that treats the judiciary as a pawn for nuisance-value settlement negotiations and makes courts waste considerable time and resources should be strongly discouraged.

By contrast, defendants like Sakar, who do not pay a patentee in a nuisance litigation simply to make a lawsuit go away, play an important role in the patent system. Such defendants insist that plaintiffs justify their positions and, when the plaintiffs cannot or will not do so, will vindicate their defenses in court. But for defendants like Sakar, abusive nuisance litigants would never be exposed because every case would settle and conceal the misconduct. Given the remedial nature of Section 285, Sakar and other similarly-situated defendants should not be discouraged from taking this more onerous and expensive course, helping to ensure that the patent system is not abused.

Absent a meaningful fee-shifting standard where fees are reasonably attainable, defendants are more likely to simply settle nuisance litigations because the financial downsides are overwhelming. If AdjustaCam's conduct is not deemed exceptional and egregious in this case, it will embolden nuisance litigants to continue their abusive conduct unchecked.

## B. The Accused Cameras Could Not Possibly Have Infringed

The district court agreed with AdjustaCam that the Accused Ball-and-Socket Products included constrained ball-and-socket joints that restricted movement to some extent. A0006. According to the district court, this constricted movement made it possible for AdjustaCam to prevail in proving infringement:

> [i]f the ball and socket joint truly restricts the range of movement such that it cannot rotate about multiple axes, the constrained ball and socket joint could meet the claim limitation which requires the hinge member being rotatably attached to the camera in a single axis of rotation. Since one could reasonably argue Defendants' products meet the "rotatably attached" limitation, AdjustaCam's infringement theories are not objectively baseless.

A0006. The problem is that the above-emphasized portion—the premise and *sine qua non* of the district court's conclusion—is not true and does not even reflect AdjustaCam's position. It is undisputed that the Accused Ball-and-Socket Products included cameras that were in fact capable of rotating about multiple axes with respect to the socket—they could be both twisted and tilted up and down.

AdjustaCam never argued that the constrained ball-and-socket joints were incapable of rotating about multiple axes—it merely posited that the different rotations were "separate." A0482-83 ("[I]f I rotate it around to the center, there is nothing that forces it to move, to tilt or to sway to either side."); A0484 ("There is two axes, but they are separate."); A0485-87 ("This happens to be a constrained

42

ball and socket joint.  So it can [1] spin about the axis, it can [2] move forward, it may be able to [3] move to the side.").

On this record, there is no question that the cameras of the Accused Ball-and-Socket Products were capable of rotating in at least two different and distinct directions with respect to the sockets, not merely rotating about the claimed and singular "first axis of rotation."  '343 Patent, Claim 1 ("*said camera*, when the hinge member is so attached, *rotating, about a first axis of rotation*, relative to said hinge member").  It was objectively baseless for AdjustaCam to contend that such cameras were "limited to a *single* axis of rotation."  A0022-23.  One could not reasonably argue otherwise.

Importantly, AdjustaCam was not advancing a theory of infringement under the doctrine of equivalents, and so its case hinged on proof of literal infringement. *See, e.g.,* A0996-97 and A1160-61 (AdjustaCam's expert report presenting only direct, literal infringement theory).

Long before the district court's *Markman* Order formally doomed AdjustaCam's case, the plain language of the claims, and especially in light of the specification, made clear that the Accused Ball-and-Socket Products could not possibly infringe.  A0022 ("The claims plainly describe each 'rotatably attached' object as rotating about a single axis."); A0021 ("Every reference to a 'rotatably attached' object in the specification and claims describes the attachment as

43

permitting motion over a single axis of rotation."). From the outset of this lawsuit, no reasonable plaintiff could have expected to succeed in proving infringement.

The situation would be somewhat different if AdjustaCam honestly did not know that infringement was impossible to prove at the outset of the case, but later discovered that it could not prevail. Here, such ignorance is implausible given the readily apparent functionality of the accused products and the simplicity of the patent and its claims. But even if AdjustaCam could legitimately plead ignorance, ignorance is no excuse to continue undeterred—for nearly five months, which included considerable and expensive expert discovery—after the district court's decisive *Markman* ruling in Sakar's favor. A0013-27 (April 10, 2012 *Markman* Order). Here, as in *MarcTec*, AdjustaCam "not only initiated a frivolous lawsuit, it persisted in advancing unfounded arguments that unnecessarily extended this litigation and caused [defendant] to incur needleless litigation expenses. This vexatious conduct is, by definition, litigation misconduct, and provides a separate and independent basis supporting the district court's determination that this case is exceptional." *MarcTec, LLC v. Johnson & Johnson,* 664 F.3d 907, at 920-21 (Fed. Cir. 2012).

## C. AdjustaCam's Validity Positions Were Frivolous

As explained above, AdjustaCam advanced the following frivolous argument in response to the clear anticipation of its claims by Irifune: "With

Irifune, the camera is not even attached to the hinge member until fully tightened down using camera attachment shaft (9) and camera attachment screws (10 and (11)." A1263. Using the exceedingly narrow definition of "attached" offered in the reexamination, AdjustaCam's expert Dr. Muskivitch opined that, "[o]nce the camera is attached to the fixed part 2, the camera cannot rotate about a first axis relative to the hinge member." *Id.*

These concocted arguments were objectively baseless for several reasons. First, AdjustaCam's illogical attempt to narrow the meaning of "rotatably attached" contradicts the claim language and the specification of the '343 Patent. If the camera disclosed in the '343 Patent was "permanently fixed to," or had to be fully tightened down to the hinge member, then the camera could not rotate about the first axis of rotation as the claims and specification require. Indeed, such arguments contradict AdjustaCam's own proposed construction of "rotatably attached" in this litigation ("connected such that the connected object is capable of being rotated"). A2813-14. The Irifune camera is certainly "capable of being rotated"—e.g., when it is partially unscrewed from the threaded camera attachment shaft on the hinge. AdjustaCam's argument that a camera is not rotatably attached to a hinge member unless it is "permanently fixed to" or fully tightened down to the hinge member also contradicts the district court's *Markman* Order because such a camera would not be capable of rotation about any axis. A0021 ("Every

45

reference to a 'rotatably attached' object in the specification and claims describes the attachment as permitting motion over a single axis of rotation.").   AdjustaCam could not reasonably expect to prevail against Sakar's invalidity arguments based on Irifune.

## II. AdjustaCam's Appeal Must be Dismissed for Lack of Subject Matter Jurisdiction

Consistent with AdjustaCam's bad faith overreaching and indifference to the merits of this litigation, AdjustaCam brought its own affirmative appeal to this Court where subject matter jurisdiction is indisputably lacking.  There is no legal support whatsoever for AdjustaCam's attempt to appeal a claim construction issue that it lost in the district court, made no effort to preserve for appeal, and expressly extinguished when it dismissed its case against Sakar with prejudice. This frivolous appeal only compounds the exceptionality of this case and causes Sakar to incur further needless legal expenses.

An "actual controversy must be extant at all stages of review, not merely at the time the complaint was filed." *Benitec Austl, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1345 (Fed. Cir. 2007) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974)).  "Subject matter jurisdiction is a threshold requirement for a court's power to exercise jurisdiction over a case, and no amount of 'prudential reasons' or perceived increases in efficiency, however sound, can empower a federal court to

hear a case where there is no extant case or controversy." *Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed. Cir. 2010).

AdjustaCam filed its notice of appeal seeking review of the district court's claim construction rulings.  A0193.  But by that time, Sakar had already been dismissed with prejudice from the case and given a covenant not to be sued in the future for infringement of the '343 Patent.  A1955-57; A0319-20; A0158.  The dismissal and covenant extinguished any ongoing disputes between AdjustaCam and Sakar concerning the infringement and validity of the '343 Patent.  Indeed, when dismissing Sakar, AdjustaCam even argued that its covenant divested the district court of subject matter jurisdiction over Sakar's declaratory judgment counterclaims, citing *Dow Jones*, 606 F.3d at 1348 and *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995).  A1955-57.  If there is no jurisdiction over Sakar's non-infringement and invalidity counterclaims due to a lack of an ongoing controversy, certainly there can be no jurisdiction over AdjustaCam's underlying infringement claims that were dismissed with prejudice.

This Court has often recognized its inability to reach claim construction issues that are not subject to an ongoing case or controversy. *See, e.g, SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1354 (Fed. Cir. 2012) ("[W]here, as here, a party's claim construction arguments do not affect the final judgment entered by the court, they are not reviewable. . . . Without a final judgment as to

the infringement or validity of these claims, the court's claim constructions that impact only these withdrawn claims are not properly before us."); *Jang v. Boston Sci. Corp.,* 532 F.3d 1330, 1336 (Fed. Cir. 2008) (resolving claim construction issues "that do not actually affect the infringement controversy between the parties" would result in impermissible advisory opinion because "[t]he Supreme Court has explicitly held that Article III does not permit the courts to resolve issues when it is not clear that the resolution of the question will resolve a concrete controversy between interested parties"); *see also NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282, 1311 (Fed. Cir. 2005).

Although AdjustaCam purports to appeal from the district court's final judgment, because that final judgment was in no way based on the claim construction ruling, but was instead based entirely on the mutual consent of the parties to end the case, this Court lacks subject matter jurisdiction to review the claim constructions.

This is not a case where the parties consented to a judgment of non-infringement based on the claim constructions to allow for appeal of the construction. *See, e.g., SanDisk*, 695 F.3d at 1353 ("SanDisk voluntarily withdrew the '893 and '808 patents and claims 1 and 10 of the '842 patent from this action, and it does not dispute that the district court never entered a stipulated judgment of

non-infringement with respect to these claims. Thus, these claims do not present a current infringement controversy before this court.").

Here, AdjustaCam made no effort whatsoever to preserve any challenges to the district court's claim constructions when it decided to dismiss its case against Sakar. Even in defending AdjustaCam's litigation positions and opposing Sakar's motion for attorneys' fees, AdjustaCam noted no disagreement with the district court's claim constructions. A0258-62; A0262 (arguing that "AdjustaCam's infringement positions are entirely consistent with the Court's construction").

This Court cannot hear AdjustaCam's appeal because it lacks subject matter jurisdiction over the challenges raised to the claim construction rulings by the district court. AdjustaCam's appeal must be dismissed.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, this case should be declared exceptional and egregious, and the case should be remanded for a determination of the amount of attorneys' fees and expert fees owed to Sakar.

Additionally, AdjustaCam's appeal should be dismissed for lack of subject matter jurisdiction.

Respectfully submitted,

Dated:  September 24, 2014          By:    /s/ Ezra Sutton

Ezra Sutton
EZRA SUTTON, P.A.
900 Route 9 North
Plaza 9, Suite 201
Woodbridge, NJ 07095
Telephone: (732) 634-3520

*Counsel for Defendant-Cross-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 24, 2014, copies of the foregoing Brief of Defendant-Cross-Appellant was served on counsel for Plaintiff-Appellant AdjustaCam, LLC via the Court's ECF system and via electronic mail upon the following:

> John J. Edmonds
> Collins, Edmonds, Pogorzelski, Schlather & Tower PLLC
> 1616 South Voss Road
> Houston, TX 77057
> Direct: 281-501-3425
> Email: jedmonds@cepiplaw.com


> /s/ Ezra Sutton
> Ezra Sutton
> *Counsel for Defendant-Cross-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the body of this brief, beginning with the Jurisdictional Statement on page 1, and ending with the last line of the conclusion on page 49, including headings, footnotes, and quotations, contains 10,175 words, in compliance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

/s/ Ezra Sutton
Ezra Sutton
*Counsel for Defendant-Cross-Appellant*

EXHIBIT 4

2013-1665, -1666, -1667

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ADJUSTACAM, LLC,

Plaintiff-Appellant,

v.

NEWEGG INC., NEWEGG.COM, INC., & ROSEWILL, INC.,

Defendants-Cross-Appellants

and

SAKAR INTERNATIONAL, INC.,

Defendant-Cross-Appellant

Appeals from the United States District Court for the Eastern District of Texas
in Case No. 10-CV-329, Chief Judge Leonard Davis

## NON-CONFIDENTIAL BRIEF OF DEFENDANTS-CROSS-APPELLANTS NEWEGG INC., NEWEGG.COM, INC., & ROSEWILL, INC.

Kent. E. Baldauf, Jr.
Daniel H. Brean
Anthony W. Brooks
THE WEBB LAW FIRM
One Gateway Center
420 Fort Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222
Telephone: (412) 471-8815

Edward R. Reines
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

Richard G. Frenkel
LATHAM & WATKINS
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 463-3080

Yar R. Chaikovsky
McDERMOTT, WILL &
EMERY
275 Middlefield Rd., Suite 100
Menlo Park, CA 94025
Telephone: (650) 815-7447

*Counsel for Defendants-Cross-Appellants Newegg, Inc.,
Newegg.com, Inc., and Rosewill, Inc.*

September 25, 2014

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Adjustacam v. Newegg, 2013-1665

<u>CERTIFICATE OF INTEREST FOR NEWEGG INC.</u>

Counsel for Newegg Inc. hereby certifies the following:

1.      The full name of every party or amicus represented by me is:

      Newegg Inc.; Newegg.com, Inc.; Rosewill, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      No publicly held company owns ten percent or more stock in Newegg Inc.; Newegg.com, Inc.; or Rosewill, Inc.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Kent E. Baldauf, Jr., The Webb Law Firm
      Daniel H. Brean, The Webb Law Firm
      Anthony W. Brooks, The Webb Law Firm
      Herbert A Yarbrough, III, Yarbrough & Wilcox, PLLC
      Debra Elaine Gunter, Yarbrough Wilcox, PLLC
      John N. Zarian, Parsons Behle & Latimer
      Robert A. Matson, Parsons Behle & Latimer
      Justin Neil Stewart, Parsons Behle & Latimer
      Dana M. Herberholz, Parsons Behle & Latimer

Christopher Cuneo, Parsons Behle & Latimer
Edward R. Reines, Weil Gotshal & Manges
Richard G. Frenkel, Latham & Watkins
Yar R. Chaikovsky, McDermott Will & Emery


Dated:  September 25, 2014         /s/ Kent E. Baldauf, Jr._____
                                   *Counsel for Defendants-Cross-Appellants*
                                   *Newegg, Inc. Newegg.com, Inc., and*
                                   *Rosewill, Inc.*

# **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES .......................................................... viii

JURISDICTIONAL STATEMENT.......................................................... 1

STATEMENT OF THE ISSUES.......................................................... 1

STATEMENT OF THE CASE .......................................................... 2

STATEMENT OF FACTS .......................................................... 6

   I.   Preliminary Statement .......................................................... 6
   II.   The Parties .......................................................... 8
   III.   AdjustaCam's Infringement Allegations .......................................................... 9
   IV.   AdjustaCam's Validity Arguments .......................................................... 17
   V.   AdjustaCam's Nuisance-Value Settlements and Demands .......................................................... 19

SUMMARY OF THE ARGUMENT .......................................................... 26

STANDARD OF REVIEW.......................................................... 29

ARGUMENT .......................................................... 30

   I.   The District Court Abused its Discretion by Not Finding This Case
      Exceptional and Egregious .......................................................... 30
      A.   AdjustaCam Filed and Prosecuted This Case in Bad Faith .......................................................... 32
         1.   AdjustaCam Brought this Case for the Improper Purpose of Obtaining
            Nuisance-Value Settlements .......................................................... 33
         2.   Nuisance Litigation is Exceptional and Egregious .......................................................... 38
         3.   Nuisance Litigation Should be Strongly Discouraged .......................................................... 41
      B.   The Accused Cameras Could Not Possibly Have Infringed .......................................................... 44
      C.   AdjustaCam's Validity Positions Were Frivolous .......................................................... 47
      D.   The District Court's Actions Cumulatively Reveal Its Abuse Of
         Discretion .......................................................... 48

   II.   AdjustaCam's Appeal Must be Dismissed for Lack of Subject Matter
      Jurisdiction.......................................................... 51

CONCLUSION .......................................................... 54

**<u>CONFIDENTIAL MATERIAL OMITTED</u>**

The material omitted on pages 2-3, 19-21, 23-24, 26, and 33 reflects the terms of settlement agreements that were designated as confidential by AdjustaCam, and are subject to a protective order entered by the district court.

## TABLE OF AUTHORITIES

### Cases

*Am. Standard, Inc. v. York Int'l Corp.*,
  244 F. Supp. 2d 990 (W.D. Wis. 2002)..................................................34

*Amsted Indus. v. Buckeye Steel Castings Co.*,
  23 F.3d 374 (Fed. Cir. 1994) ..............................................................30

*Artese v. Academy Collection Service*,
  No. 3:96-cv-2546-GLG, 2000 U.S. Dist. LEXIS 1186
  (D. Conn. Jan. 18, 2000)............................................................. 34, 42

*Benitec Austl, Ltd. v. Nucleonics, Inc.*,
  495 F.3d 1340 (Fed. Cir. 2007) ..........................................................51

*Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*,
  393 F.3d 1378 (Fed. Cir. 2005) ..........................................................31

*Colombrito v. Kelly*,
  764 F.2d 122 (2d Cir. 1985) ...............................................................36

*Cooter & Gell v. Hartmarx Corp.*,
  496 U.S. 384 (1990) ..................................................................... 30, 44

*Dow Jones & Co., Inc. v. Ablaise Ltd.*,
  606 F.3d 1338 (Fed. Cir. 2010) ..................................................... 51, 52

*Eltech Sys. Corp. v. PPG Indus., Inc.*,
  903 F.2d 805 (Fed. Cir. 1990) ............................................................15

*Eon-Net LP v. Flagstar Bancorp*,
  653 F.3d 1314 (Fed. Cir. 2011) ..................................................... 34, 40

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983) ..........................................................23

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  134 S. Ct. 1744 (2014) .................................................. 29, 30, 31, 44

*Ingenuity 13, LLC v. Doe*
  No. 2:12-cv-8333-ODW, 2013 U.S. Dist. LEXIS 64564
  (C.D. Cal. May 6, 2013) ......................................................................36

*Jang v. Boston Sci. Corp.*,
  532 F.3d 1330 (Fed. Cir. 2008) ...........................................................53

*Kelora Systems, LLC v. Target Corp. et al.*,
  No. 11-1548 (C.D. Cal.) .........................................................................6

*Kilopass Tech., Inc. v. Sidense Corp.*,
  738 F.3d 1302 (Fed. Cir. 2013) ..................................................... 39, 41

*MarcTec, LLC v. Johnson & Johnson*,
  664 F.3d 907 (Fed. Cir. 2012) .................................................... passim

*Mathis v. Spears*,
  857 F.2d 749 (Fed. Cir. 1988) ..............................................................37

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*,
  603 F.3d 943 (Fed. Cir. 2010) .............................................................39

*Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*,
  726 F.3d 1359 (Fed. Cir. 2013) ..................................................... 35, 37

*NTP, Inc. v. Research In Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005) ...........................................................53

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  134 S. Ct. 1749 (2014) ............................................ .................... passim

*Rude v. Westcott*,
  130 U.S. 152 (1889) .............................................................................23

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*,
  57 F.3d 1054 (Fed. Cir. 1995) .............................................................52

*SanDisk Corp. v. Kingston Tech. Co.*,
  695 F.3d 1348 (Fed. Cir. 2012) ..................................................... 52, 53

*Seismograph Svc. Corp. v. Offshore Ray-Dist, Inc.*,
  263 F.2d 5 (5th Cir. 1958) ...................................................................50

*Steffel v. Thompson*,
   415 U.S. 452 (1974) ............................................................51

*Upthegrove v. Health Prof'ls, LTD.*,
   No. 07-cv-0596-BBC, 2009 U.S. Dist. LEXIS 4546
   (W.D. Wis. Jan. 21, 2009) ................................................37

## **Statutes**

28 U.S.C. § 1295(a)(1) ........................................................1

28 U.S.C. § 2107(a) ............................................................1

28 U.S.C. § 1331 ................................................................1

28 U.S.C. § 1338(a) ............................................................1

35 U.S.C. § 285 .......................................................... passim

## **Rules**

Federal Rule of Appellate Procedure 4 ................................1

## <u>STATEMENT OF RELATED CASES</u>

No other appeal in or from this same civil action was previously before this Court or any other court of appeals.   Newegg Inc., Newegg.com, Inc., and Rosewill, Inc. (collectively, "Newegg" or "the Newegg Defendants") and their undersigned counsel are unaware of any other actions now pending in this or any other court that will directly affect or be directly affected by this Court's decision in the present appeal.

## JURISDICTIONAL STATEMENT

Newegg's Cross-Appeal:

The district court had original jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). Newegg filed a timely and proper notice of appeal under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

AdjustaCam's Appeal:

For reasons discussed below, this Court does *not* have subject matter jurisdiction over AdjustaCam's appeal and AdjustaCam's appeal must be dismissed.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred by failing to find this case exceptional and egregious to award Newegg its attorneys' fees and expert fees under 35 U.S.C. § 285 and its inherent authority, respectively, despite clear and unrebutted evidence showing that this lawsuit was meritless, and that it was filed and prosecuted to leverage the high cost and burden of litigation to coerce a nuisance-value settlement payment from Newegg.

2.      Whether this Court has subject matter jurisdiction over AdjustaCam's appeal, given that the case on the merits was mutually and voluntarily dismissed in its entirety, and no case or controversy remains between the parties.

1

CONFIDENTIAL MATERIAL OMITTED

## STATEMENT OF THE CASE

AdjustaCam, LLC ("AdjustaCam") brought this action in July 2010 against 59 defendants, including the Newegg Defendants, alleging that certain camera products sold by Newegg infringed United States Patent No. 5,855,343 ("the '343 Patent"), entitled "Camera Clip."  A0004.  The '343 Patent is owned by Global-Media Group, LLC, and AdjustaCam is the exclusive licensee of the patent.  A1789.

Immediately after filing suit, AdjustaCam began seeking to settle with the defendants for amounts far below the cost of defense.  All defendants other than the Newegg Defendants and Sakar International, Inc. ("Sakar") settled with AdjustaCam well before trial and were dismissed.  A0004.  Generally, each defendant paid [[███████████████]] and, in many cases, [[███████████]] as a settlement fee, and always as a round number.  A1282.

A *Markman* hearing was held on February 9, 2012 to construe various claim terms of the '343 Patent.  A0013.  Magistrate Judge Love issued a *Markman* order on April 10, 2012, which was subsequently adopted in full by Chief Judge Davis on June 7, 2012.  A0013-27; A0012 ("the *Markman* Order").

Among the terms addressed in the *Markman* Order was the term "[r]otatably attached / adapted to be rotatably attached / adapted to rotatably attach." A0020-23.  The parties disputed whether the term as used in the claims "allow[s] for a

CONFIDENTIAL MATERIAL OMITTED

'rotatably attached' object to rotate over more than a single axis." A0020. The district court agreed with the defendants, noting that "[t]he claims plainly describe each 'rotatably attached' object as rotating about a single axis." A0022.[1] The district court also explained that "[e]very reference to a 'rotatably attached' object in the specification and claims describes the attachment as permitting motion over a single axis of rotation." A0021. Although the term "did not require construction," the district court nonetheless resolved the claim interpretation dispute, holding that "'rotatably attached' objects in the patent-in-suit are limited to a single axis of rotation." A0022-23 (prohibiting the parties from contradicting the district court's resolution of the dispute as the case went forward).

    In the few months following the April 2012 *Markman* Order, AdjustaCam quickly proceeded to settle with and dismiss the few remaining defendants from the case. A1282; A0147-53. These companies generally paid AdjustaCam [[███████████████]] to be dismissed, which is consistent with the pre-*Markman* nuisance settlements—and again, always as a round number. A1282.

---

[1] As the district court explained (A0020), the claims of the '343 Patent referred consistently to a "rotatably attached" hinge member rotating in only one of two specific axes of rotation, depending on whether it was rotating with respect to the camera or the support frame. *See, e.g.,* Claim 1 ("a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, rotating, about a first axis of rotation, relative to said hinge member"); ("a support frame rotatably attached to said hinge member . . . said hinge member rotating about a second axis of rotation relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation").

3

On August 27, 2012, after considerable expert discovery was completed and the case was on the verge of summary judgment and *Daubert* proceedings, AdjustaCam filed a motion to dismiss its claims against the Newegg Defendants with prejudice. A2136-37. The motion also sought to dismiss the Newegg Defendants' invalidity and non-infringement declaratory judgment counterclaims for lack of subject matter jurisdiction, *with* prejudice, based on a covenant not to sue that extinguished the case or controversy with respect to the counterclaims. *Id*. According to AdjustaCam, the reason for its motion was that it had "recently resolved its claims against almost all of the remaining Defendants," including defendants whose products were sold by Newegg, such that "NewEgg/Rosewill is no longer selling unlicensed webcams manufactured by any other Defendant." A2137. Thus, AdjustaCam professed a "desire[] to simplify this case by focusing its claims going forward solely upon Defendant Sakar and Defendant Kohl's, which is accused of infringement solely on account of Sakar manufactured products. NewEgg/Rosewill's remaining damages exposure . . . is relatively *de minimis*, and is dwarfed by the damages exposure of Sakar." A2137-38.

Newegg opposed the motion to dismiss, arguing that its declaratory judgment counterclaims should not be dismissed *with* prejudice. A2093-95 (explaining that "the covenant not to sue offered by AdjustaCam lacks certain critical elements required to protect Newegg from charges of infringement by

4

AdjustaCam or its successors regarding future Newegg products"). AdjustaCam subsequently filed a new, unopposed motion that sought to dismiss its infringement claims with prejudice and Newegg's counterclaims without prejudice, which the district court granted. A1986-87; A155.

Newegg then filed a motion for attorneys' fees and expert fees, which was denied. A0156, A0160. Newegg also submitted an unopposed bill of costs in the amount of $8,492.66, but when the district court entered final judgment, the judgment did not reflect Newegg's unopposed costs, erroneously stating that "all costs are to be borne by the party that incurred them." A0199-200, A0001-03.

Newegg moved the district court to amend the erroneous judgment, A0199-200, but when the correction was not made before the appeal deadline Newegg filed a notice of appeal seeking review of the denial of its motion for attorneys' fees. A0160; A0195. AdjustaCam filed a separate notice of appeal the same day, seeking review of the district court's claim construction order. A0193. Although AdjustaCam's notice of appeal also referred to the district court's final judgment, that final judgment was not premised on any claim construction issues, nor did AdjustaCam seek a consent judgment incorporating the claim construction order as the basis for a judgment of non-infringement. Rather, the final judgment merely reflected the parties' agreed mutual dismissal of the case. A0001-03; A1986-87.

The appeals were docketed by this Court but then deactivated due to Newegg's pending motion to correct the judgment. Dkt. No. 17. When the district court had still not decided Newegg's motion to correct the judgment after six months, Newegg withdrew the motion, having been forced by the district court's extensive and unexplained delay in ruling on a simple clerical motion to forego recovering Newegg's costs to avoid further delay of this appeal.[2] A0162. This Court subsequently reactivated the appeal. Dkt. No. 20.

Meanwhile, after Newegg had withdrawn its motion to correct the judgment, and shortly before this appeal was reactivated, the Supreme Court decided *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), which relaxed the standard for finding a case "exceptional" under Section 285.

## STATEMENT OF FACTS

### I.   PRELIMINARY STATEMENT

Unable to squeeze a nuisance-value settlement payment from Newegg after more than two years of litigation, patent assertion entity AdjustaCam decided it

---

[2] Newegg believed that further delay would materially prejudice its ability to recover any amounts subsequently awarded against AdjustaCam because AdjustaCam is a shell entity that can quickly and easily be taken into bankruptcy and have its assets dispersed. Newegg has been prejudiced by such delay in the past. *See Kelora Systems, LLC v. Target Corp. et al.*, No. 11-1548 (C.D. Cal.) at ECF Nos. 543, 551 (Newegg's award of costs in the amount of $28,304.80 and subsequent mooting of motion to appoint receiver due to Kelora's bankruptcy).

would rather dismiss Newegg with prejudice than face the inevitability that this case would be resolved on the merits in Newegg's favor.

AdjustaCam never genuinely believed that Newegg infringed its patent, nor reasonably could it.  The '343 Patent covers adjustable cameras with very precisely defined axes of rotation that are facially absent from Newegg's accused products. Even after the district court emphatically rejected AdjustaCam's attempt to sidestep its patent's claim language, AdjustaCam pressed on with the case and made overreaching and unsupportable nuisance-value settlement demands. Finally, when summary judgment briefing was underway and trial was looming, AdjustaCam, having already obtained settlement payments from almost all other defendants, cut and ran to avoid putting its patents in jeopardy and thus preserve its shakedown business.

The filing and prosecution of this action by AdjustaCam was solely intended to extort nuisance-value settlement fees from defendants, not to resolve any legitimate claims of infringement or damages.  Baseless cases that abuse the judicial system for financial gain must be found exceptional and warrant fee shifting.

By the time Newegg filed its motion for fees, AdjustaCam had forced Newegg to spend more than $350,000 in attorneys' fees and expert fees to defend itself, not to mention the considerable additional expense of the present appeal.

A1793-94.[3]  Prevailing parties that are willing to contest meritless claims rather than succumb to the offer of a nuisance settlement serve as important safeguards for the system.  With the proliferation of mass patent litigation based on a business model of seeking quick, small nuisance settlements from many targets without a genuine intent to pursue the case to the merits, this safeguard is particularly important because such broadside abuses sour opinion leaders and the public on the patent system.   Yet, unless fees are shifted in cases such as this one, the decision to incur big expenses to defend meritless cases, rather than paying a tiny fraction to settle, become so unattractive that there will be even less resistance to this cynical but successful patent monetization approach.

## II.    THE PARTIES

AdjustaCam is an LLC that is exclusively in the business of patent litigation.  As a wholly-owned subsidiary of Acacia Research Group, LLC, its business follows the all-too-familiar model of using the burden and expense of patent litigation as leverage to extort settlement fees from defendants.  A1779.

Newegg is an online-only retailer that primarily sells computers, computer components and peripherals, and consumer electronics.  Newegg conducts its business primarily via www.newegg.com.  Rosewill is Newegg's private-label

---

[3] Approximately $60,000 of additional expert fees were invoiced to Newegg via the Parsons Behle firm.  Newegg seeks recovery of all its fees and expenses, including these additional expert fees and attorneys' fees incurred during and subsequent to its fee briefing before the district court.

brand for certain products.  Rosewill does not manufacture its products, but simply purchases and re-sells its products under its "Rosewill" brand name.

Many of AdjustaCam's target defendants in this case were successful online retailers like Amazon.com and Newegg, who simply purchased and re-sold the accused cameras, not manufacturers who actually made the accused cameras.

## III.    ADJUSTACAM'S INFRINGEMENT ALLEGATIONS

AdjustaCam is the exclusive licensee of United States Patent No. 5,855,343 ("the '343 Patent"), entitled "Camera Clip."   A1789.   The '343 Patent is generally directed to a camera clip that supports a camera when sitting on a flat surface or when attached to an object, such as a computer monitor:





'343 Patent, Figs. 1, 2, 4.  The clip allows the camera to rotate in two distinct directions about distinct axes of rotation.

First, as shown in Fig. 1, the camera can be rotated to pan side-to-side.  The specification explains: "[h]inge member 16 is rotatably attached to camera 12, where camera 12 rotates over a first axis 26 in a direction shown by arrow 28 relative to hinge member 16."  '343 Patent, at 4:17-19.  Second, as shown in Fig. 2, the camera can be tilted upward and downward.  The specification explains: "[h]inge member 16 rotates over a second axis 32 in the direction shown by arrow 34 relative to support frame 18.  First axis 26 is perpendicular to second axis 32."  '343 Patent, at 4:21-24.

These particular axes of rotation are expressly required by all independent claims in the '343 Patent.  *See, e.g.,* '343 Patent, Claim 1 ("a hinge member

10

adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, *rotating, about a first axis of rotation*, relative to said hinge member"); *id* ("a support frame rotatably attached to said hinge member . . . , said hinge member *rotating about a second axis of rotation* relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation").[4]

     To be clear, the camera products claimed in the '343 Patent require *three* distinct components of importance to this case: (1) a camera; (2) a hinge member; and (3) a support frame. While the camera product—including the hinge member—rotates about two axes, the camera of the '343 Patent *itself* only rotates about one axis; this is what is described, and this is what is claimed. This is evident from the claim language, which specifies that the *camera* is "rotatably attached" to the *hinge member* of the claimed apparatus such that the camera rotates about a single axis of rotation (the claimed "first axis of rotation"). Similarly, the *support frame* of the apparatus is itself "rotatably attached" to the *hinge member* such that the support frame rotates relative to the hinge member about a separate, single axis of rotation (the claimed "second axis of rotation"). Importantly, the two axes of rotation with respect to the three components are distinct, and are distinctly claimed. Accordingly, the district court correctly held that the term "[r]otatably

---

[4] All emphases herein are added unless otherwise indicated.

attached / adapted to be rotatably attached / adapted to rotatably attach" as used in the claims indicated that "'rotatably attached' objects in the patent-in-suit are limited to a single axis of rotation." A0022-23.

Unlike the camera covered by the '343 Patent, AdjustaCam accused products do not rotate about a single axis of rotation. Instead, these products (the "Accused Ball-and-Socket Products") include a camera having a ball connected to a support frame having a socket, the two components being connected via a ball-and-socket joint, which facilitates rotation about *multiple axes*.

This constitutes substantial and material differences between the Accused Ball-and-Socket Products and the '343 Patent claims, as illustrated by the following photographs of the accused Rosewill RCM-8163 (below left) and Hercules Classic (below right) webcams, which are representative of the Accused Ball-and-Socket Products:



A1786; *see also* A1755-75.  The nature of these ball-and-socket joints is that they allow for rotation for each of the parts of the camera product about multiple axes—the camera is able to spin and pivot about multiple axes of rotation with respect to the socket (not just a single axis), and the support frame is likewise able to spin and pivot about multiple axes of rotation with respect to the ball (not just a single axis). A1755-75.  Comparing the accused products to the claims and specification of the '343 Patent clearly shows that AdjustaCam's infringement allegations were baseless.  A young child could see and understand the difference.

Another key reason the '343 Patent claims do not map to the Accused Ball-and-Socket Products is the fact that, unlike the *three* distinct components claimed in the '343 Patent, the Accused Ball-and-Socket Products have only *two* distinct components of importance to this case: (1) a camera having a ball; and (2) a support frame having a socket.  The use of a ball-and-socket joint between these two components eliminates the need for a third element—an intermediate hinge member—as claimed in the '343 Patent.  A ball-and-socket camera is simply an inapt product to accuse of infringement given the precisely claimed three-part camera of the '343 Patent and its limited rotation capabilities.  The Accused Ball-and-Socket Products work in a fundamentally different and, arguably, more streamlined and elegant, manner.

Because of its expressly claimed hinge member, the '343 Patent claims require that the camera and support frame each be able to independently rotate about only a single axis of rotation. *See* A0022 (district court explaining that "[t]he claims plainly describe *each* 'rotatably attached' object [i.e., the camera and support frame] as rotating about a single axis"). But in the Accused Ball-and-Socket Products, both the camera and support frame components can rotate about multiple axes with respect to each other. The mere fact that the cameras can be *both* twisted *and* tilted about the socket ends the infringement inquiry because it establishes rotation of the camera about at least two distinct axes. The *Markman* order conclusively established that such a configuration was outside the scope of the claims of the '343 Patent.

Long before the district court's *Markman* Order, however, the Accused Ball-and-Socket Products were facially non-infringing—the ball-and-socket joints are prominent and plainly visible, and their functionality is plain. At the outset of this lawsuit no reasonable litigant could realistically have expected to avoid summary judgment. Yet even after the *Markman* Order cemented AdjustaCam's inability to prove infringement by the Accused Ball-and-Socket Products, AdjustaCam pressed on with the case in hopes of recovering a nuisance settlement.

After the *Markman* Order, AdjustaCam served the expert report of John C. Muskivitch who—despite the district court's clarification that "rotatably attached"

objects are "limited to a single axis of rotation"—opined that the Accused Ball-and-Socket Products included a hinge member "adapted to be rotatably attached to the camera." *See generally* A1253-60.   By continuing to press its frivolous infringement arguments, and by forcing Newegg to retain a testifying expert to respond to such arguments, AdjustaCam's bad faith is evident. *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990) ("Where, as here, the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, and inference is proper of bad faith.").

AdjustaCam's only defense of its baseless case is a hollow contention that its infringement allegations are consistent with the district court's constructions because "what Newegg/Rosewill allege is a ball and socket joint is actually a modified ball and socket joint . . . because there is a channel that restricts movement." A1194.

 

A1194-95.   According to AdjustaCam, "[t]his restricted movement results in two functionally independent joints which have ranges of movement independent of each other." *Id.*   In other words, AdjustaCam's nonsensical position is that even

though the camera can move in *two* different and distinct directions with respect to the support frame, the fact that a channel restricts that movement compared to a channel-less camera means that somehow the Accused Ball-and-Socket Products are "limited to a *single* axis of rotation."  A0022-23.

The testimony of AdjustaCam's expert highlights the absurdity of this contention.  In Dr. Muskovitch's deposition, he explained that the various rotations are "separate" because "if I rotate it around to the center, there is nothing that forces it to move, to tilt or to sway to either side."  A0482-83; A0484 ("There is two axes, but they are separate.").  Even though the supposedly "constrained" ball-and-socket joint enables the camera to rotate in multiple directions, as long as one only chooses to rotate the camera in only a single direction at a time, Dr. Muskovitch concluded that the joint is "*limited* to a single axis of rotation."   The '343 Patent claims do not permit this baseless theory, which is akin to arguing that an airplane is merely a car unless and until it is actually in flight.

While the presence of two axes of rotation for the camera would be sufficient to preclude infringement, Dr. Muskovitch in fact conceded that there are at least *three* different axis of rotation for the camera in each Accused Ball-and-Socket Product: "This happens to be a constrained ball and socket joint.  So [the camera] can [1] spin about the axis, it can [2] move forward, it may be able to [3] move to the side."  A0485-87.

16

Based on the foregoing, there could never have been any infringement by the Accused Ball-and-Socket Products. AdjustaCam's argument that a garden-variety ball-and-socket joint can somehow morph into, and be recharacterized as, two separate (single axis) joints is manifestly unreasonable. Even a "constrained ball-and-socket joint," as contrived by AdjustaCam, allows movement in multiple axes of rotation and is, therefore, outside the reach of the '343 Patent's claims.

## IV.   ADJUSTACAM'S VALIDITY ARGUMENTS

Adjustacam also took frivolous positions in distinguishing prior art, such as Japanese Utility Model Publication No. H2-19997 to Irifune ("Irifune"). This prior art discloses a camera rotatably attached to a hinge member (mounting device (2)) via the threaded "camera attachment shaft (9)":



A1386, A1387, A1394. AdjustaCam's expert took the indefensible position that Irifune does not disclose a device that can be rotatably attached to a camera. Specifically, Dr. Muskivitch reasoned that "[w]ith Irifune, the camera is not even attached to the hinge member until fully tightened down using camera attachment

17

shaft (9) and camera attachment screws (10 and (11)." A1263.   Using an exceedingly narrow definition of "attached" ("permanently fixed joined, connected, or bound"), Dr. Muskivitch opined that Irifune did not meet the claim requirements because "[o]nce the camera is attached to the fixed part 2, the camera cannot rotate about a first axis relative to the hinge member." *Id.*   Put another way, in Dr. Muskivitch's view, when the camera of Irifune is screwed all the way onto the hinge member, the camera cannot be rotated, and if the camera is loosened to permit rotation, the camera is not attached.  *Id.* ("[E]ven assuming for the sake of argument that with Irifune the camera is attached, it is not "rotatably attached.").

As early as August 12, 2011, in a reexamination proceeding regarding the '343 Patent, the USPTO rejected the asserted claims as anticipated and/or obvious based on Irifune.  A1425; A1431-36; A1376-96 (English translation of Irifune). Like Dr. Muskivitch later did in the litigation, during the reexamination proceedings patent owner Global-Media argued that the camera of Irifune is not "rotatably attached" to the hinge member because the camera "is not attached to the hinge member until *fully screwed or threaded to the hinge member*." A1448. To make such an argument, Global-Media posited that the plain and ordinary meaning of attached is "permanently fixed, joined, connected, or bound." A1447. The examiner rejected this argument twice, correctly concluding that "it is clearly possible to loosen the attachment screw, to enable the pivoting of the camera

CONFIDENTIAL MATERIAL OMITTED

relative to support (fixed part 2) while the camera is still attached to the support." A1508-10; A1476.   After the third rejection based on Irifune, Global-Media cancelled all the asserted claims on September 20, 2012.   A1515-19, A1460, A1465, A1469-74, A1493, A1502-06.

## V.    ADJUSTACAM'S NUISANCE-VALUE SETTLEMENTS AND DEMANDS

Newegg, like its co-defendants, was served with a lawsuit and then approached by AdjustaCam to discuss settlement of the case.   Nearly every defendant proceeded to settle for a dollar amount well under the cost to defend oneself against the infringement allegations, most for less than [[          ]].  A1282 (AdjustaCam settlement agreement summary).

Just two months after filing this lawsuit in July 2010, AdjustaCam executed its first nuisance-value settlement with defendant Trippe Manufacturing in the amount of [[          ]].   A2182.   Soon thereafter, AdjustaCam settled with defendants Klip Extreme, LLC and Software Brokers of America (D/B/A Intcomex) for [[          ]], and a few months later AdjustaCam settled with defendants Phoebe Micro and jWIN for [[          ]] and [[          ]], respectively. *Id.*  By the time AdjustaCam dismissed Newegg in 2012, AdjustaCam had settled with at least:

- Twelve defendants for [[          ]] or less;
- Three defendants for an amount between [[                    ]];

19

CONFIDENTIAL MATERIAL OMITTED

• Five defendants for an amount between [[ ██████████████ ]]; and

• Two defendants for an amount between [[ ██████████████ ]].

A1282.  All of the payments made by the various defendants are facially a small fraction of the cost of defense of a patent infringement lawsuit.

None of the settlement payments have any demonstrable tie to the defendants' potential exposure in the litigation.  Yet AdjustaCam and its damages expert maintained that AdjustaCam's settlement agreements (and demands) were based on an established target royalty of $1.25-$1.50/unit. *See* A1195-97 ("In its licensing program for this litigation, AdjustaCam used this $1.25 - $1.50 per webcam royalty rate as a baseline for licensing the various defendants."); A1324 ("[T]he 14 lump-sum settlements were based on negotiations targeting a royalty of $1.25 to $1.50."); A1327-30.  This assertion has no support in the record. For example, looking at the units sold by AdjustaCam's licensees, the effective royalty rate for 15 of the lump-sum settlement ranged from a minimum of [[ ████████ ]] to a maximum of [[ ████████ ]], with scattered data points in between:

CONFIDENTIAL MATERIAL OMITTED

**Attachment 12**
**Implied Royalty Rates**

[[  ]]

A1283-85.  Of those 15 settlements, not a single agreement included an effective

royalty rate between $1.25 and $1.50 per unit for the defendant's known past sales

figures.  *Id.*  Few were even close.

The alleged basis for the target royalty of $1.25-$1.50/unit was two

settlement and license agreements entered into in 2001[5] by one of AdjustaCam's

predecessors in interest, PAR Technologies, both of which included lump sum

payments plus prospective running royalty components.  A1197; A1282; A1303-

06.  One of these agreements had a tiered prospective royalty structure ranging

from [[          ]] per unit as the number of units increased, and the other had

a royalty structure of [[      ]] per unit that decreased to [[    ]] as the sales

---

[5] The PAR Technologies agreements were therefore dated five years prior to the
hypothetical negotiation date in this case.  *See* A0540 (indicating that the
hypothetical negotiation date in this case was 2006).

21

volume increased.  A0542-45; A0631.  From these two PAR Technologies agreements alone, to the exclusion of the more than a dozen other licenses that do not support the proffered royalty rage, and without making any comparison of the PAR Technologies licenses to the facts of the case against Newegg, AdjustaCam and its expert took the position that "a royalty in the $1.25 to $1.50 frame" was an appropriate and consistent target for licensing discussions.  A1305-06.

Moreover, this supposed "target" royalty was essentially fixed in AdjustaCam's view, as it was determined with no regard for price of the accused products sold by the defendants, the cost of the patented clip feature in the accused products, or even the number of units sold.  A1309-10 (characterizing $1.25 to $1.50 as the "intrinsic value of the patented feature" regardless of the sales price); A1311-12 (stating that the manufacturing cost of the patented camera clip is "not relevant" because "licensees have uniformly agreed to pay in the range of $1.25 to $1.50 per unit"); A1329-30 (explaining that a substantial increase in sales "wouldn't affect my analysis because the target had always been in the range of $1.25 to $1.50").

AdjustaCam also tried to paint its target royalty as an established royalty. A1201 ("AdjustaCam's settlement numbers were tied to a pre-established unit royalty of $1.25 - $1.50 per infringing device.").  But AdjustaCam falls far short of the high standard for proving and established royalty because AdjustaCam did not

CONFIDENTIAL MATERIAL OMITTED

show that the PAR Technologies licenses were of sufficient number and frequency "to establish a regular price for a license" and "reflect a general acquiescence in [the price's] reasonableness," that the royalty-establishing licenses were not settlements of threatened or actual litigation, and that the circumstances and rights of the licenses are comparable to those in the present lawsuit. *See, e.g., Rude v. Westcott*, 130 U.S. 152, 165 (1889); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). None of these factors are met in this case—the two PAR Technologies licenses were both settlements of litigation and neither was shown by AdjustaCam to be in any way comparable to the dispute between AdjustaCam and Newegg other than the fact that both involve the '343 Patent. A1196; A0631.

In attempt to manufacture some credibility for its "target royalty," six of AdjustaCam's litigation settlement agreements were drafted to include [[ ███████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████ ]]. A0545-49. This self-serving provision was included by AdjustaCam knowing full well that none of those six defendants would sell enough products to ever pay a running royalty during the term of the patent. A0558 (AdjustaCam's expert stating "I understand that AdjustaCam utilized this royalty structure because these licensees had a low volume of past sales it would be highly unlikely that total

CONFIDENTIAL MATERIAL OMITTED

volume sales would exceed the units included in the lump-sum payment"); A1313-14 (AdjustaCam's expert admitting that none of the six licensees ever reached the maximum number of sales and had to pay a running royalty). Conveniently, AdjustaCam set the meaninglessly high number of units threshold, when divided by the lump sum payment, to equate to an effective royalty for past sales of [[███████████████████]]. A0631-33. In reality, the parties to those six agreements, like every other settling defendant, paid nuisance value (between [[███████████████]]) to settle with AdjustaCam. A631-33. This effort by AdjustaCam to conceal the true nature of its agreements evidences its deceptive intent and bad faith.

Thus, all of AdjustaCam's settlement licenses in reality reflect a nuisance-value lump sum payment, and AdjustaCam has no evidence that it ever approached any negotiations with an intention to obtain its alleged target royalty. Indeed, AdjustaCam's 30(b)(6) representative could not even verify that it was, at any time, aware of the number of units sold by any of the defendants with which it settled. A1337-38. Such information certainly does not appear in AdjustaCam's expert's report.

AdjustaCam also made multiple settlement offers to Newegg that reflect a nuisance value and were untied to Newegg's sales of the accused cameras. By the time of a November 9, 2011 mediation, Newegg had confirmed sales of 14,499

units of the accused Rosewill products for total revenues of $63,760 and sales of 5,904 units of other accused products—the majority of which were supplied to Newegg by other named defendants—for total revenues of $33,379.   A1784; A1226; A1362-63.   Despite claiming entitlement to a minimum per-unit royalty between $1.25 and $1.50, AdjustaCam demanded $75,000—nearly three times its "target" per-unit royalty and more than 75% of Newegg's total revenue from sales of the accused products.   A1226; A1362-63.

After mediation and before eventually dismissing Newegg, AdjustaCam made two additional nuisance-value settlement demands. In March 2012, after many of the accused Newegg products had been the subject of settlements between AdjustaCam and Newegg's suppliers, AdjustaCam demanded $65,000 to settle the case. A1227.   Then, on July 11, 2012, less than two weeks after serving a report from its damages expert, AdjustaCam demanded more than $50,000 to settle. A1227; A1365.   This reduced demand was still nearly three times the amount calculated by AdjustaCam's own expert.   A1244-45 (calculating damages as to Newegg at $17,928—i.e., $1.25 x 14,342 units).   In fact, AdjustaCam's expert admitted that this final demand, effectively more than $3.50 per unit, would be decidedly unreasonable.   A1331 ("Q. Do you believe a per-unit royalty for Newegg of $3 or more than $3 would be reasonable?  A. No.").

CONFIDENTIAL MATERIAL OMITTED

## SUMMARY OF THE ARGUMENT

AdjustaCam sued Newegg and dozens of other targets for the improper purpose of seeking nuisance-value settlement payments.  This patent lawsuit had nothing to do with any bona fide complaint of infringement.  Newegg should be reimbursed for its expenses contesting this meritless case.

Every agreement AdjustaCam obtained for its patent was for a dollar amount constituting a small fraction of the cost of defense, the majority for [[███████]] or less, and always as a round number.  Yet AdjustaCam desperately twisted this nuisance-value evidence in attempt to justify an unsupportable $1.25 per unit royalty demand—a supposed "target royalty" that never really existed and was never used as a target by anybody in settlement discussions.  In truth, the defendants universally paid off AdjustaCam because it was far cheaper than defending themselves, just as AdjustaCam intended.

Newegg refused to pay to make this case go away because AdjustaCam was abusively accusing products that did not, and could not, infringe the patent-in-suit, and was merely using the high cost of litigation defense to leverage nuisance settlements.  For justice to be done, somebody had to challenge AdjustaCam's baseless case and extortive patent litigation practices.  Newegg accepted the task, and took on the expense of defending against AdjustaCam's nuisance litigation campaign.

26

AdjustaCam's patent covers a camera that is claimed to rotate in a *single* axis of rotation.  But it is undisputed that AdjustaCam accused products having ball-and-socket joints such that, by definition, the cameras can be rotated about *multiple* axes of rotation.  This impossibility of infringement was apparent when the lawsuit was filed, but AdjustaCam pursued the case anyway because proving infringement was never the point of this lawsuit.

Even after the district court construed the claims decisively foreclosing AdjustaCam's effort to avoid the single-axis-of-rotation claim requirement, AdjustaCam pressed on undeterred as long as Newegg refused to accept AdjustaCam's many nuisance-value settlement offers.   Clearly AdjustaCam assumed that eventually Newegg would take the easy way out and just pay to make this case go away, but AdjustaCam was wrong.

After extensive and burdensome expert discovery solidified the long-known and fatal shortcomings of AdjustaCam's case, AdjustaCam simply walked away. Finally conceding that its shakedown efforts against Newegg were futile and that its infringement case was doomed, AdjustaCam dismissed its case with prejudice, thus avoiding having to back up its allegations in court and put its patent in jeopardy.

To make matters worse, all Newegg's time and money (totaling more than $350,000 in attorneys' fees and expert fees at the time of Newegg's fee motion,

plus the considerable additional expenses of this appeal) was wasted on defending this frivolous lawsuit even though AdjustaCam knew for nearly a year before Newegg was dismissed that Newegg's potential exposure was truly *de minimis.* Newegg initially confirmed accused sales of less than $100,000, and that figure decreased over time as AdjustaCam' licensed Newegg's suppliers to a figure less than $20,000.

Unlike its many of co-defendants who settled with AdjustaCam and further funded AdjustaCam's nuisance litigation campaign against remaining defendants, Newegg took the expensive path and defended against the baseless and bad faith infringement assertions. Companies that are willing to help weed out bad actors by challenging their frivolous patent assertions should not be left to bear their litigation expenses without some reasonable and fair prospect of being made whole for having to endure such injustice. The protection of Section 285 is a critical safeguard to protect the system against the type of cynical, nuisance patent litigation that has given patents a bad name in some quarters. The business model of using meritless patent claims to extract nuisance payments from a broad cross-section of small businesses is, by design, normally kept out of this Court's view. Without a faithful application of fee shifting in this type of case, the sharp practices on display here will stay in the shadows rather than being exposed in the disinfectant of the light. And companies such as Newegg would have that much

less incentive to contest nuisance-settlement claims, even when fighting such claims appears to many to be economically irrational and distracting.

Nuisance litigation like AdjustaCam's cannot be encouraged, nor can it be immunized from fee-shifting merely because AdjustaCam eventually dismissed the case.  Although bad faith nuisance litigation is commonplace among today's patent litigants, litigants are required to litigate in good faith.  Because AdjustaCam did not litigate in good faith, this case "stands out from the others" and is exceptional under *Octane Fitness*, and is also sufficiently egregious to warrant expert fee shifting.  This Court should declare as much and order the payment by AdjustaCam of Newegg's recoverable fees.

## STANDARD OF REVIEW

The denial of a motion for attorneys' fees under 35 U.S.C. § 285 is reviewed for abuse of discretion.  *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1747 (2014) ("[A]n appellate court should review all aspects of a district court's § 285 determination for abuse of discretion.").

A district court's decision not to award expert fees under its inherent authority is also reviewed for an abuse of discretion.  *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921 (Fed. Cir. 2012).

"The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would

necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'"  Highmark, 134 S. Ct. at 1748 n. 2 (quoting *Cooter & Gell* v. *Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

## ARGUMENT

### I. THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT FINDING THIS CASE EXCEPTIONAL AND EGREGIOUS

The Supreme Court in its recent *Octane Fitness* decision explained that, under the 35 U.S.C. § 285, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  134 S. Ct. at 1756.  "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."  *Id.*

While Section 285 allows for shifting of attorneys' fees, for egregious cases, such as those involving an abuse of the judicial process, district courts also have the inherent authority to award expert fees.  *MarcTec,* 664 F.3d at 921 (explaining that district courts should exercise this inherent authority in cases involving fraud or bad faith where "the very temple of justice has been defiled") (internal quotation marks omitted); *Amsted Indus. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378 (Fed. Cir. 1994) (explaining that "abuse of the judicial process" justifies shifting expert fees).

30

As noted above, the district court decided Newegg's motion before *Octane Fitness* relaxed the standard for finding a case "exceptional" under Section 285.  In denying Newegg's motion, the district court recited and applied the then-applicable law under *Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005), stating that absent material inappropriate conduct in litigation, "an exceptional case may only be found if 'both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless.'"  A0005.

Unlike under the *Brooks Furniture* standard relied on by the district court, the exceptionality standard now does not, for example, require proof of both objective baselessness and bad faith, require misconduct to be independently sanctionable, or require proof by clear and convincing evidence.  *Octane Fitness*, 134 S. Ct. at 1757-58.  Here, because the district court erred by denying Newegg's motion under the strict *Brooks Furniture* standard, it certainly also erred under the far less burdensome *Octane Fitness* standard as well.

In denying Newegg's motion for attorneys' fees and expert fees, the district court misapprehended the evidence and the parties' contentions to reach a manifestly incorrect result.  Under either the *Brooks Furniture* or *Octane Fitness* analytical framework, this "clearly erroneous assessment of the evidence" constitutes an abuse of discretion.  *Highmark*, 134 S. Ct. at 1748 n. 2.

A.    AdjustaCam Filed and Prosecuted This Case in Bad Faith

According to the district court, "there is insufficient evidence that the action was brought in bad faith and for an improper purpose." A0006. In fact, the evidence of bad faith was overwhelming.

Not only did AdjustaCam pursue Newegg for two years on patent claims that were facially not infringed by the Accused Ball-and-Socket Products, but it pressed on with its case even after the *Markman* Order emphatically precluded any possible relief for AdjustaCam. *See infra.* All the while, AdjustaCam made Newegg spend considerable sums of money on discovery—including extensive expert discovery—defending against these baseless allegations. To make matters worse, all this time and money was wasted on a frivolous lawsuit even though AdjustaCam knew that Newegg's potential exposure was minimal. A1784; A1226; A1362-63.

This bad faith behavior is easily understood when one looks at AdjustaCam's purpose in bringing its lawsuits—to extract nuisance-value settlements. Even the district court conceded that "the smaller settlements suggest this case was a settlement driven case." A0007. The merits of the cases had nothing to do with the filing and maintenance of the lawsuits. As long as AdjustaCam could convince its target defendants that it was cheaper, and made more business sense, to pay a small sum of money to make the case go away than

CONFIDENTIAL MATERIAL OMITTED

to defend themselves, AdjustaCam would continue to collect its money without ever having to risk its patent and justify its positions in court.  But AdjustaCam did not count on Newegg defending itself, and had no choice but to dismiss Newegg if it wanted to preserve its shakedown business.

> 1. *AdjustaCam Brought this Case for the Improper Purpose of Obtaining Nuisance-Value Settlements*

As explained above, the record shows that AdjustaCam's settlement agreements are all for nuisance value.  *See supra* Statement of Facts, Part V.  The vast majority of Newegg's co-defendants paid [[          ]] or less to settle, more than half paying [[          ]] or less, and always as a round number.  A1282.

None of AdjustaCam's post-hac efforts to align those nuisance-value agreements with its supposed damages calculations pass muster.  *See supra* Statement of Facts, Part V.  AdjustaCam's fabrication of an unsupportable and unused "target" royalty (e.g., A1195-96), as well as its illusory and never-paid "running royalty" components of six of its settlements (A0545-49; A0558; A1313-14; A0631-33), are no more than self-serving litigation-induced arguments.  In reality, the effective royalties paid by Newegg's co-defendants were all over the map.  A1283-85 (effective royalties ranging from [[               ]] per unit).  Not even the two supposedly "foundational" PAR Technologies license agreements support a "target" (and, essentially, fixed) royalty of $1.25 to $1.50 per unit.  A0542-45 (discussing royalty ranges from [[               ]]); A0631.

AdjustaCam's settlements, as well as the settlement demands made to Newegg, are not reasonably tied to any prior comparable licenses or the potential infringement exposure of any party.  The settlement payments are merely round numbers set to encourage defendants not to fight the lawsuit on the merits due to the far greater expense involved in doing so.  District courts cannot be allowed to turn a blind eye to such flagrant bad faith.

As this Court has observed, "low settlement offers . . . effectively ensure[] that [the patentee's] baseless infringement allegations remained unexposed, allowing [the patentee] to continue to collect additional nuisance value settlements."  *Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314, 1327 (Fed. Cir. 2011); *see also Am. Standard, Inc. v. York Int'l Corp.*, 244 F. Supp. 2d 990, 997 (W.D. Wis. 2002) (Bad faith litigation tactics "force defendants into settlement and away from their legitimate defenses."); *Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG, 2000 U.S. Dist. LEXIS 1186, at *10 (D. Conn. Jan. 18, 2000) (holding that the filing of many lawsuits seeking relatively small settlements "gives rise to a suspicion of *barratry* and *champerty*").

Here, AdjustaCam's settlement amounts are very small compared to the cost of defense, showing that AdjustaCam's desire is to obtain nuisance settlement revenue rather than actually pursue meritorious claims in litigation.   When Newegg, after nearly two years, still refused to settle and remained determined to

vindicate its legal positions, AdjustaCam's response exposed its true purpose in suing Newegg. Instead of trying to prove Newegg's defenses wrong in court, AdjustaCam simply walked away from its case. Such an "overall vexatious litigation strategy" that is wasteful of judicial resources evidences bad faith. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 726 F.3d 1359, 1367 (Fed. Cir. 2013).

Belated timing of dismissal can also evidence bad faith and justify fee shifting. In *Monolithic Power Systems*, the case was deemed exceptional in large part because the plaintiff "withdrew its claims and granted covenants not to sue after substantial litigation had taken place," "moving to dismiss only after [defendants] had completed their filings for the final pretrial conference, wasting the parties' and the court's resources." *Id.* Likewise, here AdjustaCam waited two years to dismiss Newegg, knowing that Newegg's exposure was minimal, and did not actually dismiss Newegg until after Newegg had incurred considerable expense in attorney and expert fees. AdjustaCam cannot just lose interest and walk away with zero consequences after forcing Newegg to spend more than $350,000 in attorneys' fees and expert fees to defend itself up its fee motion. A1793-94; A1239 (explaining that Newegg expended $286,102.52 in attorneys' fees, plus $68,183.93 in expert fees through just September 2012). To date, Newegg has been forced to spend more than $450,000 by AdjustaCam's frivolous lawsuit, with

outstanding invoices of $60,000 at present, plus more by the time this appeal concludes.

In *Ingenuity 13, LLC v. Doe*, copyright plaintiffs were found to have acted in bad faith and sanctioned for fees in circumstances largely identical to those in this case.  No. 2:12-cv-8333-ODW, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013).  First, the plaintiffs engaged in a strategy to file lawsuits against many defendants.  *Id.* at *6-7.  Due to "the high cost of litigation," "[m]ost defendants settled . . . , resulting in proceeds of millions of dollars due to the numerosity of defendants."  *Id.*  "For defendants that refused to settle, the Principals engaged in vexatious litigation designed to coerce settlement. These lawsuits were filed using boilerplate complaints based on a modicum of evidence, calculated to maximize settlement profits by minimizing costs and effort."  Importantly, like AdjustaCam, in *Ingenuity 13* "[t]he Principals have shown little desire to proceed in these lawsuits when faced with a determined defendant.  Instead of litigating, they dismiss the case." *Id.* at *7.

Courts have acknowledged in various circumstances that it is fundamentally unfair for a plaintiff to force a defendant to endure substantial burden and expense in litigation and then lose interest and walk away from the case without any consequences.  *See Colombrito v. Kelly*, 764 F.2d 122, 134-35 (2d Cir. 1985) (noting that awarding fees would be appropriate "if a litigant had made a practice

36

of repeatedly bringing potentially meritorious claims and then dismissing them with prejudice after inflicting substantial litigation costs on the opposing party and the judicial system"); *Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC, 2009 U.S. Dist. LEXIS 4546, at *12 (W.D. Wis. Jan. 21, 2009) ("Plaintiff cannot expect to subject defendant Rose to a year of litigation and walk away with no consequences."); *compare Monolithic Power Sys.*, 726 F.3d at 1367 (affirming award of fees, emphasizing that vexatious case was dismissed "after substantial litigation had taken place . . . wasting the parties' and the court's resources").

AdjustaCam professes that its desire was not to extort a nuisance-value settlement from Newegg.  According to AdjustaCam, its decision to dismiss Newegg was for "strategic reasons unrelated to the merits"—essentially, "winnowing out" Newegg due to its *de minimis* infringement in comparison with Sakar once other defendants were dismissed and some of Newegg's sales became licensed.  A1192-93.  First, the timing of events, with the *Markman* Order triggering several small settlements in short order, does not bear out AdjustaCam's position.  *See supra*.  Second, AdjustaCam's implying that it is perfectly acceptable to file and maintain lawsuits against "*de minimis* infringers" so long as it "winnows them out" and dismisses them before trial is deeply misguided.  Section 285's exceptional case provision exists precisely to prevent such "gross injustice to an alleged infringer." *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988).

37

AdjustaCam knew of Newegg's minimal exposure long before Newegg was dismissed and, in fact, well before Newegg had to endure the burden and expense of the February 2012 *Markman* hearing and subsequent discovery, including considerable expert discovery.  A1784; A1226; A1362-63 (describing sales figures provided to AdjustaCam at least as early as November 2011); A2136 (August 2012 dismissal motion).  Shackling Newegg with considerable and unjustifiable litigation costs, despite Newegg's minimal exposure, is exceptional and abusive.

2. *Nuisance Litigation is Exceptional and Egregious*

It is no secret that nuisance litigation brought by patent assertion entities is now fairly common and has become its own lucrative industry.  *See, e.g.,* Colleen V. Chien, *Patent Trolls by the Numbers*, Santa Clara University Studies Research Paper No. 08-13, *available at* http://ssrn.com/abstract=2233041 (March 13, 2013) (explaining that patent assertion entities file the majority patent lawsuits in the U.S., primarily targeting non-technology companies).

It would be clear error and an abuse of discretion, however, for the district court to conclude from this state of affairs that such litigation misconduct is not "exceptional" within the meaning of Section 285.  *Octane Fitness* explained that "an 'exceptional' case is simply one that stands out from others" regarding weak merits positions or litigation misconduct.  134 S. Ct. at 1756.  But the Court certainly did not suggest, let alone hold, that courts should allow themselves to

become desensitized to bad faith nuisance litigation just because it is commonplace.  Such a conclusion contradicts the plain purpose of Section 285, as well as basic fairness and common sense.

Section 285 is supposed to be remedial—to correct for unfairness and injustice in a flexible, fact-specific manner.  *See Octane Fitness*, 134 S. Ct. at 1753, 1756 n.6; *see also Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1312-13 (Fed. Cir. 2013).  Neither Congress nor the Supreme Court was so cynical as to assume that patent litigation ordinarily involves bad faith and misconduct.  The obvious assumption and requirement of Section 285 is that patent litigation will be brought and conducted in good faith, and that a case is "exceptional" when it sufficiently deviates from this expectation of litigants.  *Cf. Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 954 (Fed. Cir. 2010) ("[T]here is a presumption that an assertion of infringement of a duly granted patent is made in good faith.").

Moreover, using the court system to further AdjustaCam's extortive business practices is exactly the kind of egregious bad faith and abuse of the judiciary that warrants shifting of expert fees.  *MarcTec*, 664 F.3d 907 at 921.  Bad faith assertions of frivolous lawsuits unreasonably burden the litigation targets and the courts.  Awarding expert fees is necessary where a plaintiff's vexatious misconduct forces a defendant to incur those expert fees unnecessarily, as those fees are not

compensable under Section 285. *Id.* at 921-22 (holding that expert fees were properly awarded because "Cordis was forced to incur expert witness expenses to rebut MarcTec's unreliable and irrelevant expert testimony," such that "MarcTec's vexatious conduct and bad faith increased the cost of litigation in ways that are not compensated under § 285"). Here, as in *MarcTec*, AdjustaCam's experts' testimony was fatally flawed and could not possibly have proven infringement or AdjustaCam's alleged damages. AdjustaCam only proceeded into expert discovery to apply more pressure to Newegg for a nuisance-value settlement. For Newegg to have to spend huge sums of money on experts to rebut AdjustaCam's experts' baseless allegations, on top of all the other misconduct and expense inflicted by AdjustaCam in seeking nuisance-value settlements, is a grave injustice that cannot be permitted. *Id.* at 921 (inherent authority should be exercised to shift expert fees where "the very temple of justice has been defiled").

Patent litigation is supposed to resolve legitimate disputes surrounding bona fide infringement allegations, not facilitate nuisance-value patent monetization campaigns. *See Eon-Net,* 653 F.3d at 1328 ("[T]he appetite for licensing revenue cannot overpower a litigant's and its counsel's obligation to file cases reasonably based in law and fact and to litigate those cases in good faith."). This Court should take this opportunity to clarify that litigation brought for the purposes of extorting nuisance-value settlements is exceptional and will not be tolerated or immunized

from fee-shifting simply because it is widespread.  And to the extent a nuisance litigation campaign crosses into the expert discovery phase of a case, those expert expenses should not have to be borne by the defendants.

District courts cannot be allowed to make the presumption of good faith litigation unrebuttable by turning a blind eye to clear evidence of bad faith.  Here, the district court appears to have looked the other way and thereby abused its discretion in multiple ways.

3.    *Nuisance Litigation Should be Strongly Discouraged*

Section 285 and *Octane Fitness* recognize that the specter of fee-shifting is intended to have a deterrent effect on bad faith litigation and misconduct.  134 S. Ct. at 1756 n.6 (reminding district courts of "the need in particular circumstances to advance considerations of compensation and deterrence").  That purpose would be frustrated if all one had to do to avoid any possible fee-shifting is dismiss its case and avoid losing on the merits.  AdjustaCam cannot avoid the expensive and wasteful consequences of its extortion tactics simply because it dismissed Newegg from the case.  *See Kilopass*, 738 F.3d at 1317 ("[T]rial courts retain broad discretion to make findings of exceptionality under § 285 *in a wide variety of circumstances*.").

To be clear, a plaintiff's voluntary dismissal of a meritless case should be encouraged at the earliest juncture.  But when a case is brought for reasons

41

unrelated to the merits and to obtain nuisance-value settlements, as it was here, the incentive to dismiss must also include an incentive to dismiss at a meaningful time—i.e., before substantial expense and burden is inflicted on the defendant. This Court should clarify that Section 285 provides those incentives, and that such plaintiffs who pursue such cases for too long before dismissing will be viewed as acting in bad faith and will be ordered to pay a defendant's attorneys' fees. Again, to the extent a nuisance litigation campaign crosses into the expert phase of a case, those expert fees and expenses should not have to be borne by the defendants.

Using the United States judiciary to leverage nuisance-value settlements also reflects selfish opportunism and unreasonably burdens the courts. *See Artese*, 2000 U.S. Dist. LEXIS 1186 at *10-11 ("[I]t is not merely the prejudice and costs to the opposing party but also the effect upon the judicial system of such litigation. When we consider the numerous other cases commenced by this plaintiff . . . there has been indeed a substantial burden on the judicial system."). Behavior that treats the judiciary as a pawn for nuisance-value settlement negotiations and makes courts waste considerable time and resources should be strongly discouraged.

By contrast, defendants like Newegg, who do not pay a patentee in a nuisance litigation simply to make a lawsuit go away, play an important role in the patent system. Such defendants insist that plaintiffs justify their positions and, when the plaintiffs cannot or will not do so, will vindicate their defenses in court.

If not for defendants like Newegg, abusive nuisance litigants would never be exposed because every case would settle (or be unilaterally dismissed by the plaintiffs) and conceal the misconduct.  Section 285 should serve as a meaningful deterrent to patent abuses like those present in this case.  Newegg and other similarly-situated defendants should not be discouraged from taking the more onerous course of defending themselves to help discourage abusive patent assertions.

Absent a meaningful fee-shifting standard where fees are reasonably attainable, defendants are more likely to simply settle nuisance litigations because the financial downsides of mounting a strong defense are overwhelming.   If AdjustaCam's conduct is not deemed exceptional and egregious in this case, it will embolden nuisance litigants to continue their abusive conduct unchecked.

When the Supreme Court issued its *Octane Fitness* and *Highmark* decisions on the same day, notwithstanding the adoption of an abuse-of-discretion standard for appellate review in *Highmark*, the decisions collectively reflected a clear directive from the Supreme Court that fee shifting was supposed to be made easier to achieve, not harder.  *See, e.g., Octane Fitness*, 134 S. Ct. at 1756 (characterizing the *Brooks Furniture* standard as "inflexible"; *id.* at 1756-57 (explaining that misconduct to justify fee-shifting need not be independently sanctionable); *id.* at 1758 (noting that the burden of proof for exceptionality is merely a preponderance

43

of the evidence, not clear and convincing).  This Court has the power to police the district courts in their exercises of discretion, and the Supreme Court undoubtedly intended that reviewing courts would step in to ensure that Section 285 was administered in a fair and just manner. *See Highmark*, 134 S. Ct. at 1748 n. 2 ("The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'") (quoting *Cooter*, 496 U.S. at 405).

B.    The Accused Cameras Could Not Possibly Have Infringed

The district court agreed with AdjustaCam that the Accused Ball-and-Socket Products included constrained ball-and-socket joints that restricted movement to some extent.  A0006.  According to the district court, this constricted movement made it possible for AdjustaCam to prevail in proving infringement:

> [i]f the ball and socket joint truly restricts the range of movement such that it cannot rotate about multiple axes*, the constrained ball and socket joint could meet the claim limitation which requires the hinge member being rotatably attached to the camera in a single axis of rotation.   Since one could reasonably argue Defendants' products meet the "rotatably attached" limitation, AdjustaCam's infringement theories are not objectively baseless.

A0006.  The problem is that the above-emphasized portion—the premise and *sine qua non* of the district court's conclusion—is not true and does not even reflect AdjustaCam's position.   It is undisputed that the Accused Ball-and-Socket

44

Products included cameras that were in fact capable of rotating about multiple axes with respect to the socket—they could be both twisted and tilted up and down.

AdjustaCam never argued that the constrained ball-and-socket joints were incapable of rotating about multiple axes—it merely posited that the different rotations were "separate." A0482-83 ("[I]f I rotate it around to the center, there is nothing that forces it to move, to tilt or to sway to either side."); A0484 ("There is two axes, but they are separate."); A0485-87 ("This happens to be a constrained ball and socket joint. So it can [1] spin about the axis, it can [2] move forward, it may be able to [3] move to the side.").

On this record, there is no question that the cameras of the Accused Ball-and-Socket Products were capable of rotating in at least two different and distinct directions with respect to the sockets, not merely rotating about the claimed and singular "first axis of rotation." '343 Patent, Claim 1 ("*said camera*, when the hinge member is so attached, *rotating, about a first axis of rotation*, relative to said hinge member"). It was objectively baseless for AdjustaCam to contend that such cameras were "limited to a *single* axis of rotation." A0022-23. One could not reasonably argue otherwise.

Importantly, AdjustaCam was not advancing a theory of infringement under the doctrine of equivalents, and so its case hinged on proof of literal infringement.

45

*See, e.g.,* A0996-97 and A1160-61 (AdjustaCam's expert report presenting only direct, literal infringement theory).

Long before the district court's *Markman* Order formally doomed AdjustaCam's case, the plain language of the claims, and especially in light of the specification, made clear that the Accused Ball-and-Socket Products could not possibly infringe. A0022 ("The claims plainly describe each 'rotatably attached' object as rotating about a single axis."); A0021 ("Every reference to a 'rotatably attached' object in the specification and claims describes the attachment as permitting motion over a single axis of rotation."). From the outset of this lawsuit, no reasonable plaintiff could have expected to succeed in proving infringement.

The situation would be somewhat different if AdjustaCam honestly did not know that infringement was impossible to prove at the outset of the case, but later discovered that it could not prevail. Here, such ignorance is implausible given the readily apparent functionality of the accused products and the simplicity of the patent and its claims. But even if AdjustaCam could legitimately plead ignorance, ignorance is no excuse to continue undeterred—for nearly five months, which included considerable and expensive expert discovery—after the district court's decisive *Markman* ruling in Newegg's favor. A0013-27 (April 10, 2012 *Markman* Order); A2141 (August 27, 2012 motion to dismiss Newegg). Here, as in *MarcTec*, AdjustaCam "not only initiated a frivolous lawsuit, it persisted in

46

advancing unfounded arguments that unnecessarily extended this litigation and caused [defendant] to incur needleless litigation expenses. This vexatious conduct is, by definition, litigation misconduct, and provides a separate and independent basis supporting the district court's determination that this case is exceptional." *MarcTec, LLC v. Johnson & Johnson,* 664 F.3d at 920-21 (Fed. Cir. 2012).

### C.   AdjustaCam's Validity Positions Were Frivolous

As explained above, AdjustaCam advanced the following frivolous argument in response to the clear anticipation of its claims by Irifune: "With Irifune, the camera is not even attached to the hinge member until fully tightened down using camera attachment shaft (9) and camera attachment screws (10 and (11)." A1263.   Using the exceedingly narrow definition of "attached" offered in the reexamination, AdjustaCam's expert Dr. Muskivitch opined that, "[o]nce the camera is attached to the fixed part 2, the camera cannot rotate about a first axis relative to the hinge member." *Id.*

These concocted arguments were objectively baseless for several reasons. First, AdjustaCam's illogical attempt to narrow the meaning of "rotatably attached" contradicts the claim language and the specification of the '343 Patent. If the camera disclosed in the '343 Patent was "permanently fixed to," or had to be fully tightened down to the hinge member, then the camera could not rotate about the first axis of rotation as the claims and specification require.   Indeed, such

arguments contradict AdjustaCam's own proposed construction of "rotatably attached" in this litigation ("connected such that the connected object is capable of being rotated").  A2813-14.  The Irifune camera is certainly "capable of being rotated"—e.g., when it is partially unscrewed from the threaded camera attachment shaft on the hinge.  AdjustaCam's argument that a camera is not rotatably attached to a hinge member unless it is "permanently fixed to" or fully tightened down to the hinge member also contradicts the district court's *Markman* Order because such a camera would not be capable of rotation about any axis.  A0021 ("Every reference to a 'rotatably attached' object in the specification and claims describes the attachment as permitting motion over a single axis of rotation.").  AdjustaCam could not reasonably expect to prevail against Newegg's invalidity arguments based on Irifune.

> D.   The District Court's Actions Cumulatively Reveal Its Abuse
>        Of Discretion

District courts cannot look the other way when there is clear evidence of bad faith litigation misconduct.  Here, the district court appears to have done just that, and thereby abused its discretion.  This is evident by several rulings—and absence of rulings—in the waning months of the case after AdjustaCam abandoned its unsustainable patent infringement case.

First, there is no doubt that patent litigation is expensive, and the courts have set up a system whereby prevailing parties may recover their costs.  In this case,

not only did Newegg prevail when AdjustaCam gave up in the litigation, but Newegg also got AdjustaCam to not oppose its application for $8,492.66 in costs. Despite the unopposed nature of Newegg's bill of costs, the district court did not award them, instead and without explanation providing that each party is to bear its own costs.  A0199-200, A0001-03.

Second, Newegg gave the district court the opportunity to correct this error in awarding costs, immediately moving to correct the erroneous judgment.  But the district court sat on Newegg's motion for six months, not ruling on it even though the failure to give Newegg its costs was plainly in error and easily fixable as a clerical matter.  This had the effect of causing this Court to deactivate the appeal of the denial of attorneys' fees, and after an extensive delay, Newegg was forced to withdraw its motion to avoid further delay of this appeal.

Third, as explained herein, the district court refused to grant attorneys' fees under 35 U.S.C. § 285, ignoring that AdjustaCam's claim construction position was never reasonable, ignoring that AdjustaCam's post-claim construction infringement position was egregious, and ignoring the length of time that AdjustaCam pursued its case without any valid basis.

Finally, the district court abused its discretion by refusing to award to Newegg its expert fees, under its inherent authority, despite the fact that Newegg had to spend significant amounts on expert fees solely because AdjustaCam sought

49

to promulgate a frivolous infringement position—a position resting solely on the testimony of an expert who ignored the Court's claim construction and the realities of the accused products, thus forcing Newegg to counter with its own experts.

Patent litigation is expensive, and the cumulative effect of the district court's decisions (or lack thereof) was to force Newegg to spend money on patent litigation it could have been spending on its customers or employees.  This Court has the power to explain that when a party consistently pushes unsupportable positions, it should have to pay attorneys' fees.  *See* I.A.-I.C., *supra*.  But this Court also has the power to set forth that when a district court fails to provide appropriate relief in a series of rulings or lack of rulings, that is an abuse of discretion that must be rectified.  *See Seismograph Svc. Corp. v. Offshore Ray-Dist, Inc.*, 263 F.2d 5, 24 (5th Cir. 1958) (finding an abuse of discretion in failing to award attorneys' fees under Section 285 where the district court was "too charitable to Seismograph in not so holding" that the litigation was "so vexatious and unjustified as to constitute an 'exceptional case'").  Even if none of the district court's individual actions is enough to trigger the abuse of discretion alarm, certainly the cumulative effect of the district court's actions requires this Court to intervene and award to Newegg its fees, costs, and expert costs.  It is vital to the judicial system that there be some meaningful and predictable boundaries for permissible litigation behavior, and the rules proffered by Newegg in this case help

promote impartiality in fee cases, which instills confidence in the public that everyone will be treated fairly and made whole when the system has been abused.

## II. ADJUSTACAM'S APPEAL MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

Consistent with AdjustaCam's bad faith overreaching and indifference to the merits of this litigation, AdjustaCam brought its own affirmative appeal to this Court where subject matter jurisdiction is indisputably lacking.  There is no legal support whatsoever for AdjustaCam's attempt to appeal a claim construction issue that it lost in the district court, made no effort to preserve for appeal, and expressly extinguished when it dismissed its case against Newegg with prejudice. This frivolous appeal only compounds the exceptionality of this case and causes Newegg to incur further needless legal expenses.

An "actual controversy must be extant at all stages of review, not merely at the time the complaint was filed." *Benitec Austl, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1345 (Fed. Cir. 2007) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974)).  "Subject matter jurisdiction is a threshold requirement for a court's power to exercise jurisdiction over a case, and no amount of 'prudential reasons' or perceived increases in efficiency, however sound, can empower a federal court to hear a case where there is no extant case or controversy." *Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed. Cir. 2010).

51

AdjustaCam filed its notice of appeal seeking review of the district court's claim construction rulings. A0193. But by that time, Newegg had already been dismissed with prejudice from the case and given a covenant not to be sued in the future for infringement of the '343 Patent. A2136-37; A1986-87; A0155. The dismissal and covenant extinguished any ongoing disputes between AdjustaCam and Newegg concerning the infringement and validity of the '343 Patent. Indeed, when dismissing Newegg, AdjustaCam even argued that its covenant divested the district court of subject matter jurisdiction over Newegg's declaratory judgment counterclaims, citing *Dow Jones*, 606 F.3d at 1348 and *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed. Cir. 1995). A2136-37. If there is no jurisdiction over Newegg's non-infringement and invalidity counterclaims due to a lack of an ongoing controversy, certainly there can be no jurisdiction over AdjustaCam's underlying infringement claims that were dismissed with prejudice.

This Court has often recognized its inability to reach claim construction issues that are not subject to an ongoing case or controversy. *See, e.g, SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1354 (Fed. Cir. 2012) ("[W]here, as here, a party's claim construction arguments do not affect the final judgment entered by the court, they are not reviewable. . . . Without a final judgment as to the infringement or validity of these claims, the court's claim constructions that impact only these withdrawn claims are not properly before us."); *Jang v. Boston*

*Sci. Corp.,* 532 F.3d 1330, 1336 (Fed. Cir. 2008) (resolving claim construction issues "that do not actually affect the infringement controversy between the parties" would result in impermissible advisory opinion because "[t]he Supreme Court has explicitly held that Article III does not permit the courts to resolve issues when it is not clear that the resolution of the question will resolve a concrete controversy between interested parties"); *see also NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282, 1311 (Fed. Cir. 2005).

Although AdjustaCam purports to appeal from the district court's final judgment, because that final judgment was in no way based on the claim construction ruling, but was instead based entirely on the unopposed decision by AdjustaCam to affirmatively end the case, this Court lacks subject matter jurisdiction to review the claim constructions.

This is not a case where the parties consented to a judgment of non-infringement based on the claim constructions to allow for appeal of the construction. *See, e.g., SanDisk*, 695 F.3d at 1353 ("SanDisk voluntarily withdrew the '893 and '808 patents and claims 1 and 10 of the '842 patent from this action, and it does not dispute that the district court never entered a stipulated judgment of non-infringement with respect to these claims. Thus, these claims do not present a current infringement controversy before this court."). Here, AdjustaCam made no effort whatsoever to preserve any challenges to the district court's claim

constructions when it decided to dismiss its case against Newegg. Even in defending AdjustaCam's litigation positions and opposing Newegg's motion for attorneys' fees and expert fees, AdjustaCam noted no disagreement with the district court's claim constructions. A1191-94; A1194 (arguing that "AdjustaCam's infringement positions are entirely consistent with the Court's construction").

This Court cannot hear AdjustaCam's appeal because it lacks subject matter jurisdiction over the challenges raised to the claim construction rulings by the district court. AdjustaCam's appeal must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the judgment of the district court should be reversed, this case should be declared exceptional and egregious, and the case should be remanded to the district court to order payment by AdjustaCam of the attorneys' fees and expert fees owed to Newegg.

Additionally, AdjustaCam's appeal should be dismissed for lack of subject matter jurisdiction.

Respectfully submitted,

Dated:  September 25, 2014

By: /s/ Kent. E. Baldauf, Jr.
Kent E. Baldauf, Jr.
Daniel H. Brean
Anthony W. Brooks
THE WEBB LAW FIRM
One Gateway Center
420 Fort Duquesne Blvd.
Suite 1200
Pittsburgh, PA 15222
Telephone:  (412) 471-8815

Edward R. Reines
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

Richard G. Frenkel
LATHAM & WATKINS
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 463-3080

Yar R. Chaikovsky
McDERMOTT, WILL & EMERY
275 Middlefield Rd., Suite 100
Menlo Park, CA 94025
Telephone: (650) 815-7447

*Counsel for Defendants-Cross-Appellants
Newegg, Inc. Newegg.com, Inc., and
Rosewill, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 25, 2014, copies of the foregoing Brief

of Defendant-Cross-Appellant was served on counsel for Plaintiff-Appellant

AdjustaCam, LLC and counsel for Defendant-Cross-Appellant Sakar International,

Inc. via the Court's ECF system and via electronic mail upon the following:

John J. Edmonds (jedmonds@cepiplaw.com)
Shea Neal Palavan (spalavan@cepiplaw.com)
Stephen F. Schlather (sschlather@cepiplaw.com)
COLLINS, EDMONDS, POGORZELSKI, SCHLATHER & TOWER PLLC
1616 South Voss Road
Houston, TX 77057

Ezra Sutton, Attorney (esutton@ezrasutton.com)
EZRA SUTTON, P.A.
Suite 201
900 Route 9
Woodbridge, NJ 07095

/s/ Kent E. Baldauf, Jr.
*Counsel for Defendants-Cross-Appellants*
*Newegg, Inc. Newegg.com, Inc., and*
*Rosewill, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the body of this brief, beginning with the Jurisdictional Statement on page 1, and ending with the last line of the conclusion on page 54, including headings, footnotes, and quotations, is written in Times New Roman, size 14-point font, and contains 11,879 words, in compliance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

/s/ Kent. E. Baldauf, Jr.
*Counsel for Defendants-Cross-Appellants*
*Newegg, Inc. Newegg.com, Inc., and*
*Rosewill, Inc.*

57

EXHIBIT 5

2013-1665, -1666, -1667

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ADJUSTACAM, LLC,

Plaintiff-Appellant,

NEWEGG INC., NEWEGG.COM, INC., & ROSEWILL, INC.,

Defendants-Cross-Appellants

and

SAKAR INTERNATIONAL, INC.,

Defendant-Cross-Appellant

Appeals from the United States District Court for the Eastern District of Texas
in Case No. 10-CV-329, Chief Judge Leonard Davis

## NON-CONFIDENTIAL BRIEF OF DEFENDANT-CROSS-APPELLANT
## SAKAR INTERNATIONAL, INC.

Ezra Sutton
EZRA SUTTON, P.A.
900 Route 9 North
Plaza 9, Suite 201
Woodbridge, NJ 07095
Telephone: (732) 634-3520

*Counsel for Defendant-Cross-Appellant*

December 16, 2014

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Adjustacam v. Newegg, 2013-1665

<u>CERTIFICATE OF INTEREST FOR SAKAR INTERNATIONAL, INC.</u>

Counsel for Sakar International, Inc. hereby certifies the following:

1.      The full name of every party or amicus represented by me is:

      Sakar International, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      No publicly held company owns ten percent or more stock in Sakar International, Inc.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Ezra Sutton, Ezra Sutton, P.A.

Dated:  December 16, 2014          <u>/s/ Ezra Sutton</u>
                                Ezra Sutton
                                *Counsel for Defendant-Cross-Appellant*

i

## **TABLE OF CONTENTS**

STATEMENT OF RELATED CASES ....................................................................1

JURISDICTIONAL STATEMENT ......................................................................2

STATEMENT OF THE ISSUES...........................................................................2

STATEMENT OF THE CASE ..............................................................................3

STATEMENT OF FACTS .....................................................................................6

    I.   Introduction....................................................................................................6

    II.  The Parties .....................................................................................................7

    III.   AdjustaCam's Infringement Allegations.......................................................7

    IV.   AdjustaCam's Validity Arguments ............................................................12

    V.  AdjustaCam's Nuisance-Value Settlements and Demands..........................14

SUMMARY OF THE ARGUMENT ...................................................................15

STANDARD OF REVIEW .................................................................................17

ARGUMENT .......................................................................................................18

    I.   The District Court Abused its Discretion by Not Finding This Case
    Exceptional .................................................................................................18

        A.   AdjustaCam Filed and Prosecuted This Case in Bad Faith .....................19

           1.   AdjustaCam Brought this Case for the Improper Purpose of Obtaining
              Nuisance-Value Settlements ..................................................................20

    2.    Nuisance Litigation is Exceptional and Egregious ...............................22

    3.    Nuisance Litigation Should be Discouraged .......................................23

  B.   The Accused Cameras Could Not Possibly Have Infringed...................23

  C.   AdjustaCam's Validity Positions Were Frivolous ..................................25

II.  AdjustaCam's Appeal Must be Dismissed for Lack of Subject Matter

Jurisdiction.......................................................................................................25

CONCLUSION .....................................................................................................28

## <u>CONFIDENTIAL MATERIAL OMITTED</u>

The material omitted on pages 3, 14 and 15 reflects the terms of settlement agreements that were designated as confidential by AdjustaCam, and are subject to a protective order entered by the district court.

# TABLE OF AUTHORITIES

*Cases*

*Am. Standard, Inc. v. York Int'l Corp.*, 244 F. Supp. 2d 990 (W.D. Wis. 2002) ....20

*Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG, 2000 U.S. Dist.
 LEXIS 1186 (D. Conn. Jan. 18, 2000) ................................................................20

*Benitec Austl, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340 (Fed. Cir. 2007) ................26

*Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005)
 .................................................................................................................................18

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990).........................................18

*Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338 (Fed. Cir. 2010)................26

*Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805 (Fed. Cir. 1990)...................11

*Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314 (Fed. Cir. 2011) ................. 20, 23

*Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) .....15

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744 (2014)
 .................................................................................................... 17, 18, 19

*Ingenuity 13, LLC v. Doe No. 2:12-cv-8333-ODW*, 2013 U.S. Dist. LEXIS
 64564 (C.D. Cal. May 6, 2013) ..........................................................................21

*Jang v. Boston Sci. Corp.,* 532 F.3d 1330 (Fed. Cir. 2008)....................................27

*Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302 (Fed. Cir. 2013) ................22

*MarcTec, LLC v. Johnson & Johnson,* 664 F.3d 907 (Fed. Cir. 2012)

 .................................................................................................................17, 25

*Mathis v. Spears*, 857 F.2d 749 (Fed. Cir. 1988)....................................................22

*Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 726 F.3d 1359 (Fed. Cir. 2013)
 .................................................................................................... 20, 21, 22

*NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282 (Fed. Cir. 2005)................27

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014)
..................................................................... 5, 17, 18,, 19, 22,23

*Rude v. Westcott*, 130 U.S. 152 (1889) ......................................... 15

*SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348 (Fed. Cir. 2012) .................27

*Steffel v. Thompson*, 415 U.S. 452 (1974) .............................................26

*Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC, 2009 U.S. Dist. LEXIS
4546 (W.D. Wis. Jan. 21, 2009) ......................................21

## *Statutes*

28 U.S.C. § 1295(a)(1).............................................................2

28 U.S.C. § 2107(a) ................................................................2

28 U.S.C. §§ 1331 ..................................................................2

28 U.S.C. §§ 1338(a) ...............................................................2

35 U.S.C. § 285 ............................................................... passim

## *Rules*

Federal Rule of Appellate Procedure 4 ...................................................2

## STATEMENT OF RELATED CASES

No other appeal in or from this same civil action was previously before this Court or any other court of appeals.  Sakar International, Inc. ("Sakar" or "Defendant Sakar") and its undersigned counsel are unaware of any other actions now pending in this or any other court that will directly affect or be directly affected by this Court's decision in the present appeal.

## JURISDICTIONAL STATEMENT

Sakar's Cross-Appeal:

The district court had original jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). Sakar filed a timely and proper notice of appeal under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

AdjustaCam's Appeal:

For reasons discussed below, this Court does *not* have subject matter jurisdiction over AdjustaCam's appeal and AdjustaCam's appeal must be dismissed.

## STATEMENT OF THE ISSUES

1. Whether the district court erred by failing to find this case exceptional and egregious under 35 U.S.C. § 285 and its inherent authority to award Sakar its attorneys' fees and expert fees, despite clear and unrebutted evidence showing that this lawsuit was meritless, was prosecuted in bad faith, and was prosecuted to leverage the high cost and burden of litigation to coerce a nuisance-value settlement payment from Sakar.

2. Whether this Court has subject matter jurisdiction over AdjustaCam's appeal, given that the case on the merits was mutually and voluntarily dismissed in its entirety, and no case or controversy remains between the parties.

2

CONFIDENTIAL MATERIAL OMITTED
**STATEMENT OF THE CASE**

AdjustaCam, LLC ("AdjustaCam") brought this action in July 2010 against 59 defendants, including Defendant Sakar, alleging that certain camera products sold by Sakar infringed United States Patent No. 5,885,343 ("the '343 Patent"), entitled "Camera Clip." A0004. The '343 Patent is owned by Global-Media Group, LLC and AdjustaCam is the exclusive licensee of the patent. A1789.

After filing suit AdjustaCam began seeking to settle with the defendants. All defendants other than Defendant Sakar and Newegg Inc., Newegg.com, Inc., and Rosewill, Inc. (collectively, "Newegg" or "the Newegg Defendants") settled with AdjustaCam well before trial and were dismissed. However, 20 out of 22 twenty defendants settled for less than [[██████]]. A1282.

During the reexamination, on August 12, 2011, the USPTO issued a first Office Action and rejected the asserted claims of the '343 Patent, as being anticipated and/or obvious based on Japanese Utility Model Publication No. H2-19997 to Irifune (the "Irifune Publication") and U.S. Patent No. 5,880,783 to Ma entitled "Digital Camera for a Computer" (the "Ma Patent").

Then a *Markman* hearing was held on February 9, 2012 to construe various claim terms of the '343 Patent. A0013. Magistrate Judge Love issued a *Markman* order on April 10, 2012, which was subsequently adopted in full by Chief Judge Davis on June 7, 2012. A0013-27; A0012 ("the *Markman* Order").

3

In the *Markman* Order, the Court considered the term "[r]otatably attached / adapted to be rotatably attached / adapted to rotatably attach." A0020-23. Adjustacam argued that the term as used in the claims "allow[s] for a 'rotatably attached' object to rotate over more than a single axis." A0020. However, the district court agreed with the defendants, deciding that "[t]he claims plainly describe each 'rotatably attached' object as rotating about a single axis." A0022. The district court also explained that "[e]very reference to a 'rotatably attached' object in the specification and claims describes the attachment as permitting motion over a single axis of rotation." A0021.

Since Sakar's accused products had essentially a ball and socket joint, it was clear that Sakar accused products had multiple axes of rotation, and not just one or two axes of rotation, as required by the '343 Patent claims. Therefore, it was clear that there was **no infringement** for Sakar's camera having a multi-axis ball and socket joint.

At the same time, AdjustaCam's counsel was also **delaying and prolonging** the reexamination of the validity of the '343 Patent for one year until August 30, 2012, when the USPTO finally rejected the asserted claims of the '343 Patent during a third Office Action as being **not patentable and therefore invalid**. This was more than 2 years into the case, and most of the defendants had already settled except for Sakar, and the Newegg Defendants. Then, on September 20, 2012, after

4

most of the defendants had settled, AdjustaCam's counsel finally responded to the USPTO by **cancelling** the asserted claims from the '343 Patent. AdjustaCam could have cancelled the asserted claims of the '343 Patent (or at least withdrawn them from this litigation) long before September 20. Instead, AdjustaCam acted in bad faith by asserting frivolous responses to the USPTO's first two rejections between August 12, 2011 and August 30, 2012, in order to buy additional time to enter into additional nuisance-value settlements.

After AdjustaCam dismissed both the asserted claims and Sakar from the case, Sakar filed a motion for attorneys' fees and expert fees (totaling $163,522), which was denied by the trial court.  A0156, A0160.

On Sept. 18, 2013, Sakar then filed a notice of appeal seeking review of the denial of its motion for attorneys' fees. Although AdjustaCam's notice of appeal also referred to the district court's final judgment, that final judgment was not premised on any claim construction issues, nor did AdjustaCam seek a consent judgment incorporating the claim construction order as the basis for a judgment of non-infringement.  Rather, the final judgment merely reflected the parties' agreed mutual dismissal of the case.  A0001-03; A1986-87.

Meanwhile, shortly before this appeal was reactivated, the Supreme Court decided *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749

(2014), which relaxed the standard for finding a case "exceptional" under Section 285.

## STATEMENT OF FACTS

### I. Introduction

Unable to force a nuisance-value settlement payment from Sakar after more than two years of litigation, and since all of the defendants had settled except for Sakar and the Newegg Defendants, AdjustaCam decided to dismiss Sakar with prejudice in order to end the case.

This action by AdjustaCam was intended to extort nuisance-value settlement fees from defendants, and not to resolve any legitimate claims of infringement or damages. In fact, AdjustaCam knew at the time of the first Office Action rejection of the claims on August 12, 2011, that AdjustaCam could not prevail. Yet, AdjustaCam did not withdraw the patent claims and continued with the prosecution of its infringement claims and with the settlements. Such a baseless case that abuses the judiciary for personal gain is exceptional and warrants fee shifting.

By the time Sakar filed its motion for attorneys' fees and expert fees, AdjustaCam had forced Sakar to spend a total of $163,522, including $143,933 in attorney's fees and $19,589 in expert witness fees to defend itself. A1793-94. Sakar contends that it should not have to bear these fees, and that Sakar should be reimbursed by AdjustaCam

## II. The Parties

AdjustaCam is a limited liability company that is exclusively in the business of patent litigation.  As a wholly-owned subsidiary of Acacia Research Group, LLC, its business follows the model of using the burden and expense of patent litigation as leverage to extort settlement fees from defendants.  A1779.

Sakar is a wholesaler of consumer electronics products and accessories that it sells to various retailers throughout the United States under the brand name VIVITAR®.  Sakar does not manufacture its products, including the accused webcam products in this case, but simply purchases its products from third parties in China and then resells them in the United States.  Sakar's accused webcam products in this case were sold under Sakar's licensed brand name "Kodak."

A large number of defendants in this case were retailers, who simply purchased and re-sold the accused cameras and were not manufacturers who actually made the accused cameras.

## III.     AdjustaCam's Infringement Allegations

AdjustaCam is the exclusive licensee of United States Patent No. 5,855,343 ("the '343 Patent"), entitled "Camera Clip."   A1789.   The '343 Patent is generally directed to a camera clip that supports a camera when sitting on a flat surface or when attached to an object, such as a computer monitor:







'343 Patent, Figs. 1, 2, 4.  The clip allows the camera to rotate in two distinct

directions about distinct axes of rotation.

First, as shown in Fig. 1, the camera can be rotated to pan side-to-side.  The

specification explains: "[h]inge member 16 is rotatably attached to camera 12,

where camera 12 rotates over a **first axis 26** in a direction shown by arrow 28

8

relative to hinge member 16." '343 Patent, at 4:17-19.  Second, as shown in Fig. 2, the camera can be tilted upward and downward.   The specification explains: "[h]inge member 16 rotates over a **second axis 32** in the direction shown by arrow 34 relative to support frame 18.  First axis 26 is perpendicular to second axis 32." '343 Patent, at 4:21-24.

These two different axes of rotation are expressly required by all independent claims in the '343 Patent.  In Claim 1 ("a hinge member adapted to be rotatably attached to the camera, said camera, when the hinge member is so attached, *rotating, about a first axis of rotation*, relative to said hinge member"); Claim 1 also requires ("a support frame rotatably attached to said hinge member ..., said hinge member *rotating about a second axis of rotation* relative to said support frame, said first axis of rotation being generally perpendicular to said second axis of rotation").

Accordingly, the district court correctly held that the term "[r]otatably attached / adapted to be rotatably attached / adapted to rotatably attach" as used in the claims indicated that "'rotatably attached' objects in the patent-in-suit are **limited to a single axis of rotation**."  A0022-23.

Unlike the camera covered by the '343 Patent, Sakar's accused cameras do not rotate about a single axis of rotation. Instead, Sakar's cameras (the "Accused Ball-and-Socket Products") include a camera connected to a support frame via a

9

**ball-and-socket joint**, which permits rotation about *multiple axes*, not just a first and second axis of rotation, as claimed.

Thus, the structure of Sakar's camera is different, since the Accused Ball-and-Socket Camera structure of Sakar is different from the structure of the '343 Patent claims, as illustrated by the following photographs of the accused Kodak webcams (Model Nos. Kodak S101 and Kodak T130):



A0307. The nature of these ball-and-socket joints is that they allow for rotation for each of the parts of the camera product about **multiple axes**—the camera is able to spin and pivot about **multiple axes of rotation** with respect to the socket **(not just a single axis)**, and the support frame is likewise able to spin and pivot about multiple axes of rotation with respect to the ball **(not just a single axis)**. A0296-98. Comparing Sakar's products to the claims and specification of the '343 Patent shows that **AdjustaCam's infringement allegations were baseless from the outset**.

Therefore, AdjustaCam's bad faith is evident. *Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990) ("Where, as here, the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith.").

In addition, AdjustaCam's own expert, Dr. Muskivitch, admitted three times during his deposition on cross-examination that Sakar's Kodak webcams with a ball and stem fixed to the camera DO NOT rotate about a **single axis of rotation** as required by asserted claims 1(a) and 19(a):

> **1) First Admission**
> A. Yes. The stem and the ball and the camera all are -- if you are going to rotate it, they will all rotate together.
> Q. Okay. So am I correct, would you be -- is it correct to say that the Kodak camera does not rotate relative to the stem and ball because they are fixed to each other?
> A. That's correct. (Muskivitch Deposition, p.280, ll.4-12);
> **2) Second Admission**
> Q. Well, we have -- we have already talked about the relationship between the camera and the stem and ball, and we have agreed earlier -- or you agreed earlier that -- that in a Kodak webcam, there is no rotational movement between the -- the camera and the ball and stem that fits [are fixed] together. Do you remember that?
> A. Yeah, sure, sure. (Id. at 308, ll.12-19); and
> **3) Third Admission**
> Q. Okay. But there is no relative movement between the ball and stem, which are -- and the camera, which are fixed together, correct?
> A. I agree. Right. (Id. at 311, ll.14-17).

(A0297-98).

Based on the foregoing admissions by AdjustaCam's expert, there could never have been any infringement by Sakar's Accused Ball-and-Socket Product.

## IV.        AdjustaCam's Validity Arguments

In its two arguments to the Patent Office, AdjustaCam also took frivolous positions in distinguishing the prior art cited by the Examiner, such as Japanese Utility Model Publication No. H2-19997 to Irifune ("Irifune"). This prior art discloses a camera rotatably attached to a hinge member (mounting device (2)) via the threaded "camera attachment shaft (9)":



A1386, A1387, A1394. AdjustaCam's expert incorrectly asserted that Irifune does not disclose a device that can be rotatably attached to a camera.   Dr. Muskivitch argued that "[w]ith Irifune, the camera is not even attached to the hinge member until fully tightened down using camera attachment shaft (9) and camera attachment screws (10 and (11)." A1263.  Using an exceedingly narrow definition of "attached" ("permanently fixed joined, connected, or bound"), Dr. Muskivitch argued that Irifune did not meet the claim requirements because "[o]nce the camera

12

is attached to the fixed part 2, the camera cannot rotate about a first axis relative to the hinge member." *Id.*   In Dr. Muskivitch's view, when the camera of Irifune is screwed all the way onto the hinge member, the camera cannot be rotated, and if the camera is loosened to permit rotation, the camera is not attached. *Id.* ("[E]ven assuming for the sake of argument that with Irifune the camera is attached, it is not "rotatably attached.").

In the first office action, on August 12, 2011, in a reexamination proceeding regarding the '343 Patent, **the USPTO rejected the asserted claims as anticipated and/or obvious based on Irifune**.   A1425; A1431-36; A1376-96 (English translation of Irifune).   Like Dr. Muskivitch later did in the litigation, during the reexamination proceedings patent owner Global-Media argued that the camera of Irifune is not "rotatably attached" to the hinge member because the camera "is not attached to the hinge member until *fully screwed or threaded to the hinge member*." A1448.  To make such an argument, Global-Media posited that the plain and ordinary meaning of attached is "permanently fixed, joined, connected, or bound." A1447. The examiner rejected this argument twice, correctly concluding that "it is clearly possible to loosen the attachment screw, to enable the pivoting of the camera relative to support (fixed part 2) while the camera is still attached to the support." A1508-10; A1476.  After the third office action, which was a final rejection based on Irifune, AdjustaCam cancelled all the asserted claims

CONFIDENTIAL MATERIAL OMITTED

on September 20, 2012, which effectively ended the case. By that time, all the parties had settled, except Sakar and NewEgg.  A1515-19, A1460, A1465, A1469-74, A1493, A1502-06.

## V. AdjustaCam's Nuisance-Value Settlements and Demands

Sakar, like its co-defendants, was served with a lawsuit and was then approached by AdjustaCam to discuss settlement of the case.   Nearly every defendant proceeded to settle for a dollar amount well under the cost to defend oneself against the infringement allegations, 20 out of 22 for less than [[▮▮▮▮▮▮]].  A1282 (AdjustaCam settlement agreement summary).

AdjustaCam and its damages expert state that AdjustaCam's settlement agreements were based on an established target royalty of $1.25-$1.50/unit. *See* A1195-97  ("In its licensing program for this litigation, AdjustaCam used this $1.25 - $1.50 per webcam royalty rate as a baseline for licensing the various defendants."); A1324. The chart below does not support this royalty rate alleged by AdjustaCam:

CONFIDENTIAL MATERIAL OMITTED

**Attachment 12**
Implied Royalty Rates



[[                                                                    ]]

A1283-85.

The alleged basis for the target royalty of $1.25-$1.50/unit was two settlement and license agreements entered into in 2001 by one of AdjustaCam's predecessors in interest, PAR Technologies, both of which included lump sum payments plus prospective running royalty components.  A1197; A1282; A1303-06.  One of these agreements had a tiered prospective royalty structure ranging from [[$1.00 to $8.00]] per unit as the number of units increased, and the other had a royalty structure of [[$1.25]] per unit that decreased to [[zero]] as the sales volume increased.  A0542-45; A0631.  From these two PAR Technologies agreements alone, to the exclusion of the more than twenty other licenses that do not support the proffered royalty rage, and without making any comparison of the

PAR Technologies licenses to the facts of the case against Sakar, AdjustaCam and its expert took the unsupported position that "a royalty in the $1.25 to $1.50 frame" was an appropriate and consistent target for licensing discussions.  A1305-06.

AdjustaCam also asserts that "AdjustaCam's settlement numbers were tied to a pre-established unit royalty of $1.25 - $1.50 per infringing device." A1201. But AdjustaCam has no proof of this established royalty rate. *See, e.g., Rude v. Westcott*, 130 U.S. 152, 165 (1889); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983).

Settlements were untied to Sakar's sales of the accused cameras.  However, Sakar refused all of AdjustaCam's settlement demands in 2011 and 2012 because the asserted claims of the '343 Patent were not infringed, invalid, and had been rejected by the U.S. Patent Office.

## SUMMARY OF THE ARGUMENT

This lawsuit by AdjustaCam sued Sakar and its dozens of co-defendants was for the purpose of seeking nuisance-value settlement payments.

AdjustaCam's patent covers a camera that is claimed to rotate in a *single* axis of rotation.  But it is undisputed that Sakar's ball-and-socket joint rotated about *multiple* axes of rotation, not a single axis of rotation.

Even after the district court construed the claims against AdjustaCam, AdjustaCam continued to pursue many nuisance-value settlement offers.

15

To make matters worse, all Sakar's time and money (totaling $163,522 in attorneys' fees and expert fees) was wasted on defending this frivolous lawsuit even though AdjustaCam knew for nearly a year before Sakar was dismissed that Sakar's accused ball and socket product did not infringe.

Because AdjustaCam did not litigate in good faith, this case "stands out from the others" and is exceptional under *Octane Fitness*, and is also sufficiently egregious to warrant expert fee shifting. Accordingly, this Court should remand the case to determine the amount of Sakar's recoverable fees.

## STANDARD OF REVIEW

The denial of a motion for attorneys' fees under 35 U.S.C. § 285 is reviewed for abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1747 (2014) ("[A]n appellate court should review all aspects of a district court's § 285 determination for abuse of discretion.").

A district court's decision not to award expert fees under its inherent authority is also reviewed for an abuse of discretion. *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 921 (Fed. Cir. 2012).

"The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the

17

law or on a clearly erroneous assessment of the evidence.'"  *Highmark*, 134 S. Ct. at 1748 n. 2 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

**ARGUMENT**

## I. The District Court Abused its Discretion by Not Finding This Case Exceptional and Egregious

The Supreme Court in its recent *Octane Fitness* decision explained that, under 35 U.S.C. § 285, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  134 S. Ct. at 1756.  "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances."  *Id.*  For particularly egregious cases, district courts also have the inherent authority to award expert fees.  *MarcTec v. Johnson & Johnson,* 664 F.3d 907, 921 (Fed. Cir. 2012).

As noted above, the district court decided Sakar's motion **before** *Octane Fitness* relaxed the standard for finding a case "exceptional" under Section 285.  In denying Sakar's motion, the district court recited and applied the then-applicable law under *Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005), stating that absent material inappropriate conduct in litigation, "an exceptional case may only be found if 'both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless.'"  A0005.

18

Unlike under the *Brooks Furniture* standard relied on by the district court, the exceptionality standard does not require proof of both objective baselessness and bad faith, or require misconduct to be independently sanctionable, or require proof by clear and convincing evidence. *Octane Fitness*, 134 S. Ct. at 1757-58. Here, because the district court erred by denying Sakar's motion under the strict *Brooks Furniture* standard, it certainly also erred under the far less burdensome *Octane Fitness* standard as well.

In denying Sakar's motion for attorneys' fees and expert fees, the district court misapprehended the evidence. Under the test of *Brooks Furniture* or *Octane Fitness,* the "clearly erroneous assessment of the evidence" constitutes an abuse of discretion. *Highmark*, 134 S. Ct. at 1748 n. 2.

## A.  AdjustaCam Filed and Prosecuted This Case in Bad Faith

According to the district court, "there is insufficient evidence that the action was brought in bad faith and for an improper purpose." A0006. In fact, the evidence of bad faith was overwhelming.

It is clear that AdjustaCam pursued Sakar for two years on patent claims that were facially **not infringed by the Accused Ball-and-Socket Products**. However, AdjustaCam continued with its case even after the Patent Office rejected the patentability of the claims on August 12, 2011, and even after the *Markman* Order emphatically precluded any possible infringement. *See infra.*

### 1. AdjustaCam Brought this Case for the Improper Purpose of Obtaining Nuisance-Value Settlements

AdjustaCam's settlements, as well as the settlement demands made to Sakar, were not reasonably tied to a particular royalty rate. District courts should not permit such **flagrant bad faith**.

The lower Court stated that "low settlement offers . . . effectively ensure [] that [the patentee's] baseless infringement allegations remained unexposed, allowing [the patentee] to continue to collect additional nuisance value settlements." *Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314, 1327 (Fed. Cir. 2011); *see also Am. Standard, Inc. v. York Int'l Corp.*, 244 F. Supp. 2d 990, 997 (W.D. Wis. 2002) (Bad faith litigation tactics "force defendants into settlement and away from their legitimate defenses."); *Artese v. Academy Collection Service,* No. 3:96-cv-2546-GLG, 2000 U.S. Dist. LEXIS 1186, at *10 (D. Conn. Jan. 18, 2000) (holding that the filing of many lawsuits seeking relatively small settlements "gives rise to a suspicion of *barratry* and *champerty*").

As stated above, the settlement amounts in this case are small compared to the cost of defense, showing that AdjustaCam's desire was to obtain settlements.. When Sakar, after nearly two years, still refused to settle, AdjustaCam's response exposed its true purpose. Such an "overall vexatious litigation strategy" that is wasteful of judicial resources evidences bad faith. *See Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*, 726 F.3d 1359, 1367 (Fed. Cir. 2013).

In *Monolithic Power Systems*, the case was deemed exceptional in large part because the plaintiff "withdrew its claims and granted covenants not to sue after substantial litigation had taken place," "moving to dismiss only after [defendants] had completed their filings for the final pretrial conference, wasting the parties' and the court's resources." *Id.* Similarly, AdjustaCam waited two years to dismiss Sakar, and did not actually dismiss Sakar until after Sakar had incurred considerable expense in attorney fees and expert fees. AdjustaCam cannot just lose the case and dismiss it with zero consequences after forcing Sakar to spend $163,522 in attorneys' fees and expert fees to defend itself.

In *Ingenuity 13, LLC v. Doe*, copyright plaintiffs were found to have acted in bad faith and sanctioned for fees in circumstances largely identical to those in this case. No. 2:12-cv-8333-ODW, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal. May 6, 2013). First, the plaintiffs engaged in a strategy to file lawsuits against many defendants. *Id.* at *6-7. Due to "the high cost of litigation," "[m]ost defendants settled . . . , resulting in proceeds of millions of dollars due to the numerosity of defendants." *Id.* "For defendants that refused to settle, the Principals engaged in vexatious litigation designed to coerce settlement."

It is unfair for a plaintiff to force Sakar to endure the substantial burden and expense of litigation and then lose the case and dismiss it. *See Upthegrove v. Health Prof'ls, LTD.*, No. 07-cv-0596-BBC, 2009 U.S. Dist. LEXIS 4546, at *12

21

(W.D. Wis. Jan. 21, 2009) ("Plaintiff cannot expect to subject defendant Rose to a year of litigation and walk away with no consequences."); *compare Monolithic Power Sys.*, 726 F.3d at 1367 (affirming award of fees, emphasizing that vexatious case was dismissed "after substantial litigation had taken place . . . wasting the parties' and the court's resources").

Section 285's exceptional case provision exists precisely to prevent "gross injustice to an alleged infringer." *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988). Sakar was left with considerable and unjustifiable litigation costs, making this case exceptional and abusive.

### 2. Nuisance Litigation is Exceptional and Egregious

Patent-type nuisance litigation brought by a patent owner has become a lucrative industry. *See, e.g.,* Colleen V. Chien, *Patent Trolls by the Numbers*, Santa Clara University Studies Research Paper No. 08-13, *available at* http://ssrn.com/abstract=2233041 (March 13, 2013) (explaining that patent assertion entities file the majority patent lawsuits in the U.S., primarily targeting non-technology companies).

The case of *Octane Fitness* explained that "an 'exceptional' case is simply one that stands out from others" regarding weak merits positions or litigation misconduct. 134 S. Ct. at 1756.

Section 285 is supposed to be remedial—to correct for unfairness and

injustice.  *See Octane Fitness*, 134 S. Ct. at 1753, 1756 n.6; *see also Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302,  1312-13 (Fed. Cir. 2013).

As stated in *Eon-Net,* 653 F.3d at 1328 ("[T]he appetite for licensing revenue cannot overpower a litigant's and its counsel's **obligation to file cases reasonably based in law and fact and to litigate those cases in good faith**.").

### 3.  Nuisance Litigation Should be Discouraged

*Octane Fitness* recognizes that the Court's power to award attorneys' fees should be a deterrent effect on bad faith litigation and misconduct.  134 S. Ct. at 1756 n.6 (reminding district courts of "the need in particular circumstances to advance considerations of compensation and deterrence").  AdjustaCam cannot be allowed to file a baseless case, and then after losing the case (claims declared invalid), AdjustaCam's only consequence is to dismiss the case.  *See Kilopass*, 738 F.3d at 1317 ("[T]rial courts retain broad discretion to make findings of exceptionality under § 285 *in a wide variety of circumstances*.").

If AdjustaCam's conduct is not deemed exceptional and egregious in this case, it will embolden nuisance litigants to continue their abusive conduct unchecked.

### B. The Accused Cameras Could Not Possibly Have Infringed

The district court agreed with AdjustaCam that the Accused Ball-and-Socket Products included constrained ball-and-socket joints that restricted movement to

23

some extent.  A0006.  According to the district court, this constricted movement made it possible for AdjustaCam to prevail in proving infringement:

> [i]f the ball and socket joint truly restricts the range of movement such that it cannot rotate about multiple axes, the constrained ball and socket joint could meet the claim limitation which requires the hinge member being rotatably attached to the camera in a single axis of rotation.  Since one could reasonably argue Defendants' products meet the "rotatably attached" limitation, AdjustaCam's infringement theories are not objectively baseless.

A0006.   However, it is undisputed that the Accused Ball-and-Socket Products included cameras that were in fact capable of rotating about multiple axes with respect to the socket—they could be both twisted and tilted up and down.

See A0022 ("The claims plainly describe each 'rotatably attached' object as rotating about a single axis."); A0021 ("Every reference to a 'rotatably attached' object in the specification and claims describes the attachment as permitting motion over a single axis of rotation.").  Therefore, from the beginning of this lawsuit, no reasonable plaintiff could have expected to succeed in proving infringement.

The situation would be somewhat different if AdjustaCam honestly did not know that infringement was impossible to prove at the outset of the case, but later discovered that it could not prevail.  Here, such ignorance is implausible given the readily apparent functionality of the accused products and the simplicity of the patent and its claims.  But even if AdjustaCam could legitimately plead ignorance,

24

ignorance is no excuse to continue undeterred—for nearly five months, which included considerable and expensive expert discovery—after the district court's decisive *Markman* ruling in Sakar's favor.  A0013-27 (April 10, 2012 *Markman* Order).  Here, as in *MarcTec*, AdjustaCam "not only initiated a frivolous lawsuit, it persisted in advancing unfounded arguments that unnecessarily extended this litigation and caused [defendant] to incur needleless litigation expenses. This vexatious conduct is, by definition, litigation misconduct, and provides a separate and independent basis supporting the district court's determination that this case is exceptional." *MarcTec, LLC v. Johnson & Johnson,* 664 F.3d 907, at 920-21 (Fed. Cir. 2012).

### C.  AdjustaCam's Validity Positions Were Frivolous

As explained above, AdjustaCam advanced the following incorrect argument to the Patent Office:  "With Irifune, the camera **is not even attached to the hinge member until fully tightened** down using camera attachment shaft (9) and camera attachment screws (10 and (11)." A1263.  Using the exceedingly narrow definition of "attached" offered in the reexamination, AdjustaCam's expert Dr. Muskivitch opined that, "[o]nce the camera is attached to the fixed part 2, the camera cannot rotate about a first axis relative to the hinge member." *Id.*  These conducted aruguments were objectively baseless for several reasons.

25

## II. AdjustaCam's Appeal Must be Dismissed for Lack of Subject Matter Jurisdiction

AdjustaCam brought its own affirmative appeal to this Court, but there is no subject matter jurisdiction. There is no legal support whatsoever for AdjustaCam's attempt to appeal a claim construction issue that it lost in the district court, made no effort to preserve for appeal, and expressly extinguished when it dismissed its case against Sakar with prejudice. This frivolous appeal only compounds the exceptionality of this case and causes Sakar to incur further needless legal expenses.

An "actual controversy must be extant at all stages of review, not merely at the time the complaint was filed." *Benitec Austl, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1345 (Fed. Cir. 2007) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974)). "Subject matter jurisdiction is a threshold requirement for a court's power to exercise jurisdiction over a case, and no amount of 'prudential reasons' or perceived increases in efficiency, however sound, can empower a federal court to hear a case where there is no extant case or controversy." *Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed. Cir. 2010).

AdjustaCam filed its notice of appeal seeking review of the district court's claim construction rulings. A0193. But by that time, Sakar had already been dismissed with prejudice from the case and given a covenant not to be sued in the future for infringement of the '343 Patent. A1955-57; A0319-20; A0158. The

26

dismissal and covenant extinguished any ongoing disputes between AdjustaCam and Sakar concerning the infringement and validity of the '343 Patent.

This Court has often recognized its inability to reach claim construction issues that are not subject to an ongoing case or controversy. *See, e.g, SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1354 (Fed. Cir. 2012) ("[W]here, as here, a party's claim construction arguments do not affect the final judgment entered by the court, they are not reviewable. . . . Without a final judgment as to the infringement or validity of these claims, the court's claim constructions that impact only these withdrawn claims are not properly before us."); *Jang v. Boston Sci. Corp.,* 532 F.3d 1330, 1336 (Fed. Cir. 2008) (resolving claim construction issues "that do not actually affect the infringement controversy between the parties" would result in impermissible advisory opinion because "[t]he Supreme Court has explicitly held that Article III does not permit the courts to resolve issues when it is not clear that the resolution of the question will resolve a concrete controversy between interested parties"); *see also NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282, 1311 (Fed. Cir. 2005).

Although AdjustaCam purports to appeal from the district court's final judgment, but that final judgment was in no way based on the claim construction ruling. It was instead based entirely on the mutual consent of the parties to end the

case.  Therefore, this Court lacks subject matter jurisdiction to review the claim constructions.

Here, AdjustaCam made no effort whatsoever to preserve any challenges to the district court's claim constructions when it decided to dismiss its case against Sakar.

This Court cannot hear AdjustaCam's appeal because it lacks subject matter jurisdiction over the challenges raised to the claim construction rulings by the district court.  AdjustaCam's appeal must be dismissed.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, this case should be declared exceptional and egregious, and the case should be remanded for a determination of the amount of attorneys' fees and expert fees owed to Sakar.

Additionally, AdjustaCam's appeal should be dismissed for lack of subject matter jurisdiction.

Respectfully submitted,

Dated:  December 16, 2014          By:    /s/ Ezra Sutton
                                   Ezra Sutton
                                   EZRA SUTTON, P.A.
                                   900 Route 9 North
                                   Plaza 9, Suite 201
                                   Woodbridge, NJ 07095
                                   Telephone: (732) 634-3520
                                   *Counsel for Defendant-Cross-Appellant*

28

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the body of this brief, beginning with the Jurisdictional Statement on page 1, and ending with the last line of the conclusion on page 28, including headings, footnotes, and quotations, contains 5,532 words, in compliance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

/s/ Ezra Sutton
Ezra Sutton
*Counsel for Defendant-Cross-Appellant*

## CERTIFICATE OF SERVICE

This is to certify that on December 16, 2014, copies of the foregoing Brief of Defendant-Cross-Appellant were served on counsel for Plaintiff-Appellant AdjustaCam, LLC via the Court's ECF system and via electronic mail upon the following:

John J. Edmonds
Collins, Edmonds, Pogorzelski, Schlather & Tower PLLC
1616 South Voss Road
Houston, TX 77057
Direct: 281-501-3425
Email: jedmonds@cepiplaw.com

/s/ Ezra Sutton
Ezra Sutton
*Counsel for Defendant-Cross-Appellant*

EXHIBIT 6

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

## TXu 1-911-314

**Effective date of
registration:**

October 20, 2014

---

## Title

**Title of Work:** Appellate Brief

## Completion/Publication

**Year of Completion:** 2014

## Author

- **Author:** Newegg Inc.
  **Author Created:** text, editing

  **Work made for hire:** Yes
  **Domiciled in:** United States

- **Author:** The Webb Law Firm, P.C.
  **Author Created:** text, editing

  **Work made for hire:** Yes
  **Domiciled in:** United States

- **Author:** Latham & Watkins LLP
  **Author Created:** text, editing

  **Work made for hire:** Yes
  **Domiciled in:** United States

- **Author:** Weil, Gotshal & Manges LLP
  **Author Created:** text, editing

  **Work made for hire:** Yes
  **Domiciled in:** United States

■ **Author:** McDermott Will & Emery LLP

**Author Created:** text, editing

**Work made for hire:** Yes

**Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Newegg Inc.

16839 East Gale Avenue, City of Industry, CA, 91745, United States

**Copyright Claimant:** The Webb Law Firm, P.C.

One Gateway Center, 420 Ft. Duquesne Blvd., Suite 1200, Pittsburgh, PA, 15222, United States

**Copyright Claimant:** Latham & Watkins LLP

355 South Grand Avenue, Los Angeles, CA, 90071-1560, United States

**Copyright Claimant:** Weil, Gotshal & Manges LLP

201 Redwood Shores Parkway, Redwood Shores, CA, 94065, United States

**Copyright Claimant:** McDermott Will & Emery LLP

227 West Monroe Street, Chicago, IL, 60606-5096, United States

## Rights and Permissions

**Organization Name:** The Webb Law Firm

**Name:** Kent, Jr. E. Baldauf

**Email:** trademarks@webblaw.com          **Telephone:** 412-471-8815

**Address:** One Gateway Center

420 Ft. Duquesne Blvd., Suite 1200

Pittsburgh, PA 15222  United States

## Certification

**Name:** Christian D. Ehret

**Date:** October 20, 2014

**Applicant's Tracking Number:** 5188-146869



**Registration #:** TXU001911314
**Service Request #:** 1-1839297891



The Webb Law Firm
Kent, Jr. E. Baldauf
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222  United States